Francisco Eugenio **MARTINEZ**, Plaintiff,

v.

**Fred M. WINNER, Chief Judge of the United States District Court for the District of Colorado, individually and in his official capacity; Joseph M. Dolan, United States Attorney for the District of Colorado, individually and in his official capacity; Susan Roberts, Assistant United States Attorney, individually and in her official capacity; John R. Barksdale, Assistant United States Attorney, individually and in his official capacity; Dan Christopher, Assistant United States Attorney, individually and in his official capacity; Jan Chapman, Assistant United States Attorney, individually and in her official capacity; United States Department of Justice, a governmental entity; Federal Bureau of Investigation, a governmental entity; "John Doe" and other unnamed and unknown agents in the Denver Office of the Federal Bureau of Investigation, individually and in their official capacities; Matt Dunn, deputy United States Marshal, individually and in his official capacity; Peyton Baer, deputy United States Marshal, individually and in his official capacity; Les Weisenhorn, deputy United States Marshal, individually and in his official capacity; City and County of Denver, a governmental entity; Dale A. Tooley, District Attorney for the City and County of Denver individually and in his official capacity; Castelar Garcia, Jr., Deputy District Attorney, individually and in his official capacity; City of Denver Police Department, a governmental entity; Arthur Dill, Chief of Police, individually and in his official capacity; Robert Shaughnessy, Chief, City of Denver Police Department, individually and in his official capacity; Robert Nicoletti, Captain, Denver Police Department, individually and in his official capacity; J. C. Tyus, Detective, Denver Police Department; "John Doe", and other unnamed and unknown agents of**

the Denver Police Department; Sandy Spencer; and Peter Webb, Defendants.

No. 82–BJ–199.

United States District Court,
D. Colorado.

July 30, 1982.

David Graham, Esq. & Adele Graham, Denver, Colo., for plaintiff.

Gary Cornwell, Denver, Colo., for Judge Fred M. Winner.

J. Paul McGrath, John J. Farley, III, John L. Euler, R. Joseph Sher, Torts Branch, Dept. of Justice, Washington, D. C., for Joseph Dolan, Susan Roberts, John R. Barksdale, Jan Chapman, Matt Dunn, and Les Weisenhorn and U. S. Dept. of Justice and F. B. I.

George G. Matava, James E. Nesland, Denver, Colo., for Dan Christopher.

Theodore S. Halaby, Denver, Colo., for City and County of Denver, Arthur Dill, Robert Shaughnessy & Robert Nicoletti.

Daniel J. Sears, Denver, Colo., for Sandy Spencer.

David Brougham, Denver, Colo., for Dale Tooley and Castelar Garcia.

Jeffrey A. Chase, Denver, Colo., for Peter Webb.

Stephen M. Munsinger, Denver, Colo., for defendants.

## MEMORANDUM OPINION

JENKINS, District Judge.

This is a civil rights action alleging wrongdoing on the part of a Federal Judge, a United States Attorney and several Assistant United States Attorneys, several deputy United States Marshals, a host of individuals and agencies engaged in federal and state law enforcement, and a television news reporter. The plaintiff seeks damages for and declaratory and equitable relief from what he asserts to be an overall conspiracy to deprive him of his civil rights and to "railroad" him into prison on unsubstantiated criminal charges.[1] The allegations in Martinez' complaint relate to the commencement of a criminal action entitled *United States v. Martinez* and the events leading to a mistrial in that case. Those events have been briefly summarized by the Court of Appeals:

On November 9, 1973, Martinez was indicted on seven counts relating to possession of unregistered explosives and the sending of explosives through the United States mails. Before trial commenced, in January, 1981, four counts were severed by the district court, Chief Judge Fred Winner presiding. Martinez went to trial on counts one, four, and seven; one count alleged a conspiracy and the other two charged possession of explosives and mailing of the explosives to an individual known as Carol Hogue.

On January 27, 1981, trial commenced in Pueblo, Colorado on the unsevered counts. On January 29, the defendant moved to replace two jurors with two alternates because of complaints allegedly made by the two jurors about spectators wearing T-shirts with "Free Kiko" (defendant's nickname) printed on them. The two jurors had also allegedly complained about a law student at the de-

---

1. See Hearing Transcript [Hrg. Tr.] at 60, 119– 121, 130; Complaint at ¶¶ 64, 89.

fense table wearing sun-glasses. The government objected to the motion and Judge Winner denied the motion.

On the evening of the third day of trial, January 29, the trial judge held a secret meeting with the prosecutors, court personnel, and several government witnesses in his hotel room. Neither defendant nor his counsel were notified about this meeting. Judge Winner stated that he believed there was an atmosphere of intimidation in the court room caused by some of the spectators who were sympathetic to the defendant and that he wanted hidden cameras to be installed to record the intimidation. Judge Winner informed the prosecutors that he would grant a motion for a mistrial, but advised them not to make such a motion until after the cameras were installed and after the defense presented its case. The judge further indicated that he could provoke defense counsel to request a mistrial. One witness, Officer Tyus, stated that he could cause a mistrial by giving testimony which had previously been ruled inadmissible. Judge Winner repeated many of these comments in chambers to United States Attorney Roberts who arrived from Denver the next day. The trial judge also expressed a desire to remain in ex parte contact with the prosecutors. The reason given for not inviting defendant's counsel to the meeting was the court's suspicion (unverified on this record) that one of defendant's counsel might be involved in a conspiracy to intimidate the jury.

On January 30, the morning after the meeting, the government stated that it "did not object to the granting of defendant's motion for a mistrial." At that time all of the defendant's motions had been overruled. The prosecutor, Mr. Barksdale, explained:

We understand the jurors' two names were in the newspaper. I was aware of that this morning. We also understand from the Court this morning that the—in court, of course, the juror was—one juror was ill, and we, therefore, have changed our position.

The court granted a recess to allow the defense to decide whether to join in the government's motion. The defense then joined in the motion. The trial court granted the joint motion for mistrial.

*United States v. Martinez,* 667 F.2d 886, 887–888 (10th Cir. 1981) (footnote omitted). The Court of Appeals held in the criminal case that the prosecutors' failure to inform the defense of the January 29 meeting barred retrial on three counts because of the Double Jeopardy Clause.[2] *Id.,* 667 F.2d at 890. Martinez now asserts claims for wrongdoing at and after the January 29 meeting as well as claims based upon a pattern of purported wrongdoing by state and federal officials reaching back to before the filing of the indictment against him in November of 1973.[3]

He asserts claims based upon 42 U.S.C. §§ 1981, 1983, 1985, 1986, and 1988, the First, Fourth, Fifth, Sixth, Eighth, Ninth, Thirteenth, and Fourteenth Amendments to the United States Constitution, unspecified sections of the Constitution of the State of Colorado, common-law tort actions such as false arrest, false imprisonment, abuse of process, harassment, gross misconduct, outrageous conduct, and negligence, and violations of the Code of Judicial Conduct and the Code of Professional Responsibility.

## I. JURISDICTION

Though this action was not commenced in this Court, and the pleadings consequently

---

2. The Fifth Amendment to the United States Constitution provides that "[n]o person shall be subject for the same offence to be twice put in jeopardy of life or limb; . . ."

3. Martinez alleges that the Denver Police Department adopted "an official policy and plan to overcome, repress, vilify and deny rights to persons and organizations seeking to assert

and vindicate their rights," which caused formulation of a more personalized "get Martinez" policy. Complaint at ¶¶ 29, 32. The federal officials, including Judge Winner, allegedly joined in the effectuation of the "get Martinez" policy at a later date. *Id.,* at ¶ 50. Martinez alleges a broad pattern of surveillance, intimidation and fabrication of charges.

lack the jurisdictional allegations common to federal complaints, the jurisdiction of this Court is firmly established by the removal statutes relied upon by the defendants in moving the case to this forum. See 28 U.S.C. §§ 1441(b), 1442(a) (1976). This Court has original jurisdiction of plaintiff's action pursuant to 28 U.S.C. §§ 1331 (federal question), and 1343(a) (civil rights actions); see *Davis v. Passman,* 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979) (actions directly under Constitution), as well as exclusive original jurisdiction of plaintiff's tort claims against the United States. See 28 U.S.C. § 1346(b) (1976). Though all but two named defendants have moved to dismiss the plaintiff's complaint, subject matter jurisdiction is not at issue.[4] But see Part VIII, *infra.*

## II. MOTIONS UNDER RULE 12(b)(6)

 The defendants' motions uniformly assert that the plaintiff's complaint should be dismissed "for failure to state a claim upon which relief may be granted," Rule 12(b)(6), Federal Rules of Civil Procedure, the modern equivalent of the obsolete plea of demurrer. In determining the issue raised by the motions, the material factual allegations of the complaint are, of course, to be taken as true, see *Hospital Building Co. v. Trustees of Rex Hospital,* 425 U.S. 738, 740, 96 S.Ct. 1848, 1850, 48 L.Ed.2d 338 (1976); *Mandeville Island Farms, Inc. v. American Crystal Sugar Co.,* 334 U.S. 219, 222, 68 S.Ct. 996, 999, 92 L.Ed. 1328 (1948),[5] and the complaint is to be read in a light

most favorable to the plaintiff. See *Jenkins v. McKeithen,* 395 U.S. 411, 421–422, 89 S.Ct. 1843, 1848–1849, 23 L.Ed.2d 404 (1969); 5 C. Wright & A. Miller, Federal Practice and Procedure § 1357 at 594 & n. 46 (1969). A complaint should not be dismissed unless it appears to a certainty that plaintiff is not entitled to relief under any state of facts which could be proved in support of the claim. *Haines v. Kerner,* 404 U.S. 519, 520–521, 92 S.Ct. 594, 595–596, 30 L.Ed.2d 652 (1972); *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957); 2A Moore's Federal Practice ¶ 12.08 at 2274 (2d ed. rev. 1981). The requisite want of merit "may consist in an absence of law to support a claim of the sort made, or of fact sufficient to make a good claim, or in the disclosure of some fact which will necessarily defeat the claim." *DeLoach v. Crowley's, Inc.,* 128 F.2d 378, 380 (5th Cir. 1942).[6]

## III. THE EIGHTH AND THIRTEENTH AMENDMENT CLAIMS

 The complaint, paragraphs 163–164, 167–168, alleges in a conclusionary fashion that the conduct of the defendants described in the complaint (jointly and severally) violates the plaintiff's rights under the Eighth [7] and Thirteenth [8] Amendments to the United States Constitution. Yet Martinez' complaint describes no "excessive" bail requirement, see *e.g., Stack v. Boyle,* 342 U.S. 1, 5, 72 S.Ct. 1, 3, 96 L.Ed. 3 (1951); *United States v. Beaman,* 631 F.2d

---

4. The plaintiff's expressed fears that this Court will "divest itself of jurisdiction" contrary to the teachings of *Bell v. Hood,* 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946), seem misplaced at best. See plaintiff's Brief in Response at 42–43.

5. This deference to the pleadings, however, does not extend to allegations in the complaint that state legal conclusions rather than plead material facts. See 2A Moore's Federal Practice ¶ 12.08, at 2268–2269 & n. 4 (2d ed. rev. 1981), and cases cited therein. Additionally, unwarranted inferences of fact or conclusions of law may not be drawn from the pleaded facts in order to preclude dismissal. See *Ryan v. Scoggin,* 245 F.2d 54, 57 (10th Cir. 1957).

6. Rule 8(f) of the Federal Rules of Civil Procedure provides that "[a]ll pleadings shall be construed as to do substantial justice."

7. The Eighth Amendment provides that:
 Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.

8. The Thirteenth Amendment provides that:
 Sec. 1 Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.
 Sec. 2 Congress shall have power to enforce this article by appropriate legislation.

85 (4th Cir. 1980), no imposition of an excessive fine (or any fine, for that matter), *e.g., United States v. Miller,* 588 F.2d 1256 (9th Cir. 1978), *cert. denied* 440 U.S. 947, 99 S.Ct. 1426, 59 L.Ed.2d 636, nor facts even approaching the imposition of a "cruel and unusual punishment," *e.g., Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976), or conditions of "slavery or involuntary servitude." See *e.g., United States v. Booker,* 655 F.2d 562 (4th Cir. 1981).[9]

One can only conclude from a careful reading of the lengthy pleading filed by the plaintiff that these claims for relief are surplusage.[10]

The 189 paragraphs of the complaint in this action are heavily laden with colorful legal terminology. Paragraph 38, for example, alleges that

38. Said [Denver] Police Department and named and unnamed officers and employees thereof investigated the allegations against plaintiff in a reckless and negligent manner so as to deny him the equal protections of the laws through malicious abuse of process.

That a defendant could *negligently* engage in a *malicious* act seems incongruous. Abuse of process (if that be the ground relied upon) is an intentional tort. See Restatement (Second) of Torts § 682 (1977). The plaintiff's conclusory assertions of liability under the Eighth and Thirteenth Amendments exhibit similar weaknesses. The complaint offers conclusions of liability under these two amendments, without a factual premise.

Rule 8(e)(1), F.R.Civ.P.,—useful in both federal and state litigation—states that "[e]ach averment of a pleading shall be simple, concise and direct," and Rule 8(a) directs that the complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief."

Since no such claims under the Eighth and Thirteenth Amendments appear within the four corners of the pleading, Counts X and XII shall be and are DISMISSED as against all defendants. See also Rule 12(f), Federal Rules of Civil Procedure.

## IV. CLAIMS UNDER THE NINTH AMENDMENT

Similarly, all one can say about Martinez' Ninth Amendment claims is that they are alleged in Count XI of the complaint as conclusions. The Ninth Amendment provides:

The enumeration in the Constitution of certain rights, shall not be construed to deny or disparage others retained by the people.

The complaint nowhere particularizes which of these unenumerated rights have allegedly been violated, how they have been violated, or by whom. This leaves the Court in the curious position of having to identify the plaintiff's Ninth Amendment claims through a comparison of Martinez' "factual" allegations with the body of governing case law as it has developed under that amendment. Chief Justice Burger offered some guidance in a recent opinion in *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980):

Notwithstanding the appropriate caution against reading into the Constitution rights not explicitly defined, the Court has acknowledged that certain unarticulated rights are implicit in enumerated guarantees. For example, the rights of association and of privacy, the right to be presumed innocent, and the right to be judged by a standard of proof beyond a

---

**9.** Martinez' claims arising under legislation enacted pursuant to § 2 of the Thirteenth Amendment, e.g., 42 U.S.C. § 1981, are examined elsewhere. See Part VII, *infra.*

**10.** The Bill of Rights and later amendments such as the Thirteenth encompass important statements of specific principles. They are not a magical incantation that one recites to draw down the wrath of the Court upon defendants.

To be sufficient, a complaint must set forth facts reflecting a specific violation of a particular constitutional limitation or requirement. See *Baker v. McCollan,* 443 U.S. 137, 140, 99 S.Ct. 2689, 2692, 61 L.Ed.2d 433 (1979); *Taylor v. Nichols,* 409 F.Supp. 927, 932 (D.Kan.1976), *affirmed* 558 F.2d 561 (10th Cir. 1977). Martinez' complaint repeatedly fails to do so.

reasonable doubt in a criminal trial, as well as the right to travel, appear nowhere in the Constitution or Bill of Rights. Yet these important but unarticulated rights have nonetheless been found to share constitutional protection in common with explicit guarantees.

*Id.,* 448 U.S. at 579–580, 100 S.Ct. at 2828–2829 (footnote omitted) (Burger, C. J., for plurality). In *Richmond Newspapers,* the Court found the right to attend criminal trials to be constitutionally protected by implication. *Id.* at 580, 100 S.Ct. at 2829.

Relying upon the Chief Justice's informal enumeration, as well as similar authority,[11] this Court will search among the penumbral shadows of plaintiff's other claims for the defendants' alleged Ninth Amendment liabilities.

The plaintiff's allegations against the federal defendants make up a veritable pepper pot of claims, including constitutional, statutory and common-law causes of action. The defendants in return have asserted various forms of official immunity to those claims, and have attacked the allegations as meritless on their face. For convenience, the claims and defenses shall be determined by category of defendant.

## V. CLAIMS AGAINST JUDGE WINNER

Many of the allegations of the complaint focus on the conduct of Chief Judge Winner before and during the jury trial in *United States v. Martinez.* Martinez asserts that Judge Winner received and read police surveillance materials and reports concerning Martinez which were gathered and provided by the Denver police and the Federal Bureau of Investigation.[12] He further claims that Judge Winner assigned the *Martinez* case to himself in violation of established work distribution procedures, that he maintained "tight" security arrangements in the courtroom, that he made rulings unfavorable to the defense, and that he planned and/or conspired to have hidden cameras installed to conduct surveillance on spectators in the courtroom and to "spy on" Martinez and his defense attorneys. Further, the complaint alleges that he conspired with the persons he called to the *ex parte* meeting on January 29, 1981 to procure the conviction of Martinez and to prosecute Martinez' supporters who attended the trial through the use of evidence to be obtained by the hidden cameras.[13] See complaint, at ¶¶ 69–111. The complaint alleges that Judge Winner utilized the news media to publish "false and libelous" accusations against Martinez. Complaint, at ¶¶ 112–122. Counsel for the plaintiff asserts that the Judge's actions and omissions in and around the trial were acts in furtherance of a "conspiracy by Judge Winner, F. B. I. agents and police to railroad plaintiff to jail, . . ." Plaintiff's Brief in Response, at 10; see also Complaint, at ¶ 64 ("defendant Winner determined to have plaintiff convicted of a crime and railroaded to jail in order to chill plaintiff . . .").

---

11. See *e.g., Brewer v. Hoxie Sch. Dist. No. 46,* 238 F.2d 91 (8th Cir. 1956). Rather than serving as a substantive source of constitutional guarantees, the Ninth Amendment acts as a forceful reminder of the duty of the federal courts to protect unenumerated fundamental rights. "[T]he Ninth Amendment shows a belief of the Constitution's authors that fundamental rights exist that are not expressly enumerated in the first eight amendments and an intent that the list of rights included there not be deemed exhaustive." *Griswold v. Connecticut,* 381 U.S. 479, 492, 85 S.Ct. 1678, 1686, 14 L.Ed.2d 510 (1965) (opinion of Goldberg, J.). Cf. *Charles v. Brown,* 495 F.Supp. 862, 864 (N.D.Ala.1980) ("[T]he Ninth Amendment is merely a rule of construction... [T]here are no constitutional rights secured by that amendment.").

12. The plaintiff's brief states that "Judge Winner decided to insure conviction of plaintiff at the trial as a result of the intelligence reports and his animosity towards plaintiff." *Id.,* at 9. This kind of mindreading involves, at best, the drawing of an inference rather than expression of a known fact. It is certainly one not necessarily drawn. See *Ryan v. Scoggin,* 245 F.2d 54, 57 (10th Cir. 1957).

13. The further assertion that he assigned court personnel to the case who were hostile to the plaintiff "for the purpose of affecting the jurors' deliberations," see Plaintiff's Brief at 13, does not appear in the complaint.

The threshold inquiry would seem to be whether defendant Winner's actions were "judicial" acts, or whether they were conduct of a different sort, e.g., of an investigative nature. In *Stump v. Sparkman,* 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978), the United States Supreme Court identified two factors to be considered in determining whether an act is "judicial": (1) "the nature of the acts itself, *i.e.,* whether it is a function normally performed by a judge," and (2) "the expectation of the parties, *i.e.,* whether they dealt with the judge in his judicial capacity." *Id.,* 435 U.S. at 362, 98 S.Ct. at 1107. A judge who acts in the "clear absence of all jurisdiction" *id.,* 435 U.S. 357, 98 S.Ct. at 1105, is not acting "judicially"; a judge, on the other hand, who is acting within his jurisdiction is likely engaging in "judicial" actions, notwithstanding the fact that the judge may have committed "grave procedural errors." *Id.,* 435 U.S. at 359, 98 S.Ct. at 1106. The complaint avers no "clear absence of jurisdiction" in *United States v. Martinez.* The question "whether at the time he took the challenged action he had jurisdiction over the subject matter before him," *Stump v. Sparkman, supra,* 435 U.S. at 356, 98 S.Ct. at 1104, must be answered in the affirmative.

■ The inquiry thus turns to the nature of the acts and the perceived capacity of the actor. There are few acts more "judicial" than the making of rulings upon motions and objections during the course of a trial. That is a part of a trial judge's function. Control over the admission and presentation of evidence, for example, is expressly vested in the trial judge. Rule 611, Federal Rules of Evidence. A claim arising from a judge's rulings on motions is a claim concerning a "judicial" act. See *Clark v. Taylor,* 200 U.S.App.D.C. 231, 627 F.2d 284, 288 (1980).

■ Similarly, the division of the workload in a federal district court is a "judicial" function governed "by rules and orders of the court." 28 U.S.C. § 137 (1976). As chief judge, defendant Winner possessed authority to secure the observance of such rules and orders, and to "divide the business and assign the cases as far as such rules and orders do not otherwise prescribe." *Id.* If the district judges prove unable to agree on an appropriate distribution system, "the judicial council of the circuit shall make the necessary orders." *Id.,* 28 U.S.C. § 332. It is significant that the Administrative Office of the United States Courts plays no part in this matter. See 28 U.S.C. §§ 601 *et seq.* If a chief judge violates an outstanding order on workload distribution, the appropriate remedy is a petition to the appropriate court of appeals for a writ of mandamus. See *Utah-Idaho Sugar Co. v. Ritter,* 461 F.2d 1100, 1104 (10th Cir. 1972) (per curiam); *Kerr-McGee Corp. v. Ritter,* 461 F.2d 1104, 1105 (10th Cir. 1972) (per curiam), or raising the question after the fact as an error from which an appeal is taken.

> The agreed distribution of business ... is merely to promote accord and avoid conflict; it may be imperative, so far as it extends, but it does not go to the essence of the judge's power.... [C]ompliance with every rule of court is not essential to the judge's jurisdiction, nor may his acts be ignored if they do not conform to all. There is a way to correct such errors which must be followed. Yet unless rules for the distribution of business stand on a different footing from rules in general, the decrees vacated were not the empty words of a mere intruder.

*Johnson v. Manhattan Ry. Co.,* 61 F.2d 934, 938 (2d Cir. 1932), *affirmed* 289 U.S. 479, 53 S.Ct. 721, 77 L.Ed. 1331 (1933). In *Johnson,* the Senior Circuit Judge for the Second Circuit assigned himself to sit in the Southern District of New York and then designated himself to sit in a specific case involving the Interboro Rapid Transit Company. He then appointed receivers to manage property that was a subject of the suit. Johnson filed a collateral lawsuit that assailed the authority of the Senior Circuit Judge to make the appointments. The Court of Appeals for the Second Circuit held that the work allocation rules "are only directory, and that their disregard was at most no more than error." *Id.,* 61 F.2d

at 939; "however valid the rules may be," a judge's order in violation of them *would still be a judicial act,* unassailable collaterally." [Emphasis added.] *Id.,* 61 F.2d at 938. The Supreme Court affirmed. Though conceding that the Senior Circuit Judge had "acted hastily and evidently with questionable wisdom," *id.,* 289 U.S. at 505, 53 S.Ct. at 730, the court held the receivership appointments to be beyond collateral attack.[14]

■■ Contrary to the plaintiff's bald assertion, the control of order and security in and around the courtroom is an essential "judicial" function. In reviewing the famous Sam Sheppard murder trial, the United States Supreme Court observed that the "carnival atmosphere" at that trial "could easily have been avoided since the courtroom and courthouse premises are subject to the control of the court," *Sheppard v. Maxwell,* 384 U.S. 333, 358, 86 S.Ct. 1507, 1519, 16 L.Ed.2d 600 (1966). Where, for example, it appears that a criminal defendant's supporters are attempting to intimidate and harass witnesses and otherwise disrupt a trial, "the trial judge must exercise his power to exclude those who act and those who appear to be acting in concert with them lest it be impossible for the trial to proceed and for the jury to pass on the charges." *United States v. Fay,* 350 F.2d 967, 970 (2d Cir. 1965).

The United States Court of Appeals for this circuit has already stated that "[t]he type and necessity of precautionary measures taken during the course of the trial is within the sound discretion of the trial court." *Snow v. State of Oklahoma,* 489 F.2d 278, 280 (10th Cir. 1973) (citations omitted). Exercise of that discretion is an exclusively "judicial" function:

It is essential to the proper administration of criminal justice that dignity, order and decorum be the hallmarks of all court proceedings in our country. The flagrant

disregard in the courtroom of elementary standards of proper conduct should not and cannot be tolerated. We believe trial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case. No one formula for maintaining the appropriate courtroom atmosphere will be best in all situations. . . .

*Illinois v. Allen,* 397 U.S. 337, 343, 90 S.Ct. 1057, 1060, 25 L.Ed.2d 353 (1970).

The complaint does not allege that Martinez was bound and gagged, shackled, or involuntarily removed from the courtroom during trial.[15] Rather, it asserts that "defendant Winner issued orders designed and intended to create an atmosphere and climate of unconstitutional intimidation and tension in the courtroom. . . ." Complaint, at ¶ 69. This was allegedly accomplished through placement of deputy marshals and police officers in the courtroom, searches of persons and items entering the courtroom, and in general, ordering "tight" security. *Id.,* at ¶ 71. Such measures, says plaintiff, are not a judicial matter: "[A]cts of providing for courtroom security are routinely and ordinarily determined upon, handled and undertaken by the United States Marshal and his deputies." *Id.,* at ¶ 72.

■ In asserting that Winner's orders regarding courtroom security are not "judicial," plaintiff misconceives the focus of power to control courtroom conduct. As the Court of Appeals for the Fourth Circuit has explained, it is for the Court to balance the interests of the defendant in having the indicia of innocence, *e.g.,* a minimum of physical restraint, in appearances before the jury and the interests of the press and the public in attending trials against needs for security to maintain order and decorum in the courtroom:

*nois v. Allen, supra,* 397 U.S. at 344, 90 S.Ct. at 1061. Courtroom spectators may also be the subjects of careful security and control. See *e.g., In re Trials of Pending and Future Criminal Cases,* 306 F.Supp. 333, 336–337 (N.D.Ill. 1969).

---

14. The court urged the judge to withdraw from the proceedings voluntarily to avoid further "embarrassing the receivership." *Id.,* 289 U.S. at 505, 53 S.Ct. at 730.

15. Under appropriate circumstances, these techniques may be used to restore order without violating constitutional standards. See *Illi-*

The cases traditionally state that accommodation between these conflicting interests lies within the discretion of the district judge. It is he who is best equipped to decide the extent to which security measures should be adopted to prevent disruption of the trial, harm to those in the courtroom, escape of the accused, and the prevention of other crimes. *E.g., Gregory v. United States,* 365 F.2d 203 (8th Cir. 1966); *Guffey v. United States,* 310 F.2d 753 (10th Cir. 1962).

*United States v. Samuel,* 431 F.2d 610, 615 (4th Cir. 1970). As to the relative role of the Marshal, the court stated:

We stress that the discretion is that of the district judge. He may not, as is suggested at one part in the record before us, delegate that discretion to the Marshal. Of course he should consult with the Marshal when other than ordinary security such as the general presence of guards in the courtroom is contemplated, and he may rely heavily on the Marshal's advice as to what may be required....

*Id.,* 431 F.2d at 615. The exercise of the trial judge's discretion in controlling courtroom security is subject to appellate review. A reviewing court may determine if an abuse of discretion has occurred. *Id.* The exercise of this discretion is nevertheless "judicial" within the criteria set forth in *Stump v. Sparkman* and other cases.

 Concerning the January 29 meeting, the complaint alleges as follows:

90. Defendant Winner proposed at the aforestated January 29, 1981 meeting that;

a) he would be "meaner" to plaintiff if the prosecution desired;

b) the prosecution should ask for a mistrial;

c) the mistrial request should be made only after the prosecution had gained knowledge of the defenses and the defense strategy;

d) the mistrial could be procured by Defendant Winner's deliberate provocation of one of plaintiff's attorneys;

e) the mistrial would be granted whenever the prosecution wanted it;

f) the mistrial would be granted only under circumstances which would not support a claim of double jeopardy;

g) in the new trial, the prosecution should improve its presentations of the case in order to insure plaintiff's conviction.

Complaint, at ¶ 90. While these are the most damning of the complaint's specific allegations, such averments describe "judicial" acts. Defendant Winner, as presiding judge at the *Martinez* trial, called the prosecutors, deputy marshals and certain witnesses to a meeting. He discussed the granting of a mistrial in a manner which, though here pleaded in contradictory terms,[16] was sufficient standing alone to make a mistrial a "manifest necessity". *Arizona v. Washington,* 434 U.S. 497, 505–508, 98 S.Ct. 824, 830–831, 54 L.Ed.2d 717 (1978). The implications of the defendant Winner's remarks possess gravity because he was speaking *as the judge* regarding the impending performance of his role in the trial then before him. The alleged comments reflect a purpose to engage in "judicial" conduct in an injudicious manner.[17]

It is apparent, therefore, that the acts which the plaintiff asserts give rise to lia-

---

**16.** As alleged in the Complaint, ¶ 90(e) is not synonymous with ¶ 90(f).

**17.** In one case, the Court of Appeals for the Ninth Circuit has determined that an agreement to predetermine the outcome of a judicial proceeding prior to the commencement of the proceeding was not a "judicial" act. *Rankin v. Howard,* 633 F.2d 844, 847 (9th Cir. 1980). The scope of this ruling seems very limited. Compare *Sparks v. Duval County Ranch Co., Inc.,* 604 F.2d 976, 978 (5th Cir. 1979) (en banc), *affirmed sub nom.; Dennis v. Sparks,* 449 U.S. 24, 27–32, 101 S.Ct. 183, 186–188, 66 L.Ed.2d 185 (1980). In any event, the plaintiff's complaint herein alleges no such preindictment agreement involving Judge Winner. Such an agreement would likely prove ineffectual because a jury rather than Judge Winner would determine the outcome of the proceeding.

bility were "judicial" acts,[18] a determination of particular importance to the question of official immunity.

It seems well settled at this point that a judge "is absolutely immune from liability for his judicial acts even if his exercise of authority is flawed by the commission of grave procedural errors." *Stump v. Sparkman,* 435 U.S. 349, 359, 98 S.Ct. 1099, 1106, 55 L.Ed.2d 331 (1978). Moreover, a judge cannot be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority; rather he will be subject to liability only when he has acted in " 'clear absence of all jurisdiction.' " *Id.,* at 356–357, 98 S.Ct. at 1104–1105; *Bradley v. Fisher,* 80 U.S. (13 Wall.) 335, 351, 20 L.Ed. 646 (1871); *Rheuark v. Shaw,* 628 F.2d 297, 304 (5th Cir. 1980).

This common-law doctrine of absolute judicial immunity has been described as "[a] seemingly impregnable fortress in American jurisprudence." *Gregory v. Thompson,* 500 F.2d 59, 62 (9th Cir. 1974).[19] Yet judicial immunity, like other forms of official immunity, "is not a badge of emolument of exalted office, but an expression of a policy designed to aid in the effective functioning of government." *Barr v. Mateo,* 360 U.S. 564, 572–573, 79 S.Ct. 1335, 1340, 3 L.Ed.2d 1434 (1959). "Immunity is thought necessary to insulate judges from intimidation that might rob them of the independence so crucial to the public's interest in principled and fearless decision-making." *Gregory v. Thompson, supra,* 500 F.2d at 63.

This immunity applies even when the judge is accused of acting maliciously or corruptly, and it "is not for the protection or benefit of a malicious or corrupt judge, but for the benefit of the public, whose interest it is that the judge should be at liberty to exercise their functions with independence and without fear of consequences." (*Scott v. Stansfield,* L.R. 3 Ex. 220, 223 (1868) quoted in *Bradley v. Fisher,* [80 U.S. (13 Wall.) 335,] 349, note at 350 [20 L.Ed. 646].) It is a judge's duty to decide all cases within his jurisdiction that are brought before him, including controversial cases that arouse the most intense feelings in the litigants. His errors may be corrected on appeal, but he should not have to fear that unsatisfied litigants may hound him with litigation charging malice or corruption. Imposing such a burden on judges would contribute not to principled and fearless decision-making but to intimidation.

*Pierson v. Ray,* 386 U.S. 547, 554, 87 S.Ct. 1213, 1217, 18 L.Ed.2d 288 (1967). In *Pierson,* the United States Supreme Court held that the common-law doctrine of judicial immunity was not abridged by the enactment of the Civil Rights Act of 1871 as codified in 42 U.S.C. § 1983:

We do not believe that this settled principle of law was abolished by § 1983, which makes liable "every person" who under color of law deprives another person of his civil rights. The legislative record gives no clear indication that Congress meant to abolish wholesale all common-law immunities.

*Id.,* 386 U.S. at 554, 87 S.Ct. at 1217. State judges are thus immune from suit under § 1983 for their "judicial" acts.

---

18. The plaintiff's charge that Judge Winner held "views of social and political animosity towards plaintiff" is discussed *infra* at pp. 307–308.

19. The doctrine of absolute judicial immunity dates back to at least 1607. In *Floyd v. Barker,* 77 Eng.Rep. 1305, 1307, 12 Coke 25 (1807), it was observed that judges of the realm ought not to be called in question for any judicial proceedings by them, except before the king himself, "for this would tend to the scandal and subversion of all justice; and those who are most sincere would not be free from continual calumniations." The doctrine received its first reported American recognition in *Yates v. Lansing,* 5 Johns 282 (N.Y.1810).

In *Randall v. Brigham,* 74 U.S. (7 Wall.) 523, 536–537, 19 L.Ed. 285 (1868) and *Bradley v. Fisher,* 80 U.S. (13 Wall.) 335, 351, 20 L.Ed. 646 (1871), the Supreme Court adopted the doctrine, observing in *Randall* that "[t]his doctrine is as old as the law and its maintenance is essential to the administration of justice." *Id.,* 74 U.S. (7 Wall.) at 536.

In *Stump v. Sparkman,* 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978), the Supreme Court again affirmed the continuing force of the doctrine of judicial immunity, making clear that the question of immunity in no way depends upon the relative propriety or error to be found in a judge's actions. *Stump* unequivocally holds that immunity arises from the judicial nature of actions taken with at least a colorable claim of jurisdiction. *Id.,* 435 U.S. at 363–364, 98 S.Ct. at 1108; see also *Apton v. Wilson,* 506 F.2d 83, 90 (D.C.Cir.1974).

Both *Pierson* and *Stump* deal directly with the liability of state judges pursuant to 42 U.S.C. § 1983. In this case, plaintiff has asserted claims against Judge Winner arising under that section and § 1985 as well as direct claims under the Constitution itself. Compare *Davis v. Passman,* 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979); *Bivens v. Six Unknown Named Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

In *Kostal v. Stoner,* 292 F.2d 492 (10th Cir. 1961), the Court of Appeals for this circuit affirmed the dismissal of a lawsuit alleging that the judge and prosecutor in plaintiff's criminal trial "conspired together in the judge's chambers to deprive the plaintiff of a fair trial, as guaranteed by the 14th Amendment to the Constitution," all in violation of 42 U.S.C. §§ 1983, 1985(3). Deciding the case six years prior to *Pierson,* the court in *Kostal* observed that "[w]e have held that the Civil Rights Act does not impair the traditional common-law immunity of judges from personal liability in damages for their official acts in matters within their jurisdiction." *Id.,* 292

F.2d at 493 (citations omitted). The plaintiff now asks this Court to engraft an exception upon the rules reaffirmed in *Pierson, Stump, Kostal* and other cases, an exception imposing liability upon a federal judge for intentionally wrongful and/or conspiratorial violations of the Civil Rights Act, or the Constitution.

Counsel's sweeping statements about the scope of liability under the civil rights acts notwithstanding,[20] this Court can find no substantive legal or constitutional basis for such an exception. In fact, the governing case law is contrary to plaintiff's view. In *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), the United States Supreme Court declared that "without congressional directions to the contrary, we deem it untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials." *Id.,* 438 U.S. at 504, 98 S.Ct. at 2909. In *Butz,* the question directly raised was whether federal officials were entitled to *greater* immunity than their state counterparts. The Court held they were not. Logically, it seems equally untenable to hold that federal officials, particularly federal judges and officers of the court are entitled to a lesser immunity than state judges and court officers. The policies underpinning judicial and judicially related immunities are at least as strong in relation to the federal courts:

> The cluster of immunities protecting the various participants in judge-supervised trials stems from the characteristics of the judicial process rather than its location. As the *Bradley* Court suggest-

---

**20.** For example, at page 24 of the plaintiff's brief, counsel asserts that the Civil Rights Acts "were intended to provide a civil forum for the redress, by way of damages or other relief, of any violation or deprivation of constitutional or civil rights no matter the context in which such deprivation occurred."

The language of the Civil Rights Acts, 42 U.S.C. §§ 1981 *et seq.* is broad and sweeping. "By its terms, § 1983 'creates a species of tort liability that on its face admits no immunities.'" *Owen v. City of Independence,* 445 U.S. 622, 634, 100 S.Ct. 1398, 1407, 63 L.Ed.2d 673

(1980), *quoting Imbler v. Pachtman,* 424 U.S. 409, 417, 96 S.Ct. 984, 988, 47 L.Ed.2d 128 (1976). Immunities have nevertheless been recognized. See *e.g., Tenney v. Brandhove,* 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951) (absolute legislative immunity); *Quern v. Jordan,* 440 U.S. 332, 99 S.Ct. 1139, 39 L.Ed.2d 358 (1979) (state immunity).

"The existence of a § 1983 remedy does not require that federal courts entertain all suits in which unconstitutional deprivations are asserted," *Freeman v. Flake,* 448 F.2d 258, 261 (10th Cir. 1971).

ed, 13 Wall., at 348–349, controversies sufficiently intense to erupt in litigation are not easily capped by a judicial decree. The loser in one forum will frequently seek another, charging the participants in the first with unconstitutional animus. See *Pierson v. Ray,* 386 U.S. at 554 [, 87 S.Ct. at 1217]. Absolute immunity is thus necessary to assure that judges, advocates, and witnesses can perform their respective functions without harassment or intimidation.

*Butz v. Economou, supra,* 438 U.S. at 512, 98 S.Ct. at 2913. The court in *Butz* makes no exception to the rule of *Pierson, Stump,* and *Bradley v. Fisher;* to the contrary, it expressly extended absolute immunity from damage liability to federal hearing examiners and administrative law judges. *Id.,* 438 U.S. at 514, 98 S.Ct. at 2914.

The Courts of Appeal have also rejected the notion that judges are liable for judicial acts engaged in as part of an alleged conspiracy. In *Aldabe v. Aldabe,* 616 F.2d 1089 (9th Cir. 1980) (per curiam), the plaintiff alleged a conspiracy by six attorneys and eight judges involved in her divorce proceedings to violate her constitutional rights "by keeping her in a state of poverty for the purpose of hindering the effective prosecution of her case," *Id.,* 616 F.2d at 1091, all in violation of 42 U.S.C. §§ 1983, 1985(3). The district court dismissed the judge defendants on the basis of judicial immunity. The Court of Appeals affirmed:

> The district court dismissed appellant's action against the judge appellees on the basis of judicial immunity. Appellant maintains that the doctrine of judicial immunity, being of common law stature, has been superceded by the Civil Rights Act. That argument was specifically rejected by *Stump v. Sparkman,* . . . and *Pierson v. Ray,* . . .
>
> Appellant contends alternatively that a judge who violates a litigant's legal rights is not acting in his or her judicial capacity. *Stump* and *Pierson* similarly dispose of that argument. The district court correctly dismissed the claims against the judge appellees.

*Id.,* 616 F.2d at 1091 (citations omitted). In *Keating v. Martin,* 638 F.2d 1121 (8th Cir. 1980), the Court of Appeals for the Eighth Circuit similarly held a judge defendant immune from suit under § 1983 for allegedly meeting with counsel for a second defendant "and a member of the prosecutor's staff to 'arrange for the denial of admission into evidence' of certain materials which [their defendant] Keating planned to introduce at trial." *Id.,* 638 F.2d at 1122. Plaintiff directs this Court's attention to no recent case in which the Tenth Circuit has made any retreat from its position in *Kostal v. Stoner, supra,* 292 F.2d at 493, that judicial immunity bars conspiracy claims under §§ 1983 and 1985 relating to "judicial" acts. See also *Henriksen v. Bentley,* 644 F.2d 852, 855 (10th Cir. 1981).

The force of existing case authority aside,[21] the bar of absolute immunity as against suits arising out of a judge's con-

---

**21.** The case reports are replete with examples of the uniform application of judicial immunity to bar private civil actions against judges arising from their judicial actions. See *e.g., Moore v. Burger,* 655 F.2d 1265, 1266 (D.C.Cir.1981) (per curiam) (Supreme Court Justices held immune); *Sullivan v. Kelleher,* 405 F.2d 486, 487 (1st Cir. 1968); *Dacey v. Dorsey,* 568 F.2d 275, 277 (2d Cir. 1978), *cert. denied* 436 U.S. 906, 98 S.Ct. 2238, 56 L.Ed.2d 405; *Princeton Community Phone Book, Inc. v. Bate,* 582 F.2d 706, 711 & n. 13 (3d Cir. 1978), *cert. denied* 439 U.S. 966, 99 S.Ct. 454, 58 L.Ed.2d 424 (1978); *Wilkins v. Rogers,* 581 F.2d 399, 404–405 (4th Cir. 1978); *Rheuark v. Shaw,* 628 F.2d 297, 304 (5th Cir. 1980), *cert. denied* 450 U.S. 931, 101 S.Ct. 1392, 67 L.Ed.2d 365; *Littleton v. Fisher,* 530 F.2d 691, 692 (6th Cir. 1976); *Briscoe v. LaHue,* 663 F.2d 713, 722 (7th Cir. 1981); *Duba v. McIntyre,* 501 F.2d 590, 591–593 (8th Cir. 1974), *cert. denied,* 424 U.S. 975, 96 S.Ct. 1480, 47 L.Ed.2d 745; *Beard v. Udall,* 648 F.2d 1264, 1268 (9th Cir. 1981); *Wiggins v. New Mexico State Supreme Court Clerk,* 664 F.2d 812, 815 (10th Cir. 1981); and see generally, 51 West's Federal Practice Digest 2d at 524–542; *id.,* 1982 pocket part at 94–100 (1981).

Of course, "[a] judge can be liable for participating in a conspiracy if the acts indicating participation were taken by the judge 'otherwise than in his judicial role.' " *Beard v. Udall,* 648 F.2d 1264, 1270 (9th Cir. 1981), quoting *Slavin v. Curry,* 574 F.2d 1256, 1264 (5th Cir.) *modified,* 583 F.2d 779 (1978). See *e.g., Crowe v. Lucas,* 595 F.2d 985, 990 (5th Cir. 1979).

duct of a proceeding makes logical sense and serves sound public policy. "The cases granting absolute immunity to judges recognize that extraordinary reasons are required to justify the drastic step of barring the genuinely wronged individual from any redress against the wrongdoer." *Sellars v. Procunier,* 641 F.2d 1295, 1299 (9th Cir. 1981). The most significant reason is the potential effect of such suits upon the judges and the judicial system.

The judge is in a unique posture in the adversary system. His or her sole task is to make impartial decisions in vigorously contested actions, to "decide '[c]ontroversies involving not merely great pecuniary interests, but the liberty and character of the parties, and consequently exciting the deepest feelings.'" *Butz v. Economou,* 438 U.S. at 509, 98 S.Ct. at 2912 quoting *Bradley v. Fisher,* 80 U.S. (13 Wall.) 335, 348, 20 L.Ed. 646 (1872). The threat of constant litigation against the decision-maker is apparent . . . . Judges should not have to fear that unsatisfied litigants may hound [them] with litigation charging malice or corruption," *Pierson v. Ray,* 386 U.S. at 554, 87 S.Ct. at 1217.

Thus, the proper functioning and indeed the very survival of any independent, dispute-resolving system requires that the dread of subsequent lawsuits be prevented from becoming a factor in a judge's assessment of the merits of a case.

*Sellars v. Procunier, supra,* 641 F.2d at 1299–1300.

Beyond the intimidating effect of the litigation, the burden of defense of such suits could readily consume much of a judge's time and energy, taking him or her away from normal duties.[22]

Furthermore, there are safeguards against abuse built into the judicial process that minimize any necessity for a private civil damages action to redress erroneous or unconstitutional judicial conduct.[23] As the Supreme Court said in *Pierson v. Ray, supra,* 386 U.S. at 554, 87 S.Ct. at 1217, "*[a judge's] errors may be corrected on appeal,* but he should not have to fear that unsatisfied litigants may hound him with litigation charging malice or corruption." [Emphasis added].

The appellate remedy is a good remedy. It is an effective remedy. As the Supreme Court has reminded us, "it is typically a judicial system's appellate courts which are by their nature a litigant's most appropriate forum for the resolution of constitutional contentions." *Huffman v. Pursue, Ltd.,* 420 U.S. 592, 609, 95 S.Ct. 1200, 1210, 43 L.Ed.2d 482 (1975).[24]

At the hearing, this Court raised the question of the availability and efficacy of the appellate remedy, and whether the § 1983, § 1985, or the *Bivens*-type civil remedy is available to collaterally attack judicial and prosecutorial conduct in and concerning a trial which may be the subject of an appeal.

Those questions seem particularly meaningful in this case by virtue of the fact that the plaintiff here *prevailed* in an appeal from the attempted retrial of his criminal charges. The Court of Appeals found that portions of the conduct complained of herein barred a retrial of such charges under

---

22. This is a burden that is not avoided even in suits seeking a declaratory judgment rather than damages.

23. As the Supreme Court observed in *Butz v. Economou, supra,* 438 U.S. at 512, 98 S.Ct. at 2913:

 At the same time, the safeguards built into the judicial process tend to reduce the need for private damages actions as a means of controlling constitutional conduct. The insulation of the judge from political influence, the importance of precedent in resolving controversies, the adversary nature of the process, and *the correctability of error on appeal* are just a few of the many checks on malicious action by judges. [Emphasis added and footnote omitted].

24. In *Huffman,* the Court held that the abstention standards of *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 639 (1971), "must be met to justify federal intervention in a state judicial proceeding as to which a losing litigant has not exhausted his state appellant remedies," *id.,* 420 U.S. at 609, 95 S.Ct. at 1210, but who has filed a civil rights action seeking relief against the state court under § 1983.

the Double Jeopardy Clause. *United States v. Martinez, supra,* 667 F.2d at 889–890.

Counsel adamantly insists that plaintiff may maintain his civil action against the judge and other defendants regardless of the appellate process. At the hearings, counsel responded to this Court's inquiry as follows:

> THE COURT: ... [I]n essence you are saying, are you not, that in any situation where a criminal defendant is found not guilty or a criminal defendant is triumphant at the Court of Appeals level that he is in a position to bring an action? MS. GRAHAM: Absolutely and there are thousands of such cases. [§] 1983 in a state matter, [§] 1981, no question about it. There are thousands of cases of that kind.

> \* \* \* \* \* \*

Hrg. Tr. at 53–54; see *id.* at 50–62. In the plaintiff's brief it is asserted:

> The damages and other relief that may be recovered by means of lawsuits charging violations of those [Civil Rights Acts] and of the Constitution are not in any way dependent upon the outcome, favorable or otherwise, of a criminal prosecution. . . .

> While examples abound, the plain answer is that the Civil Rights Acts and their jurisdictional counterparts express no limitation on their use to seek damages, by a criminal defendant who was acquitted or otherwise had the charge against him dismissed. If the laws and constitutional provisions providing for rights are violated once, or an attempt is made through a conspiracy to abrogate them the later connection of the violation, or the failure of the conspiracy, does not destroy the causes of action set forth. To hold to the contrary would encourage the flouting of rights. To counsel's knowledge, no court has so ruled.

Plaintiff's Brief in Response, at 24, 27. In making this argument, the plaintiff directly relies upon *Bivens v. Six Unknown Named Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), and *Hampton v. Hanrahan,* 600 F.2d 600 (7th Cir. 1979), both of which are cases holding that law enforcement officers may be liable in damages under the Civil Rights Act, or the Constitution itself, for conduct related to unlawful searches and seizures. The *Hampton* case arose from the planning and execution of a police raid upon an apartment occupied by members of the Black Panther's Party, and the resulting shoot-out and post-raid cover-up by police officials. A careful reading of the 61 pages of opinion in *Hampton* discloses no civil damages claim against a judge for conduct in or concerning the handling of a criminal trial. Indeed, to the extent that Hanrahan and other prosecutor defendants were held potentially liable, it was because they were "performing investigative rather than advocacy functions" in planning and participating in the raid.[25] *Id.,* 600 F.2d at 631–633. The court reaffirmed its earlier finding that the prosecutors' "alleged participation in the planning and execution of a raid of this character has no greater claim to complete immunity than the activities of police officers allegedly acting under [their] direction.' " *Id.,* 600 F.2d at 632, quoting *Hampton v. City of Chicago,* 484 F.2d 602, 609 (7th Cir. 1973), *cert. denied* 415 U.S. 917, 94 S.Ct. 1413, 39 L.Ed.2d 471 (1974).

Similarly, in *Bivens* the plaintiff sought to recover damages in a direct action under the Fourth Amendment arising out of the warrantless entry and search of his apartment by federal narcotics agents and his subsequent warrantless arrest. Bivens did not complain of any unconstitutional abuse by a judge, or a prosecutor, or a deputy

---

**25.** The *Hampton* Court held Hanrahan and the other state prosecutor defendants to be absolutely immune from suit under §§ 1983 and 1985 for their post-raid prosecutorial activities which were involved "in initiating a prosecution and in presenting the state's case." *Id.,* 600 F.2d at 631–632, quoting *Imbler v. Pachtman,* 424 U.S. 409, 431, 96 S.Ct. 984, 995, 47 L.Ed.2d 128 (1976). Their immunity claims were upheld in the face of allegations that they instituted unfounded prosecutions in order to harass the survivors of the raid. *Id.,* 600 F.2d at 630. Defendant Hanrahan had dismissed those indictments before trial. *Id.,* 600 F.2d at 620.

marshal or bailiff. Any charges against Bivens had been dismissed long before a trial. In the *Bivens* case, the question was merely,

> Whether petitioner, if he can demonstrate an injury consequent upon the violation by federal agents of his Fourth Amendment rights, is entitled to redress his injury through a particular remedial mechanism normally available in the federal courts.

*Id.,* 403 U.S. at 397, 91 S.Ct. at 2005 (citations omitted). Having determined that Bivens' complaint stated a cause of action under the Fourth Amendment the Court held that the plaintiff was "entitled to recover money damages for any injuries he has suffered as a result of the agents' violation of the Amendment." *Id.*

The *Bivens* case went no farther than redressing injuries arising from the unconstitutional search and seizure and establishing the liability of those who perpetrated it. No "judicial" or judicially related conduct was at issue.

Plaintiff relies on a third case,[26] *Baldwin v. Morgan,* 251 F.2d 780 (5th Cir. 1958), in arguing that a criminal defendant may assert an independent civil damages remedy to redress trial misconduct. *Baldwin,* which counsel says "comes closest to factual situation herein," dealt with racial segregation in the waiting rooms of the Birmingham Railroad Terminal. Plaintiffs brought a class action suit for injunctive and declaratory relief against the Alabama Public Service Commissioners, Commissioners of the City of Birmingham, and the Birmingham Terminal Company alleging the maintenance of an "interstate and white waiting room," and other rooms from which black persons were excluded. *Id.,* 251 F.2d at 783–784. Misconstruing the meaning of

"state action" under § 1983 and the correct scope of the plaintiffs' complaint, the district court dismissed the action on the basis that charges against some plaintiff arising from arrests under the challenged policy had been dismissed. Observing that " '[m]isuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken' under color of 'state law,' " *id.,* 251 F.2d at 786, quoting *United States v. Classic,* 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368 (1941) the Court of Appeals reversed, holding that the plaintiffs stated a viable, justiciable cause of action concerning the policy or custom of segregation at the Terminal:

> [T]his city criminal case, or its dismissal, was not the Civil Rights case before the Court below. When the criminal proceeding was closed, it did not automatically take with it the charge made in this cause that state agencies, *pretending to act for the state and exerting the power of their respective offices* were, *under the threat of arrest or other means,* depriving Negroes of the right to be free of discrimination *in railway public waiting rooms on account of race or color.*

*Id.,* 251 F.2d at 787 (emphasis added).[27]

Nothing in *Baldwin* speaks to judicial conduct, or to error or misconduct by anyone during the course of a trial, or to damages actions arising out of a trial. Plaintiffs, as noted, were seeking declaratory and injunctive relief against a state-sanctioned policy and custom of racial segregation in public facilities.

Returning momentarily to *Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), the plaintiffs in that case, a group of white and black clergymen, sought damages from police officers who arrested them, and

---

**26.** A fourth case cited by plaintiff, *Littleton v. Berbling,* 468 F.2d 389 (7th Cir. 1972), which dealt with discriminatory bail practices, was *reversed and vacated* by the United States Supreme Court *sub nom. O'Shea v. Littleton,* 414 U.S. 488, 514, 94 S.Ct. 669, 685, 38 L.Ed.2d 674 (1974). The Court held that the case lacked the requisite "case or controversy" under Article III.

Counsel for plaintiff nowhere mentions the fact of this reversal.

**27.** The language emphasized above is that which was deleted from that sentence by plaintiff's counsel in quoting it in the brief. See Plaintiff's Brief in Response, at 26a.

from the judge who convicted them for "breaching the peace" by using segregated waiting room facilities in a bus terminal in Jackson, Mississippi in 1961. Such convictions were held unconstitutional in *Thomas v. Mississippi,* 380 U.S. 524, 85 S.Ct. 1327, 14 L.Ed.2d 265 (1965). In *Pierson,* as discussed *supra,* the Supreme Court held the judge to be absolutely immune from damages suits arising out of his clearly unconstitutional yet plainly "judicial" actions. The Civil Rights Act did not abrogate that immunity. *Id.,* 386 U.S. at 553–555, 87 S.Ct. at 1217.

It seems irrefutable that *Pierson, Stump v. Sparkman,* and related cases strike at the heart of plaintiff's argument. The cases uniformly reject the availability of a civil rights damages action as a remedy for judicial misconduct, particularly where an appellate remedy is, or has been available.

A similar problem has arisen when attorneys have sought to challenge state court disciplinary or admission proceedings on constitutional grounds. Noting that review of such questions is available by writ of certiorari in the United States Supreme Court, see *In re Summers,* 325 U.S. 561, 566, 65 S.Ct. 1307, 1310, 89 L.Ed. 1795 (1945), the courts have refused to permit collateral challenges to those proceedings under the Civil Rights Acts. In *Doe v. Pringle,* 550 F.2d 596 (10th Cir. 1976), the Court of Appeals for the Tenth Circuit states:

> This action is, in essence, an attempt by Doe to seek review in inferior federal courts of the *entire* state proceedings including the order of the Colorado Supreme Court refusing to grant his second application for admission. That function is one reserved exclusively to the United States Supreme Court. . . .
>
> Doe cannot invoke the provisions of § 1983 of the Civil Rights Act in federal district court so as to circumvent and avoid his obligation to seek direct review of the United States Supreme Court.

*Id.,* 550 F.2d at 599 (emphasis in original; citations omitted).

The Court of Appeals for the Fifth Circuit had similar words for a civil rights suit brought by a Florida lawyer to challenge his three-month suspension from practice:

> Among the several answers to plaintiff's claim, a basic and dispositive one is that we hold no warrant to review final judgments of the Florida Supreme Court. That power is reserved to the Supreme Court of the United States. Complaining of constitutional violations, Mr. Sawyer has cast his complaint in the form of a civil rights suit. What he seeks, however, is simply reversal of the state court judgment. We have scrutinized the state proceedings and find them to be manifestly judicial ones. They could have been reviewed in the Supreme Court. *In re Summers,* 325 U.S. 561, 65 S.Ct. 1307, 89 L.Ed. 1795 (1945). Mr. Sawyer has boarded the wrong flight.

*Sawyer v. Overton,* 595 F.2d 252 (5th Cir. 1979) (per curiam). As expressed by the Court of Appeals for the First Circuit, "The settled law, with which we agree, is 'that disciplinary orders of the highest court of a state may be reviewed federally only in the Supreme Court by petition for certiorari and not by suits in the district courts.'" *Martinez Rivera v. Trias Monge,* 587 F.2d 539, 540 (1st Cir. 1978), quoting *Grossgold v. Supreme Court of Illinois,* 557 F.2d 122, 125 (7th Cir. 1977). The *Grossgold* court observes:

> If no court could review the constitutional question, the alleged constitutional deprivation could be redressed in district court under the Section 1343(3) [civil rights] subject matter jurisdiction grant. If indeed judicial review of a claimed constitutional deprivation were cut off entirely, grave constitutional practices would be posed. Hart, The Power of Congress to Limit the Jurisdiction of the Federal Courts: An Exercise in Dialectic, 66 Harv.L.Rev. 1362 (1953). The flaw in plaintiff's contentions is that it overtakes the judicial review already accorded him. The Illinois Supreme Court, which is fully competent to pass on federal constitutional questions, has passed upon this constitutional question, and its decision became final when the Supreme Court of the United States denied certiorari. . . .

*Consequently there was no arguable constitutional "deprivation" upon which Section 1343 could operate to provide subject matter jurisdiction.* The doctrine of *res judicata* bars any further litigation of this question.

*Id.,* 557 F.2d at 124–125 (emphasis added).[28]

Like the plaintiff in *Grossgold,* Martinez had available the remedy of appeal, in his case to the United States Court of Appeals for the Tenth Circuit and the Supreme Court. Unlike the plaintiff in *Grossgold,* Martinez *prevailed* on the material constitutional question he raised in that appellate forum.

These cases reflect the general approach taken by the courts in foreclosing the use of the civil rights acts as a means of collateral attack seeking compensation or other relief for judicial error or misconduct when review by direct appeal is available. See *e.g., Wilkins v. Rogers,* 581 F.2d 399, 404 (4th Cir. 1978);[29] *Gibner v. Oman,* 459 F.Supp. 436, 439 (D.N.M.1977). In *Almon v. Sandlin,* 603 F.2d 503 (5th Cir. 1979), the court noted that "[a]lthough Almon has styled his complaint in the form of a civil rights action seeking monetary damages for alleged constitutional violations, this action is patently an attempt to collaterally attack the validity of the final judgment of the Supreme Court of Alabama." *Id.,* 603 F.2d at 506. If Almon had asserted his constitu-

tional grievances in the challenged proceedings, "his proper remedy for an unfavorable decision was to seek review by writ of certiorari to the Supreme Court of the United States, not by collaterally attacking the judgment in a federal district court under § 1983." *Id.*[30]

The same principle has been applied to civil rights suits which challenge the validity of criminal convictions or punitive confinement. In *Preiser v. Rodriguez,* 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973), the Supreme Court held that the 42 U.S.C. § 1983 was not available to prisoners seeking to collaterally attack the fact or duration of their confinement. The Court found that the writ of *habeas corpus* was the sole means of raising such a challenge.[31] *Id.,* 411 U.S. at 498–500, 93 S.Ct. at 1840–1841. Prisoners may maintain damages actions under the Civil Rights Act, but "[i]f a state prisoner is seeking damages he is attacking something other than the fact or length of his confinement, and he is seeking something other than immediate or more speedy release—the traditional purpose of habeas corpus." *Id.,* 411 U.S. at 494, 93 S.Ct. at 1838. An attack on "the fact or length of confinement" comprehends assertions that the plaintiff "was denied his constitutional rights at trial, as in *Johnson v. Zerbst,* [304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938) ]." *Id.,* 411 U.S. at 486, 93 S.Ct. at

---

**28.** 28 U.S.C. § 1343(a)(3) provides:

(a) The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

xxxx; xxxx

(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; xxx xxx

See also *Martinez Rivera v. Travis Monga, supra,* 587 F.2d at 540 n*.

**29.** In *Wilkins* the court observes:

The record demonstrates that Wilkins is simply dissatisfied with the results in the state court proceedings to date. If she remains dissatisfied at the conclusion of those proceedings, she may avail herself to South Carolina's appellate remedies. We therefore

affirm the district court's decision not to intervene [under the Civil Rights Acts].

**30.** Though many of these cases involve civil rights suits against state rather than federal courts, (which is understandable because of the "under color of state law" element of a § 1983 action), the logical underpinnings of these decisions as expressed in *Grossgold,* for example, seem equally relevant to actions against federal courts.

**31.** In *Preiser,* "respondents' counsel acknowledged at oral argument that a state prisoner challenging his underlying conviction and sentence on federal constitutional grounds in a federal court is limited to habeas corpus." *Id.,* 411 U.S. at 489, 93 S.Ct. at 1836. *Preiser* dealt with additional confinement administratively imposed through cancellation of good-time credits.

1834. For federal prisoners, 28 U.S.C. § 2255 provides a means equivalent to habeas corpus for raising collateral attacks on federal criminal convictions. *Davis v. United States,* 417 U.S. 333, 344, 94 S.Ct. 2298, 2304, 41 L.Ed.2d 109 (1974); *United States v. Hayman,* 342 U.S. 205, 217, 219, 72 S.Ct. 263, 271, 272, 96 L.Ed. 232 (1952). Plaintiff's post-conviction remedies, had he been convicted, would have been a direct appeal and, if appropriate standards were met, relief under § 2255. Judicial error or misconduct that is prejudicial to a criminal defendant may readily be raised upon a direct appeal. Jurisdictional, constitutional and some non-constitutional [32] errors may be redressed under § 2255. See *Hill v. United States,* 368 U.S. 424, 428, 82 S.Ct. 468, 471, 7 L.Ed.2d 417 (1962); *United States v. Addonizio,* 450 U.S. 178, 185–186, 99 S.Ct. 2235, 60 L.Ed.2d 805 (1979).

Plaintiff herein cites no authority which holds that federal prisoners have available the additional collateral remedy of a civil rights damages action against the courts, judges or prosecutors involved in their conviction.[33] In fact, § 1983 actions of this kind have been forbidden even in the absence of the availability of habeas corpus or § 2255 relief. See *Waste Management of Wisconsin, Inc. v. Fokakis,* 614 F.2d 138, 142

(7th Cir. 1980); *Hanson v. Circuit Court of the First Jud. Cir.,* 591 F.2d 404, 410–411 (7th Cir. 1979), *cert. denied* 444 U.S. 907, 100 S.Ct. 220, 62 L.Ed.2d 143; *Cavett v. Ellis,* 578 F.2d 567, 569 (5th Cir. 1978); *Lathon v. Parish of Jefferson,* 358 F.Supp. 558, 560 (E.D.La.1973).[34]

The courts have repeatedly emphasized that "[s]o far as convictions obtained in the federal courts are concerned, the general rule is that the writ of *habeas corpus* will not be allowed to do service for an appeal." *Sunal v. Large,* 332 U.S. 174, 178, 67 S.Ct. 1588, 1590, 91 L.Ed. 1982 (1947); *United States v. Timmreck,* 441 U.S. 780, 784, 99 S.Ct. 2085, 2087, 60 L.Ed.2d 634 (1979); *Davis v. United States,* 417 U.S. 333, 345, 94 S.Ct. 2298, 2304, 41 L.Ed.2d 109 (1974). The courts have also concluded that civil rights suits are not available as a substitute or supplement for the habeas corpus remedy. *Preiser v. Rodriguez, supra; Cavett v. Ellis, supra; Taylor v. Kavanaugh,* 640 F.2d 450, 451 (2d Cir. 1981). As Justice Douglas pointed out in *Sunal v. Large, supra,* "The normal and customary method of correcting errors of the trial is by appeal." 332 U.S. at 177, 67 S.Ct. at 1590. Logic would dictate that a civil rights suit against a presiding judge is likewise not available as a supplement to or substitute for an appeal.[35]

---

**32.** In *Davis v. United States, supra,* the court commented that "[t]his is not to say, however, that every asserted error of law can be raised on a § 2255 motion." *Id.,* 417 U.S. at 346, 94 S.Ct. at 2305. Rather the inquiry is whether the asserted nonconstitutional error " 'inherently results in a complete miscarriage of justice' and 'present[s] exceptional circumstances' that justify collateral relief under § 2255." *Id.,* 417 U.S. at 346–347, 94 S.Ct. 2305; see also *United States v. Addonizio,* 442 U.S. 178, 185, 99 S.Ct. 2235, 2240, 60 L.Ed.2d 805 (1979).

**33.** While prisoners may bring civil rights damages suits which are addressed to appropriate subject matter, *e.g., Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981); 42 U.S.C. § 1997e, does that right encompass an attack on prior trial proceedings? "[T]he cases holding that judges and prosecutors have an absolute immunity in damage actions brought under § 1983 . . . may render the problem academic; a damage action attacking a conviction as unconstitutional will virtually always be directed at the state judge

or prosecutor and will be subject to a motion to dismiss on immunity grounds." P. Bator, et al., eds., Hart & Wechsler's The Federal Courts and the Federal System, 1981 Supplement, at 419 (1981).

**34.** In *Cavett v. Ellis,* 578 F.2d 567, 569 (5th Cir. 1978) the court stated:

Stripped to the bone, the plaintiff's action under § 1983 is little more than a habeas corpus action without a custody requirement. We do not believe that § 1983 was meant to be a substitute for habeas corpus when there is no custody. . . . Under his theory of § 1983, appellant would have us sit in perpetual review of all criminal decisions.

Though the plaintiff in *Cavett* sought declaratory and equitable relief, it seems no more appropriate for a plaintiff to test the asserted errors in a prior criminal trial by seeking damages instead.

**35.** Such a civil rights suit may be available as a collateral remedy in a very limited class of cases, i.e., those cases in which the court pro-

The Civil Rights Act was not intended to be a source of damage actions brought by disappointed litigants against judicial officers who may commit errors or, irregularities while acting within the scope of their authority during the course of state court litigation.

*Sarelas v. Sheehan,* 326 F.2d 490, 492 (7th Cir. 1963). It is not intended to serve that purpose as to federal litigation either, including criminal prosecutions.[36]

 Nor does a party who has prevailed upon a criminal appeal have an action to exact damages from those who have erred.[36A] Again recalling *Pierson v. Ray,* 386 U.S. 547, 555, 87 S.Ct. 1213, 1218, 18 L.Ed.2d 288 (1967), and the court's comment therein that a judge's errors "may be corrected on appeal but he should not have to fear that unsatisfied litigants may hound him with litigation charging malice and corruption," it seems clear that the High Court has rejected any theory of qualified immunity for judges and prosecutors. To premise a judge's official immunity from suit upon the absence of error or even malice in his actions is to destroy it.

Absolute immunity, as the Supreme Court has acknowledged, leaves the genuinely wronged person without civil redress. However, broader societal concerns dictate that the balance be struck in favor of freeing judges from the constant fear of retaliatory suits. The alternative

of qualified immunity, or no immunity at all, would disserve the public interest, because these officials would still be subject in some degree to vexatious litigation.

*Sellars v. Procunier,* 641 F.2d 1295, 1300 (9th Cir. 1980).

The multitude of cases referred to by plaintiff's counsel in support of the contrary view, Hrg. Tr. at 53–54, have simply failed to materialize. Cases like *Bivens v. Six Unknown Named Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), have permitted private actions for damages, but have done so in relation to events wholly extrinsic to the conduct of a criminal trial.[37]

At hearing, counsel for the plaintiff cited *Gregoire v. Biddle,* 177 F.2d 579 (2d Cir. 1949), for the proposition that "[a] judge is not immune who flouts the Constitution to get a conviction and who conspires with the police to railroad a defendant." Hrg. Tr. at 49–50. The action in *Gregoire* also was against officials of the federal executive branch and alleged a claim for false arrest. There was no judicial defendant. In *Gregoire,* the court held the officials to be absolutely immune from suit, notwithstanding the fact that "their unlawful acts had been induced only by personal ill-will." *Id.,* 177 F.2d at 579. *See also Yaselli v. Goff,* 12 F.2d 396 (2d Cir. 1926), *affirmed* 275 U.S. 503, 48 S.Ct. 155, 72 L.Ed. 395 (1928). The

---

ceedings "have been a complete nullity," *Bottone v. Lindsley,* 170 F.2d 705, 707 (10th Cir. 1948); *Sarelas v. Sheehan,* 326 F.2d 490, 491 (7th Cir. 1963), in which the judge has acted in the "clear absence of all jurisdiction." *Stump v. Sparkman,* 435 U.S. 349, 357, 98 S.Ct. 1099, 1105, 55 L.Ed.2d 331 (1978).

The civil rights action would be maintainable, however, only because the challenged "proceedings" were not judicial proceedings at all. This is consistent with the general theory of collateral attack: "[S]uch an attack can be successful only where and to the extent that it discloses a want of power as distinguished from error in the exercise of power that was possessed." *Johnson v. Manhattan Ry. Co.,* 289 U.S. 479, 496, 53 S.Ct. 721, 727, 77 L.Ed. 1331 (1933) (footnote omitted).

**36.** This is not to say that a plaintiff need exhaust his appellate remedy before bringing a civil rights suit against the judge presiding at

his criminal trial. Compare *Patsy v. Florida Board of Regents,* —— U.S. ——, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982). It is to say that there will be *no* such suit if the judge was acting with at least some indicia of jurisdiction. *Stump v. Sparkman, supra.*

**36A.** Indeed, the Judicial Code expressly provides a damages remedy for persons unjustly convicted and imprisoned. That claim must be made against the United States in the Court of Claims. 28 U.S.C. §§ 1495, 2513 (1976).

**37.** In cases in which the proceedings reach the trial stage and allegations of illegal search and seizure like those in *Bivens* are determined adversely to the defendant, he is barred (by the doctrine of *res judicata* ) from maintaining a collateral *Bivens* -type action against the officers involved. See *Allen v. McCurry,* 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980).

court in *Gregoire* emphasized the important policy served by the defense of absolute immunity:

> It does indeed go without saying that an official, who is in fact guilty of using his powers to vent his spleen upon others, or for any other personal motive not connected with the public good, should not escape liability for the injuries he may so cause; and, if it were possible in practice to confine such complaints to the guilty, it would be monstrous to deny recovery. The justification for doing so is that it is impossible to know whether the claim is well founded until the case has been tried, and that to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties.

*Id.,* 177 F.2d at 581 (Learned Hand, C. J.).[38]

The plaintiff assails the application of the absolute immunity doctrine in this case because of the peculiar posture of the *Martinez* case. In *Martinez,* the Government appealed from Judge Kane's dismissal of the attempted retrial of the plaintiff on the non-severed original three counts of the indictment. The plaintiff prevailed in that appeal on his claim that double jeopardy barred such retrial based on the failure of the prosecutors to disclose the nature of the January 29 meeting to the defense at the time that a mistrial motion was agreed upon. *Id.,* 667 F.2d at 890. The Court of Appeals, however, did not have occasion to reach the plaintiff's other allegations of trial court error and judicial misconduct.[39]

The immunity defense aside, the argument that a civil action for damages is needed to redress such problems following declaration of a mistrial misapprehends the nature of a mistrial.

> The declaration of a mistrial renders nugatory all trial proceedings with the same result as if there had been no trial at all. See 58 C.J.S. Mistrial at 833–834 (1948). The situation which exists is analogous to that which results from an appellate reversal and remand for new trial.... The parties are returned to their original positions and, at the new trial, can introduce new evidence and assert new defenses not raised at the first trial. See, *e.g., United States v. Shotwell Mfg. Co.,* 355 U.S. 233, 243, 78 S.Ct. 245 [251] 2 L.Ed.2d 234 (1957); ...

*United States v. Mischlich,* 310 F.Supp. 669, 672 (D.N.J.1970) (citations omitted).

Following Judge Winner's mistrial determination, the plaintiff's liberty was no longer at risk as a consequence of any of the alleged errors or misconduct which preceded it. As to the three counts mistried, the only cloud upon the plaintiff's freedom was the threat of retrial, which dissipated upon an interlocutory appeal. See *United States v. Martinez, supra.* The errors of the first trial, whether intentional or not, have been rendered a nullity. There remains no threat of prejudice to the defendant's rights posed by the conduct of that trial.[40] No practical purpose would be

---

**38.** Counsel for plaintiff at hearing and in the brief has also cited *Picking v. Pennsylvania R. Co.,* 151 F.2d 240 (3d Cir. 1945) as authority permitting the maintenance of an action such as this under the Civil Rights statutes. *E.g.,* Hrg. Tr. at 49. The *Picking* opinion was *expressly overruled* by the United States Court of Appeals for the Third Circuit sitting *en banc* in *Bauers v. Heisel,* 361 F.2d 581, 584 (3d Cir. 1961). The holding in *Bauers* was consistent with and cited by the Court in *Pierson v. Ray, supra,* 386 U.S. 547, 555 n. 9, 87 S.Ct. 1213, 1218 n. 9, 18 L.Ed.2d 288 (1967).

Counsel is reminded of the hazards that accrue from reading opinions in isolation from each other. See also DR 7–106, ABA Code of Professional Responsibilities.

**39.** At hearing, counsel for plaintiff stated that "if it is a matter correctable on appeal, it is within the judicial function and it is immune. If it is a matter that can't be reached by any appellate review, it is not within the official immunity." Hrg. Tr. at 37–38.

The existing case law on absolute immunity expresses no such "bright-line" distinction.

**40.** Isn't the injury likely to be occasioned by trial error the potentially improper deprivation of one's liberty?

The injuries claimed by Martinez as a result of the January 1981 proceedings, i.e., the ex-

served by a present judicial finding of what was error, or what was not.

At hearing, counsel for the plaintiff spoke of the perceived need to reach that error and misconduct not passed upon by the Court of Appeals:

> MS. GRAHAM: ... Perhaps the complete correction or certainly for the plaintiff's purposes might have been a censure of Judge Winner and the prosecutors. If the judicial council or the Circuit Court and so forth had taken that step or the Bar Association Disciplinary Committee, I believe the plaintiff probably would have been satisfied with that. But those things didn't happen and that's another reason that he brought this action for violation of his rights because he'd like to stop this kind of thing from going on again.

Hrg. Tr. at 58. The Court of Appeals has repeatedly stated that "the Civil Rights Act, of course, was not enacted to discipline local law-enforcement officials." *Stringer v. Dilger,* 313 F.2d 536, 540 (10th Cir. 1963); *Clappier v. Flynn,* 605 F.2d 519, 532 (10th Cir. 1978); *Doe v. Pringle,* 550 F.2d 596, 599 (10th Cir. 1976). Nor can it be said that to have been enacted for the discipline of federal judges.[41] Other such procedures are available in dealing with the judiciary. See

R. Berger, Impeachment: The Constitutional Problems 122–180 (1973); 28 U.S.C. § 372(c) (1981 Supp.) (Judicial Council complaint procedure re: Judges); *Center for the Independence of Judges and Lawyers of the United States, Inc. v. Mabey,* 19 B.R. 635, 645 (D.C.D.Utah 1982). Where both Constitution and Congress have provided for specific remedies, extension of the Civil Rights Act, or of *Bivens*-type actions this far afield would be manifestly unwarranted. Cf. *Preiser v. Rodriguez,* 411 U.S. 475, 489–490, 93 S.Ct. 1827, 1836, 36 L.Ed.2d 439 (1973).

As an additional ground for seeking relief, the plaintiff urges that the effect of the mistrial determination was to deprive him of his entitlement to a "name clearing hearing," i.e., a completed trial which would by acquittal erase any taint of wrongdoing inferable from the fact of indictment. See Hrg. Tr. at 96–97. The mistrial and the resulting double jeopardy bar has precluded the original jury—or any jury—from reaching a verdict of innocence or guilt. Martinez now seeks vindication through a civil rights action against those who allegedly precipitated the mistrial prior to verdict.

The United States Supreme Court has often spoken of "a defendant's valued right

---

pense, the emotional strain, the exposure and potential stigma, are costs which are inseparable from those obtaining from being the defendant in a perfectly conducted criminal trial. Constitutional due process does not guarantee a perfect trial. See *e.g., Michigan v. Tucker,* 417 U.S. 433, 446, 94 S.Ct. 2357, 2364, 41 L.Ed.2d 182 (1974).

This is not in any way intended to minimize the importance of adjudicating proceedings with as little error as possible. "It would be difficult to single out any aspect of government of higher concern and importance to the people than the manner in which criminal trials are conducted." *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 575, 100 S.Ct. 2814, 2826, 65 L.Ed.2d 973 (1980) (Burger, C. J.) Judges should do the best work that they can.

Trial judges do not, however, personally insure any party a perfect proceeding, or even one that the appellate courts find "error free." Plaintiff cites no case holding a judge presiding over a mistrial liable to the parties for the costs and stresses of litigation. These are "precisely the alleged injuries" for which *Pierson* and related cases grant absolute immunity. *Lee v.*

*Willins,* 617 F.2d 320, 322 (2d Cir. 1980). They are the cost exacted by a system that entitles people to a fair trial before any punishment is considered. See *Ex parte Milligan,* 71 U.S. (4 Wall.) 2, 18 L.Ed. 281 (1866). "Bearing the discomfiture and cost of a prosecution for crime even by an innocent person is one of the painful obligations of citizenship." *Cobbledick v. United States,* 309 U.S. 323, 325, 60 S.Ct. 540, 541, 84 L.Ed. 783 (1940).

41. As the Court of Appeals has observed,

> [T]he immediate occasion for the adoption of this litigation was the post Civil War conditions primarily in the southern states. Blacks and Union sympathizers were persecuted by the Ku Klux Klan and they did not receive the protection of state laws and state law enforcement agencies.

*Wells v. Ward,* 470 F.2d 1185, 1187 (10th Cir. 1972); accord, *Monroe v. Pape,* 365 U.S. 167, 171–187, 81 S.Ct. 473, 475–484, 5 L.Ed.2d 492 (1961); *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 665–689, 98 S.Ct. 2018, 2022–2035, 56 L.Ed.2d 611 (1978).

to have his trial completed by a particular tribunal," *Wade v. Hunter,* 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949), and the constitutional significance of that right in relation to other values. See e.g., *Oregon v. Kennedy,* —— U.S. ——, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982); *United States v. Scott,* 437 U.S. 82, 92, 98 S.Ct. 2187, 2194, 57 L.Ed.2d 65 (1978); *Arizona v. Washington,* 434 U.S. 497, 503, 98 S.Ct. 824, 829, 54 L.Ed.2d 717 (1978); *United States v. Dinitz,* 424 U.S. 600, 606, 96 S.Ct. 1075, 1078, 47 L.Ed.2d 267 (1976); *United States v. Jorn,* 400 U.S. 470, 484–485, 91 S.Ct. 547, 556–557, 27 L.Ed.2d 543 (1971) (opinion of Harlan, J.); *Downum v. United States,* 372 U.S. 734, 736, 83 S.Ct. 1033, 1034, 10 L.Ed.2d 100 (1963). "[T]he interest of the defendant in having his fate determined by the jury first impaneled is itself a weighty one...." *Illinois v. Somerville,* 410 U.S. 458, 471, 93 S.Ct. 1066, 1073, 35 L.Ed.2d 425 (1973).

The reasons why this "valued right" merits constitutional protection are worthy of repetition. Even if the first trial is not completed, a second prosecution may be grossly unfair. It increases the financial and emotional burden on the accused, prolongs the period in which he is stigmatized by an unresolved accusation of wrongdoing, and may even enhance the risk that an innocent defendant may be convicted. The danger of such unfairness to the defendant exists whenever a trial is abated before it is completed. Consequently, as a general rule, the prosecutor is entitled to one, and only one, opportunity to require the accused to stand trial.

*Arizona v. Washington,* 434 U.S. at 503–505, 98 S.Ct. at 829–830 (footnotes omitted); see also *Green v. United States,* 355 U.S. 184, 187–188, 78 S.Ct. 221, 223, 2 L.Ed.2d 199 (1957). Judicial recognition of this "valued right" is embodied in the application of the Double Jeopardy Clause to bar the retrial of a defendant under a number of circumstances.

The Double Jeopardy Clause does protect a defendant against governmental actions intended to provoke mistrial requests and thereby to subject defendants to the substantial burdens imposed by multiple prosecutions. It bars retrials where "bad-faith conduct by judge or prosecutor," *United States v. Jorn, supra,* [400 U.S.] at 485 [91 S.Ct. at 557], threatens the "[h]arassment of an accused by successive prosecutions or declaration of a mistrial so as to afford the prosecution a more favorable opportunity to convict" the defendant. *Downum v. United States,* 372 U.S. [734] at 736 [83 S.Ct. 1033 at 1034, 10 L.Ed.2d 100]....

*United States v. Dinitz,* 424 U.S. at 611, 96 S.Ct. at 1081 (citations omitted). See also *Oregon v. Kennedy,* —— U.S. ——, ——, 102 S.Ct. 2083, 2088, 72 L.Ed.2d 416 (1982).[42]

 However, the "valued right" does not translate into a constitutional entitlement to retry a criminal charge in a civil proceeding, or a right to seek damages from those who may have placed fairness ahead of finality in declaring a mistrial.[43]

A defendant who raises the bar of the Double Jeopardy Clause against retrial avoids the risks and burdens of defending a second prosecution for the same offense.

*Arizona v. Washington,* 434 U.S. 497, 507–508, 98 S.Ct. 824, 831, 54 L.Ed.2d 717 (footnotes omitted).

---

**42.** A fair reading of *Dinitz* and *Oregon v. Kennedy* would lead one to conclude the reprosecution of Martinez would have been barred under the Double Jeopardy Clause because of Judge Winner's conduct alone, particularly when viewed through the historical lens:

Although there was a time when English judges served the Stuart monarchs by exercising a power to discharge a jury whenever it appeared that the Crown's evidence would be insufficient to convict, the prohibition against double jeopardy as it evolved in this country was plainly intended to condemn this "abhorrent" practice.

**43.** A court may declare a mistrial even over the defendant's objections where a "manifest necessity" appears for doing to, if "the ends of justice would otherwise be defeated." *United States v. Perez,* 22 U.S. (9 Wheat.) 579, 580, 6 L.Ed. 165 (1824); *Oregon v. Kennedy, supra,* —— U.S. ——, ——, 102 S.Ct. 2083, 2087, 72 L.Ed.2d 416 (1982).

As against that charge, the defendant retains his liberty without further shadow of doubt. He retains his liberty, however, at the cost of not knowing the outcome of the second trial which will never take place. In asserting the double jeopardy defense a defendant chooses freedom in lieu of an opportunity for vindication or conviction by verdict.

Some stigma certainly attaches to one accused of criminal wrongdoing. A defendant, however, is not left hopelessly harmed by a double jeopardy bar.

The long-standing presumption that a person remains innocent until proven guilty in a court of law finds firm recognition in American constitutional law as an essential element of due process. See *Taylor v. Kentucky*, 436 U.S. 478, 483–486, 98 S.Ct. 1930, 1933–1935, 56 L.Ed.2d 468 (1978); *Estelle v. Williams*, 425 U.S. 501, 503, 96 S.Ct. 1691, 1692, 48 L.Ed.2d 126 (1976); *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970); *Coffin v. United States*, 156 U.S. 432, 453, 15 S.Ct. 394, 402, 39 L.Ed. 481 (1895). Aside from its constitutional moorings, the presumption of innocence is grounded in a great deal of common sense. Allegations of criminal conduct are best resolved by a reasoned deliberation upon all of the appropriate evidence.

The "first remedy of any victim of defamation is self-help—using available opportunities to contradict the lie or correct the error and thereby to minimize its adverse impact on reputation," *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 344, 94 S.Ct. 2997, 3009, 41 L.Ed.2d 789 (1974), if there has indeed been falsehood or error. The plaintiff is free to hire a hall and proclaim his innocence to all who care to hear.

By itself, however, the fact that one's indictment for crime may leave one vulnerable to unfavorable public exposure is one cost, one risk, that we all bear as members of a society that guarantees an open system of public trials as part of its most funda-

mental law. See Amend. 6, U.S.Const.; *Globe Newspaper Co. v. Superior Court*, — U.S. ——, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980). It is not a cost for which a court, a judge, or a prosecutor owe a defendant indemnity in dollars.

As against those beyond the courthouse doors who would falsely defame the accused, the law of torts provides appropriate relief. See *e.g., Gertz v. Robert Welch, Inc., supra;* W. Prosser, Law of Torts §§ 111–116 (4th ed. 1971). No case cited in the plaintiff's 46-page brief even suggests that the inconclusiveness of a mistrial or double jeopardy bar may be properly abated through a collateral civil action against the presiding "judge," nor could this Court locate such authority.[44]

While in other circumstances "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential," *Board of Regents v. Roth*, 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972) quoting *Wisconsin v. Constantineau*, 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515 (1971). Here the bar of double jeopardy forecloses further prosecution; "what the government is doing to" the defendant is forcefully halted, as is his right to a trial thereon. That trial, or retrial, is the opportunity to hear and be heard that is guaranteed by the Constitution. Compare *Reilly v. Leonard*, 459 F.Supp. 291, 301 (D.Conn. 1978).

The plaintiff's claims against Judge Winner fail in other respects as well. The complaint's averments regarding the Judge's plans for courtroom "hidden camera" surveillance remind one of the dilemma posed when one tries to falsely imprison a sleeping man. Contemporaneous knowledge of restraint by the one confined is an essential element of the false imprisonment

---

**44.** While the common-law action for malicious prosecution provides a civil remedy against wholly groundless actions brought by prosecutors, an essential element of that tort is the conclusion of the subject proceedings in the defendant's favor. See W. Prosser, Law of Torts § 119 at 838–840 (4th ed. 1971).

cause of action. See Restatement (2d) of Torts § 42. Likewise, the plaintiff asserts that he and his defense attorneys were intimidated by plans for hidden cameras, plans of which they were totally unaware. Plaintiff's counsel concedes that Judge Winner's motions about hidden cameras "did not actually harm plaintiff . . ."[45] but argues that the issue of harm is not relevant to consideration of a Rule 12(b)(6) motion. Hrg. Tr. at 40.

■ The question of harm or "injury in fact" is a preliminary inquiry in every case or controversy making its way into the federal courts. A plaintiff's standing to sue is premised upon some personalized injury to his or her legally cognizable interests. See e.g., Duke Power Co. v. Carolina Environmental Study Group, 438 U.S. 59, 72, 98 S.Ct. 2620, 2629, 57 L.Ed.2d 595 (1978); Arlington Heights v. Metropolitan Housing Dev. Corp., 429 U.S. 252, 261, 262, 97 S.Ct. 555, 561, 50 L.Ed.2d 450 (1977); Warth v. Seldin, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975); Schlesinger v. Reservists Committee to Stop the War, 418 U.S. 208, 218, 220–221, 94 S.Ct. 2925, 2930, 2931–2932, 41 L.Ed.2d 706 (1974); United States v. Richardson, 418 U.S. 166, 179–180, 94 S.Ct. 2940, 2947–2948, 41 L.Ed.2d 678 (1974); O'Shea v. Littleton, 414 U.S. 488, 493, 94 S.Ct. 669, 674, 38 L.Ed.2d 674 (1974); Laird v. Tatum, 408 U.S. 1, 13–14, 92 S.Ct. 2318, 2325–2326, 33 L.Ed.2d 154 (1972) ("Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objectives harm or a threat of specific future harm."); United States v. SCRAP, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). "[A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 99 [99 S.Ct. 1601, 1608, 60 L.Ed.2d 66] (1979), and that the injury 'fairly can be traced to

the challenged action' and 'is likely to be redressed by a favorable decision,' Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 38, 41 [96 S.Ct. 1917, 1924, 1925, 48 L.Ed.2d 450] (1976)." Valley Forge Christian College v. Americans United for Separation of Church and State, —— U.S. ——, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982); (footnote omitted). This Court, therefore, may—indeed, must—inquire of the justiciability of an action or claim brought before it, including inquiry into the standing of the party to bring it. See Citizens Concerned for Separation of Church and State v. City of Denver, 628 F.2d 1289, 1294–1301 (10th Cir. 1980), cert. denied 452 U.S. 963, 101 S.Ct. 3114, 69 L.Ed.2d 975; Western Mining Council v. Watt, 643 F.2d 618, 623–624 (9th Cir. 1981).

■ A plaintiff must allege some injury to himself occurring from a judge's conduct in order to maintain any action against the judge. See Center for the Independence of Judges and Lawyers of the United States, Inc. v. Mabey, 19 B.R. 635, 645 (D.C.D.Utah 1982).

A civil rights complaint may speak no more hypothetically than may any other action. 42 U.S.C. § 1983 refers to liability for subjecting or causing to be subjected any citizen or other person to the deprivation of his or her federal rights, not for the mere possibility of deprivation. 42 U.S.C. § 1985(3) looks to conspiratorial acts "whereby another is injured in his person or property, or deprived" of his civil rights, but does not reach the mere contemplation of such acts. In Bivens-type actions, "a plaintiff seeking a damage remedy under the Constitution must first demonstrate that the constitutional rights have been violated." Davis v. Passman, 442 U.S. 228, 248, 99 S.Ct. 2264, 2278, 60 L.Ed.2d 846 (1979). As the Supreme Court recently held, "[t]he first inquiry in any § 1983 suit is whether the plaintiff has been deprived of a right 'secured by the Constitution and laws'" of the United States. Baker v. McCollan, 443 U.S. 137, 140, 99 S.Ct. 2689,

---

**45.** Plaintiff's Brief in Response at 21.

2692, 61 L.Ed.2d 433 (1979); *Martinez v. California,* 444 U.S. 277, 284, 100 S.Ct. 553, 558, 62 L.Ed.2d 481 (1980).

Aside from alleging no injury to the plaintiff, the complaint alleges no overt act in furtherance of the purported "hidden camera" conspiracy that infringed on anyone's federally protected rights. "[I]nfringement of some federally protected right independent of § 1985(3) is required for a violation of the conspiracy statute to be demonstrated." *Holmes v. Finney,* 631 F.Cd 150, 154 (10th Cir. 1980).[46]

█ Plainly the complaint fails to state a cognizable claim in reference to the hidden camera discussion.

█ The plaintiff's claims that the judge has somehow defamed him face similar difficulties. Defamation *per se* is not a violation of the civil rights laws, or the Constitution. See *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). The complaint does not expressly seek damages for common-law slander or libel. Nor does the complaint spell out with any degree of particularity the "false and damaging matter" allegedly published by Judge Winner. Complaint ¶¶ 112–122.[47] To the extent that the complaint makes general reference to Judge Winner's official communications to other judges and officials, it reaches matters clothed with immunity. See *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978); *Barr v. Mateo,* 360 U.S. 564, 79 S.Ct. 1335, 3

L.Ed.2d 1434 (1959); *Spalding v. Vilas,* 161 U.S. 483, 16 S.Ct. 631, 40 L.Ed. 780 (1896).

█ The complaint further fails to allege how the unspecified statements transgress any clearly established constitutional rule.[48] It thus wholly fails to state a common-law or constitutional claim for which relief may be granted.

Finally, the plaintiff seeks to recover damages from defendant Winner because of Winner's evil intent in presiding at the trial. The complaint alleges that he was biased and prejudiced toward the plaintiff, and that he sought to "railroad" him to jail. Complaint, ¶¶ 63–64.

█ Had the *Martinez* case been completed, and a verdict adverse to the plaintiff been rendered, I suppose the proper question on appeal would have been whether "the judge's bias infected the entire trial," *Sheppard v. Maxwell,* 384 U.S. 333, 358 n. 11, 86 S.Ct. 1507, 1519 n.11, 16 L.Ed.2d 600 (1966). It never reached that stage, however, and that question is as much a nullity at this point as the other averments of trial error. Mootness aside, the claim embraces obviously "judicial" conduct which is guarded from suit by the absolute immunity doctrine. "Evil intent is not a sufficient element for piercing judicial immunity: '[a] judge will not be deprived of immunity because the action he took ... was done maliciously ...' *Stump v. Sparkman, supra,* 435 U.S. at 356, 98 S.Ct. at 1104." *O'Neil v. City of Lake Oswego,* 642 F.2d 367, 370 (9th Cir. 1981);

---

**46.** In *Holmes,* the Court of Appeals also held that "a plaintiff's claim under ... § 1981, must be grounded on the violation of a right of substance and not merely on a theoretical speculation that some right has been infringed." *Id.,* 631 F.2d at 154.

**47.** At hearing, counsel was at a total loss in identifying any false or defamatory statements made by the judge or other defendants in the media. See Hrg. Tr. at 40–43. The single item pointed to in the complaint, a letter sent by Judge Winner to the Justice Department and circulated to other judges, is not even alleged to nor been published by the defendant. See complaint, at ¶¶ 114, 116. See also Hrg. Tr. at 147–150.

**48.** Even if one is asserting that the purported "false matter" was disseminated in furtherance of a conspiracy to deprive plaintiff of his civil rights, the complaint must allege how the plaintiff's federally protected rights have been harmed. *Holmes v. Finney, supra,* 631 F.2d at 154.

Cases such as *Harris v. Harvey,* 605 F.2d 330 (7th Cir. 1979), which dealt with a public and private campaign by a judge to vilify a city official, involve liability for conduct outside of the judicial function, and are therefore inapposite.

*Cadena v. Perasso,* 498 F.2d 383, 384 (9th Cir. 1974).[49]

In summary, the actions and conduct by Judge Winner which plaintiff alleges and about which he complains are actions which were intrinsically "judicial" in nature,[50] and thus call into question the doctrine of absolute judicial immunity. Neither actions under the Civil Rights Acts nor *Bivens*-type actions asserted directly under the Constitution have been extended so far as to reach beyond the bar of judicial immunity and expose a judge to civil liability for actions taken with something more than a "clear absence of all jurisdiction." *Stump v. Sparkman, supra,* 435 U.S. at 356–357, 98 S.Ct. at 1104; *Pierson v. Ray, supra,* 386 U.S. at 554–555, 87 S.Ct. at 1217–1218; *Butz v. Economou, supra,* 438 U.S. at 508–514, 98 S.Ct. at 2911–2914. Judge Winner was acting well within his jurisdiction when the actions complained of were taken. None of the arguments advanced by the plaintiff carry sufficient weight in authority or reasoning to overcome the bar of judicial immunity.

Additionally, some claims lack sufficient specificity to state a cognizable cause of action; others lack even the bare but essential allegation that the plaintiff suffered injury in fact as a result of the defendant's purported wrongdoing. The complaint as against Judge Winner must therefore be dismissed for failure to state a claim upon which relief may be granted.[51]

 The plaintiff's claims for declaratory relief are likewise dismissed for failure to state a claim for which relief may be

**49.** Certainly "[a] fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness." *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955). Where a judge has prejudged an issue upon which he is the trier of fact, he should appropriately disqualify himself. *United States v. Sciuto,* 531 F.2d 842, 844–846 (7th Cir. 1976); see also *United States v. Grinnell Corp.,* 384 U.S. 563, 580–583, 86 S.Ct. 1698, 1708–1710, 16 L.Ed.2d 778 (1966). Parties in a case may bring any such problem to the court's attention pursuant to the Judicial Code, see 28 U.S.C. § 144 (1976); *Berger v. United States,* 255 U.S. 22, 32–33, 35–36, 41 S.Ct. 230, 232–233, 233–234, 65 L.Ed. 481 (1921), and may raise it on appeal. *In re Murchison, supra.*

**50.** Plaintiff repeatedly avers that the defendant sought to "railroad" him to jail. A careful search through the indexes of works such as W. Prosser, Law of Torts (4th ed. 1971), the Restatements of Torts, Harper and James, Law of Torts (1956), Pollock, The Law of Torts (1939), and L. Green, et al., Cases on the Law of Torts (2d ed. 1977) discloses no reference to a constitutional or common-law tort known as "railroading." See also Whitman, "Constitutional Torts," 79 *Mich.L.Rev.* 5 (1981). Turning to Webster's Third New International Dictionary (1971), one finds that to "railroad" may mean "to convict and send esp. to prison with undue haste and [usually] by the use of false charges or insufficient evidence." *Id.,* at 1876; accord, The Random House College Dictionary 1091 (rev. ed. 1980). Were "railroading" to be granted the status of a distinct cause of action in tort law, its elements might well be defined

by the case of *Lopez v. Vanderwater,* 620 F.2d 1229 (7th Cir. 1980). In *Lopez,* the judge defendant, acting in the capacity of a private rent-collector, secured the arrest of an evicted tenant, Lopez, who had been found once more within his former premises. The judge accompanied Lopez to the police station, called the landlord to the station to sign a complaint, drafted the charging documents and signed the arrest warrant. He then made entries on a standard plea form indicating that Lopez had waived trial by jury and had pleaded guilty. He then sentenced the "defendant" to jail for 240 days. Lopez had thus been charged, arraigned, convicted and sentenced *in absentia* by the judge in the booking area of the police station. *Id.,* 620 F.2d at 1232.

The Court of Appeals for the Seventh Circuit, itself referring to the described conduct as an effort to "railroad" the plaintiff, *id.,* 620 F.2d at 1237, held the judge defendant to be liable for those unlawful acts which were prosecutorial in nature, but not for those which were "judicial" in nature. *Id.,* 620 F.2d at 1234, 1235.

*Lopez v. Vanderwater* harmonizes with the observation in *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955), that "[i]t would be very strange if our system of law permitted a judge to act as a grand jury and then try the very persons accused as a result of his investigations." Indeed it would, but the *Martinez* case is not the *Lopez* case. No such effort by Judge Winner to "railroad" the plaintiff is made out in this complaint.

**51.** To the extent that the plaintiff's common-law tort claims are to be read as pleaded against Judge Winner, they also are dismissed upon the same grounds.

granted. The question in each case under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202 (1976) is whether the facts alleged under the existing circumstances present a real controversy between parties having adverse legal interests of such immediacy and reality as to warrant a declaratory judgment. See *Lake Carriers Ass'n v. MacMullan,* 406 U.S. 498, 506, 92 S.Ct. 1749, 1755, 32 L.Ed.2d 257 (1972); *Golden v. Zwickler,* 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969); C. Wright, Law of Federal Courts § 100 at 498 n. 6 (3d ed. 1976). "The Declaratory Judgment Act was an authorization, not a command. It gave the federal courts competence to make a declaration of rights; it did not impose a duty to do so." *Public Affairs Press v. Rickover,* 369 U.S. 111, 112, 82 S.Ct. 580, 581, 7 L.Ed.2d 604 (1962) (per curiam); *Brillhart v. Excess Ins. Co.,* 316 U.S. 491, 494, 499, 62 S.Ct. 1173, 1175, 1177, 86 L.Ed. 1620 (1942); *Great Lakes Co. v. Huffman,* 319 U.S. 293, 299–300, 63 S.Ct. 1070, 1073–1074, 87 L.Ed. 1407 (1943); *Mechling Barge Line v. United States,* 368 U.S. 324, 331, 82 S.Ct. 337, 341, 7 L.Ed.2d 317 (1961). "A declaratory judgment, like other forms of equitable relief, should be granted only as a matter of judicial discretion, exercised in the public interest." *Eccles v. Peoples Bank,* 333 U.S. 426, 431, 68 S.Ct. 641, 644, 92 L.Ed. 784 (1948).

A collateral attack on a presiding judge's conduct of a criminal trial through the device of a civil suit proves no more appropriate because the defendant-turned-plaintiff seeks declaratory relief rather than damages. In *Hanson v. Circuit Court of First Jud. Cir.,* 591 F.2d 404, 409 (7th Cir. 1979), discussed above, a declaratory judgment action was held to be an inappropriate alternative to habeas corpus in attacking a judgment of conviction. It seems even more inappropriate here where nothing so potentially prejudicial as a criminal conviction has been imposed on the complaining party. See also *Cavett v. Ellis,* 578 F.2d 567, 569 (5th Cir. 1978).

A declaration of mistrial is not a final disposition of an action. Rather, it is the nullification of the first trial of an action and the premise for the commencement of a second trial. One may not appeal as a matter of right from a mistrial, even where a judge has also denied a motion for judgment of acquittal which, if well-taken, would bar a retrial. See *Esneault v. Waterman S. S. Corp.,* 449 F.2d 1296 (5th Cir. 1971); *United States v. Kaufman,* 311 F.2d 695, 698–699 (2d Cir. 1963); *Gilmore v. United States,* 264 F.2d 44, 47 (5th Cir. 1959). Permitting declaratory judgment actions in this context would permit collateral attack on a trial court's rulings even before they are ripe for direct appeal. "The correctness of a trial·court's rejection even of a constitutional claim made by the accused in the process of prosecution must await his conviction before its reconsideration by an appellate tribunal." *Cobbledick v. United States,* 309 U.S. 323, 325–326, 60 S.Ct. 540, 541, 84 L.Ed. 783 (1948); see also *Abney v. United States,* 431 U.S. 651, 662–663, 97 S.Ct. 2034, 2041–2042, 52 L.Ed.2d 651 (1977); *Wilkinson v. United States,* 601 F.2d 791 (5th Cir. 1978); *Gilmore v. United States, supra; United States v. Becton,* 498 F.Supp. 1013, 1019–1025 (S.D.Tex.1980). A mistrial declaration postpones the possibility of conviction until a retrial, if indeed there will be one. Cf. *Oregon v. Kennedy,* —— U.S. ——, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982).

A mistrial declaration often reflects a determination by the court that the proceeding has become infected by prejudicial error, whatever the error may be. See *e.g., Arizona v. Washington,* 434 U.S. 497, 510–517, 98 S.Ct. 824, 832–836, 54 L.Ed.2d 717 (1978).[52] A declaratory judgment here finding that which has already been found is needless.

Finally, as the Court of Appeals for the Eighth Circuit observed in a similar case,

> Thus, we are not presented with a case in which declaratory judgment will serve some purpose, such as the declaration of

---

**52.** Plaintiff nowhere asserts that the court's finding of sufficient error to justify a mistrial in

*Martinez* was wrong. Compare *McNeal v. Hallowell,* 481 F.2d 1145, 1152 (5th Cir. 1973).

the unconstitutionality of certain specifically enumerated statutes authorizing the complained of action.... Rather, from the face of the pleadings, we conclude that the declaratory relief portion of plaintiff's prayer is no more than an implicit predicate to his request for damages. Since we have previously found Judge Ahlgrimm to be immune from the damage claim asserted, we fail to ascertain any remaining case or controversy to be resolved by declaratory judgment.

*Hansen v. Ahlgrimm,* 520 F.2d 768, 770 (8th Cir. 1975) (citation omitted).

 The plaintiff's claims for equitable relief are also dismissed for failure to state a claim, but upon somewhat different grounds. In the prayer for relief of each of the complaints 22 counts, plaintiff asks for "an injunction against continued conduct by the named and unnamed defendants of a similar nature."

Though the Supreme Court has "never held that judicial immunity absolutely insulates judges from declaratory or injunctive relief with respect to their judicial acts," *Supreme Court of Virginia v. Consumers Union,* 446 U.S. 719, 735, 100 S.Ct. 1967, 1976, 64 L.Ed.2d 641 (1980), it does not follow that a complaint for injunctive relief may survive a Rule 12(b)(6), no matter how broadly it is worded. "The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 506–507, 79 S.Ct. 948, 954, 3 L.Ed.2d 988 (1959).

 "[H]istorically, and even today, the main prerequisite to obtaining injunctive relief is a finding that plaintiff is being threatened by some injury for which he has no adequate legal remedy." 11 C. Wright & A. Miller, Federal Practice and Procedure § 2942, at 368–369 (1973). As explained years ago by Justice Baldwin:

There is no power the exercise of which is more delicate, which requires greater caution, deliberation, and sound discretion, or more dangerous in a doubtful case, than the issuing of an injunction; it is the strong arm of equity, that never

ought to be extended unless to cases of great injury, where courts of law cannot afford an adequate or commensurate remedy in damages. The right must be clear, the injury impending or threatened, so as to be averted only by the protecting preventive process of injunction: ... It will be refused till the courts are satisfied that the case before them is of a right about to be destroyed, irreparably injured, or great and lasting injury about to be done by an illegal act; in such a case the court owes to its suitors and its own principles, to administer the only remedy which the law allows to prevent the commission of such act.

*Bonaparte v. Camden,* 3 Fed.Cas. 821, 827 (C.C.D.N.J.1830) (No. 1,617). To secure issuance of injunctive relief, a plaintiff "must demonstrate that there is a real danger that the act complained of actually will take place. There must be more than a mere possibility or fear that the injury will occur." 11 C. Wright & A. Miller, Federal Practice & Procedure § 2942 at 369 (1973). An injunction "will not be granted against something merely feared as liable to occur at some indefinite time in the future." *State of Connecticut v. Commonwealth of Massachusetts,* 282 U.S. 660, 674, 51 S.Ct. 286, 291, 75 L.Ed. 602 (1931); see also *General Fireproofing Co. v. Wyman,* 444 F.2d 391 (2d Cir. 1971).

The power to grant injunctive relief should never be exercised merely to assuage fears of what may happen in the future.

*Roseboro v. Fayetteville City Board of Education,* 491 F.Supp. 110, 112 (E.D.Tenn. 1978); see also *Continental Baking Co. v. Woodring,* 286 U.S. 352, 367–369, 52 S.Ct. 595, 600, 76 L.Ed. 1155 (1932).

We must protect that which is protectable, but, in so doing, we must limit the use of injunctive relief to situations where it is necessary to prevent immediate and irreparable injury. The dramatic and drastic power of injunctive force may be unleashed only against conditions generating a presently existing actual threat; it may not be used simply to eliminate a

possibility of a remote future injury, or a future invasion of rights, . . .

*Holiday Inns of America, Inc. v. B & B Corp.,* 409 F.2d 614, 618 (3d Cir. 1969).

An allegation as to the existence of irreparable injury is "an essential prerequisite for traditional equity jurisdiction." *United States v. American Friends Service Comm.,* 419 U.S. 7, 11, 95 S.Ct. 13, 15, 42 L.Ed.2d 7 (1974) (per curiam); see also *O'Shea v. Littleton,* 414 U.S. 488, 502, 94 S.Ct. 669, 679, 38 L.Ed.2d 674 (1974); *Boys Markets, Inc. v. Retail Clerks Union, Local 720,* 398 U.S. 235, 254, 90 S.Ct. 1583, 1594, 26 L.Ed.2d 199 (1970); *Detroit News Pub. Ass'n v. Detroit Typo Union No. 18,* 471 F.2d 872, 876–877 (6th Cir. 1972). A complaint which "alleges neither irreparable damages nor the threat of irreparable damages or fact from which it may be concluded irreparable damages may ensue" plainly "does not state a claim for any injunctive relief." *Ogden River Water Users Ass'n v. Weber Basin Water Conservancy,* 238 F.2d 936, 942 (10th Cir. 1956). In *Carter v. City of Forth Worth,* 456 F.2d 572 (5th Cir. 1972), for example, the court held insufficient a complaint which challenged the Texas constitutional and statutory election laws and sought to prospectively enjoin "any other election" under those provisions.

> But the plaintiffs have not alleged that any particular election is now pending or will be pending at any time in the near future. Irreparable injury, an indispensable ingredient of injunctive relief, is purely speculative at this time and it was purely speculative at the time the federal suit was filed, at least as to unspecified future elections. We therefore hold that the portion of the plaintiff's complaint which looked to "any other election"

failed to state a request for injunctive relief that was ripe for constitutional decision, and that the district court had no jurisdiction to grant relief on that portion of the complaint.

*Id.,* 456 F.2d at 576. See also *Chacon v. Granata,* 515 F.2d 922 (5th Cir. 1972), *cert. denied* 423 U.S. 930, 96 S.Ct. 279, 46 L.Ed.2d 258.

The plaintiff herein seeks to enjoin "continued conduct . . . of a similar nature"[53] to that allegedly engaged in by the defendants at an earlier time. The complaint is barren of any allegation of threatened or imminent irreparable injury; its numerous accusing paragraphs speak in the past tense. As near as one can tell, Martinez is asking this Court to issue a generalized order to the effect of "Don't ever do that again!"— whatever "that" may have been. See also Hrg. Tr. at 45–46.

In that regard, the law is its own injunction, its own approximate body of obligatory rules.[54] Those who serve society as members and officers of its courts owe a solemn duty to respect and uphold those rules and to avoid prejudice to the rights of persons coming into the courts.

The complaint in this case in addressing equitable relief does nothing more than call for an ongoing audit by one federal district judge of the conduct of another. This is manifestly inappropriate, cf. *O'Shea v. Littleton,* 414 U.S. 488, 500–503, 94 S.Ct. 669, 678–679, 38 L.Ed.2d 674 (1974), especially in light of the more specific remedial procedures now available, see 28 U.S.C.A. § 372(c) (1982 supp.), and the general supervisory power of the Court of Appeals. See 16 C. Wright, et al., Federal Practice and Procedure §§ 3932–3936 (1977).[55]

---

53. The complaint technically speaks of "defendants of a similar nature." See Strunk & E. White, The Elements of Style 22 (2d ed. 1972). Injunctions, however, reach particular *conduct.*

54. Wormuth, "The Dilemma of Jurisprudence," in F. Wormuth, Essays in Law and Politics 5, 13 (Nelson & Sklar, eds. 1978).

55. Additionally, the Supreme Court has "never held that the performance of the duties of judicial, legislative, or executive officers, requires

or contemplates the immunization of otherwise criminal deprivations of constitutional rights. Cf. *Ex parte Virginia,* 100 U.S. 339 [25 L.Ed. 676] (1880). On the contrary, the judicially fashioned doctrine of official immunity does not reach 'so far as to immunize criminal conduct prescribed by an Act of Congress.' *Gravel v. United States,* 408 U.S. 606, 627 [92 S.Ct. 2614, 2628, 33 L.Ed.2d 583] (1972)." *O'Shea v. Littleton, supra,* 414 U.S. at 503, 94 S.Ct. at 679.

Lacking even the bare bones of constitutional or equitable sufficiency, the plaintiff's claims for injunctive relief against Judge Winner must be dismissed. Rule 12(b)(6), Federal Rules of Civil Procedure; *O'Shea v. Littleton, supra; Ogden River Water Users Ass'n v. Weber Basin Water Conservancy, supra; Carter v. City of Forth Worth, supra.*[56]

## VI. CLAIMS AGAINST THE FEDERAL PROSECUTORS

As against former United States Attorney Joseph Dolan,[57] Assistant United States Attorneys Susan Roberts, Jan Chapman, John Barksdale and former Assistant U. S. Attorney Dan Christopher, the material allegations of the complaint seem to be (1) that the federal prosecutors failed to make an adequate independent investigation of the case against the plaintiff before submitting it to the grand jury; (2) that the federal prosecutors participated in a conspiracy with Judge Winner to wrongfully convict and imprison the defendant, or to otherwise violate his civil rights; and (3) that they failed to immediately inform Martinez' defense counsel of the nature and substance of the January 29 meeting with Judge Winner.

As against these claims, the U. S. Attorney-defendants raise the defense of absolute immunity and also attack the substantive merit of each allegation.

That prosecuting attorneys are absolutely immune from suit arising out of actions within the prosecutorial function is a question well-settled at common law. In *Yaselli v. Goff,* 12 F.2d 396 (2d Cir. 1926), for example, the Court of Appeals for the Second Circuit held that an assistant United States Attorney General

> in the performance of the duties imposed upon him by law, is immune from a civil action for malicious prosecution based on an indictment and prosecution, although it results in a verdict of not guilty rendered by a jury. The immunity is absolute, and is grounded on principles of public policy.

*Id.,* 12 F.2d at 406. The *Yaselli* opinion was affirmed by the Supreme Court, 275 U.S. 503, 48 S.Ct. 155, 72 L.Ed. 395 (1927) (per curiam) and its holding was reiterated in *Gregoire v. Biddle,* 177 F.2d 579 (2d Cir. 1949), ironically, a case cited by the plaintiff for the opposite view. See Hrg. Tr. at 49–50. In *Gregoire,* the court capsulized the difficult questions involved:

> In this instance, it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation.

*Id.,* 177 F.2d at 581; see also *Imbler v. Pachtman,* 424 U.S. 409, 421–424 & nn. 18–21, 96 S.Ct. 984, 990–992 & nn. 18–21, 47 L.Ed.2d 128 (1976).

The effect of the enactment of the Civil Rights Acts on common-law prosecutorial immunity was raised and answered as to state prosecutors in *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), and effectively answered as to *Bi-*

---

**56.** Counsel for plaintiff argues that a 12(b)(6) hearing is an inappropriate forum for a discussion of remedies, Hrg. Tr. at 48. Cf. *Build of Buffalo, Inc. v. Sedita,* 441 F.2d 284, 288 (2d Cir. 1971). To survive such a motion, the complaint must at least allege the basic requisites of the granting of remedies, esp. when dealing with injunctions. See *Boyle v. Landry,* 401 U.S. 77, 81, 91 S.Ct. 758, 760, 27 L.Ed.2d 696 (1971); *O'Shea v. Littleton, supra,* 414 U.S. at 502, 94 S.Ct. at 679. A fatally defective complaint is required to be dismissed. See *Curtis v. Utah Fuel Co.,* 59 F.Supp. 680 (D.N.J.1944), *affirmed* 148 F.2d 340 (3d Cir. 1945), *cert. denied* 326 U.S. 724, 66 S.Ct. 29, 90 L.Ed. 429 (1945). A 12(b)(6) motion tests for the lack of essential requisites and the existence of fatal

defects. See 2A Moore's Federal Practice ¶ 12.08 (2d ed. rev. 1982). A complaint stating a *Bivens*-type action "might nevertheless be dismissed under Rule 12(b)(6) unless it can be determined that judicial relief is available." *Davis v. Passman,* 442 U.S. 228, 244, 99 S.Ct. 2264, 2276, 60 L.Ed.2d 846 (1979).

**57.** Defendant Joseph Dolan's motion to dismiss on grounds of insufficient service of process, which was argued at the hearing, has since been withdrawn. See Defendant's Withdrawal & Substitution of Defense (July 23, 1982). The substitute defense raised by Dolan has not been considered by this Court.

*vens*-type actions against federal prosecutors in *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978).

In *Imbler,* the plaintiff sought to recover damages, charging that the prosecuting attorney had knowingly used false testimony and had suppressed material evidence at the plaintiff's criminal trial. Rejecting that claim, the United States Supreme Court expressly held that "in initiating a prosecution and in presenting the State's case, the prosecutor is immune from a civil suit for damages under § 1983." *Id.,* 424 U.S. at 431, 96 S.Ct. at 995. Further, it appears in *Imbler* that absolute immunity was accorded the prosecutor's acts not because he was a prosecutor *per se,* but because the activities were functionally related to the judicial process. The Court of Appeals found, and the Supreme Court affirmed, that the prosecutor's "activities were intimately associated with the judicial phase of the criminal process, and thus were functions to which the reasons for absolute immunity apply with full force." *Id.,* 424 U.S. at 430, 96 S.Ct. at 994.

> The common-law immunity of a prosecutor is based upon the same considerations that underlie the common-law immunities of judges and grand jurors acting within the scope of their duties. These include concern that harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust. . . .
>
> A prosecutor is duty bound to exercise his best judgment both in deciding which suits to bring and in conducting them in court. The public trust of the prosecutor's office would suffer if he were constrained in making every decision by the consequences in terms of his own potential liability in a suit for damages. Such suits could be expected with some frequency, for a defendant often will transform his resentment at being prosecuted into the ascription if improper and malicious actions to the State's advocate. . . .

*Id.,* 424 U.S. at 422–423, 424, 425, 96 S.Ct. at 991, 992 (footnotes & citations omitted).

Holding prosecutors to be answerable in damages for their errors in trial preparation and performance would often divert their attention from the duties of their office to their own defense:

> The prosecutor's possible knowledge of a witness' falsehoods, the materiality of evidence not revealed to the defense, the propriety of a closing argument, and—ultimately in every case—the likelihood that prosecutorial misconduct so infected a trial as to deny due process, are typical of issues with which judges struggle in actions for post-trial relief, sometimes to differing conclusions. The presentation of such issues in a § 1983 action would often require a virtual retrial of the criminal offense in a new forum, and the resolution of some technical issues by the lay jury . . . frequently acting under serious constraints of time and even information, a prosecutor inevitably makes many decisions that could engender colorable claims of constitutional deprivation. Defending these decisions, often years after they were made, could impose unique and intolerable burdens upon a prosecutor responsible annually for hundreds of indictments and trials.

*Id.,* 424 U.S. at 425–426, 96 S.Ct. at 992–993 (footnote omitted). As further explained in *Imbler,* subjecting prosecutors to personal liability would heavily burden their otherwise wide discretion in the presentation of evidence. The trier of fact may often be denied the benefit of relevant evidence if a prosecutor fears liability for a witness that may be of less than absolute veracity. *Id.*

The right to a fair trial before an impartial jury is deemed to be a fundamental element of due process of law. See *e.g., Singer v. United States,* 380 U.S. 24, 36, 85 S.Ct. 783, 790, 13 L.Ed.2d 630 (1965); *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955); *United States v. Crow Dog,* 532 F.2d 1182, 1187 (8th Cir. 1976), *cert. denied* 430 U.S. 929, 97 S.Ct. 1547, 51 L.Ed.2d 772 (1977). Like the question of judicial error or misconduct, there

are adequate post-trial legal remedies for alleged prosecutorial error or misconduct, and for determining whether in fact a fair trial has been held.

> These procedures include the remedial powers of the trial judge, appellate review, and state and federal post-conviction collateral remedies. In all of these the attention of the reviewing judge or tribunal is focused primarily on whether there was a fair trial under law. This focus should not be blurred by even the subconscious knowledge that a post-trial decision in favor of the accused might result in the prosecutor's being called upon to respond in damages for his error or mistaken judgment.

*Imbler v. Pachtman, supra,* 424 U.S. at 427, 96 S.Ct. at 993 (footnote omitted).[58]

Superimposing the civil damages remedy on this time-tested and well-balanced system of post-trial remedies would serve no need now unmet. It might even prove counterproductive. A prosecutor whose perspective is skewed by the spectre of personal liability might be more prone to conceal evidence suggesting innocence or mitigation, particularly following an initial conviction. Cf. ABA Code of Professional Responsibility SEC 7–13 (1969); *Imbler v. Pachtman, supra,* 424 U.S. at 427 n.25, 96 S.Ct. at 993 n.25. Taken together, the *Imbler* court found the potential harm of allowing § 1983 liability to plainly outweigh the benefits, and held state prosecutors to be immune from suit for conduct in the initiation and prosecution of a criminal case.

That an equivalent immunity is available to federal prosecuting attorneys seems evident from a reading of *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), decided two years after *Imbler.*

Finding it untenable to draw a distinction between suits under § 1983 against state officials and direct actions under the Constitution against federal officers, the Supreme Court held that federal prosecutors, including those who serve that function in administrative agencies, are absolutely immune. *Id.,* 438 U.S. 512–517, 98 S.Ct. at 2913–2916. In so holding, the Court re-emphasized the functional purposes of the bar of absolute immunity:

> The cluster of immunities protecting the various participants in judge-supervised trials stems from the characteristics of the judicial process.... As the *Bradley* court suggested, 13 Wall., at 318–349,[59] controversies sufficiently intense to erupt in litigation are not easily capped by a judicial decree. The loser in one forum will frequently seek another, charging the participants in the first with unconstitutional animus. See *Pierson v. Ray,* 386 U.S. at 554 [87 S.Ct. at 1217]. Absolute immunity is thus necessary to assure that judges, advocates, and witnesses can perform their respective functions without harassment or intimidation.

*Id.,* 438 U.S. at 512, 98 S.Ct. at 2913. *Butz* applies the full force of *Imbler* to immunize federal prosecutors from *Bivens*-type liability for their "prosecutorial" acts.

> To be sure, this immunity does leave the genuinely wronged defendant without civil redress against a prosecutor whose malicious and dishonest action deprives him of liberty. But the alternative of qualifying a prosecutor's immunity would disserve the broader public interest. It would prevent the vigorous and fearless performance of the prosecutor's duty that is essential to the proper functioning of the criminal justice system....

---

**58.** Prosecutors, like judges, are not immune to liability under the criminal provisions of the civil rights laws, *e.g.,* 18 U.S.C. § 242 (1976), *id.,* 424 U.S. at 429, 96 S.Ct. at 994; *O'Shea v. Littleton,* 414 U.S. 488, 503, 94 S.Ct. 669, 679, 38 L.Ed.2d 674 (1974), and further may be held accountable for misconduct by the professional association of their peers. See ABA Code of Professional Responsibility § DR 7–102 (1969).

Counsel for plaintiff queries, "who will prosecute the prosecutor?" Brief in Response, at 34

N. 26. When called upon, the system works, and works well. *E.g., United States v. Mitchell,* 410 F.Supp. 1201 (D.D.C.1976), *affirmed sub nom. United States v. Haldeman,* 559 F.2d 31 (D.C.Cir.1976), *cert. denied sub nom. Mitchell v. United States,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977).

**59.** *Bradley v. Fisher,* 80 U.S. (13 Wall.) 335, 20 L.Ed. 646 (1872).

*Imbler v. Pachtman, supra,* 424 U.S. at 427–428, 96 S.Ct. at 993–994 (footnote omitted). There is thus no "name-clearing" civil retrial of a criminal charge in a damages suit against a United States Attorney or his assistants. There is no recovery of civil damages—particularly when, as here, the prosecutors' alleged misconduct has *not* deprived a defendant of his liberty.

In both *Butz* and *Imbler,* the Court left open the question whether prosecuting attorneys are absolutely immune for their "administrative" or "investigative" acts, i.e., for those actions which are not "intimately associated with the judicial phase of the criminal process." *Imbler v. Pachtman, supra,* 424 U.S. at 430–431, 96 S.Ct. at 994–995; *Butz v. Economou, supra,* 438 U.S. at 511 n. 37, 98 S.Ct. at 2913 n. 37. A number of court of appeals decisions have held a prosecutor's investigative or administrative acts to be the subject of a qualified "good faith" immunity rather than a quasi-judicial absolute immunity. See *e.g., Guerro v. Mulhearn,* 498 F.2d 1249, 1256 (1st Cir. 1974); *Dodd v. Spokane County,* 393 F.2d 330 (9th Cir. 1968); *Robichaud v. Ronan,* 351 F.2d 533, 537 (9th Cir. 1965). Indeed, several of the cases cited by plaintiff's counsel in support of the complaint are classic examplars if this distinction. *Hampton v. Hanrahan,* 600 F.2d 600 (7th Cir. 1979),[59A] for example, applied a qualified immunity to participation by state district attorneys in an unlawful police raid on an apartment. Such actions were wholly outside of the judicial phase of a criminal prosecution. Compare *Heidelberg v. Hammer,* 577 F.2d 429 (7th Cir. 1978). *Briggs v. Goodwin,* 569 F.2d 10 (D.C.Cir.1977), *cert. denied* 437 U.S. 904, 98 S.Ct. 3089, 57

L.Ed.2d 1133 (1978), cited for the proposition that a prosecutor's "lying is not immune," Hrg. Tr. at 54, dealt with allegations that a Justice Department attorney had perjured himself while testifying as a witness. Following extensive analysis of the relevant case law, the Court of Appeals in *Briggs* determined that "appellant's false statement to the federal district court in Florida is properly characterized as an act of investigation rather than advocacy." Such conduct "bears no relation whatever to the advocate's role as conceived by the Supreme Court in *Imbler.*" *Id.,* 569 F.2d at 21. A third cited case, *Apton v. Wilson,* 165 U.S.App.D.C. 22, 506 F.2d 83 (1974), held that officials of the Justice Department were entitled only to a qualified immunity in connection with their policy-making and supervisory participation in the arrest and detention of demonstrators during the "May Day Demonstrations" of 1971. A fourth, *Littleton v. Berbling,* 468 F.2d 389 (7th Cir. 1922),[60] also recognizes and applies this distinction, *id.,* 468 F.2d at 410–412, as do more recent cases not referred to in the brief. See *e.g., Brawer v. Horowitz,* 535 F.2d 830, 834 (3d Cir. 1976); *Lee v. Willins,* 617 F.2d 320, 321 (2d Cir. 1980); *Forsyth v. Kliendienst,* 599 F.2d 1203 (3d Cir. 1979); *Slavin v. Curry,* 574 F.2d 1256, 1264–1265, *modified* 583 F.2d 779 (5th Cir. 1978).

The question in this case, therefore, distills to an inquiry whether the defendants' actions as set forth in the complaint describe "investigative" or "administrative" conduct, or describe actions which are intrinsically related to the initiation and prosecution of a criminal case.[61] *Imbler* and *Butz* leave to the courts the task of discerning what is "investigative," "administra-

---

**59A.** The Supreme Court reversed *Hampton* insofar as it awarded 42 U.S.C. § 1988 attorneys fees prior to a final disposition of the merits. *Hanrahan v. Hampton,* 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980) (per curiam). The Court of Appeals' opinion remains otherwise intact.

**60.** As noted *supra* note 26, *Berbling* was reversed and vacated on other grounds by the United States Supreme Court. See *O'Shea v. Littleton,* 414 U.S. 488, 514, 94 S.Ct. 669, 685, 38 L.Ed.2d 674 (1974); *Spomer v. Littleton,* 414

U.S. 514, 523, 94 S.Ct. 685, 690, 38 L.Ed.2d 694 (1974).

**61.** In *Imbler,* the court observed that "[p]reparation, both for the initiation of the criminal process and for a trial, may require the obtaining, reviewing, and evaluating of evidence," *id.,* 424 U.S. at 431 n. 33, 96 S.Ct. at 995 n. 33, which is at least to a degree, "investigative." See *Forsyth v. Kleindienst,* 599 F.2d 1203, 1215 (3d Cir. 1979).

tive," or "judicial" about a prosecutor's behavior. In *Imbler,* Justice Powell observed that "[d]rawing a proper line between these functions may present difficult questions ..." *Id.,* 424 U.S. at 431 n. 33, 96 S.Ct. at 995 n. 33.

A practical analytical approach to this inquiry has been formulated by Judge Nickerson of the U. S. District Court for the Eastern District of New York. In approving that approach, the Court of Appeals for the Second Circuit described it as follows:

> We believe Judge Nickerson sensibly distinguished these two concepts in his opinion below. Although he recognized that prosecutorial and investigatory activities are necessarily interrelated to some degree, he separated them for purposes of applying the *Imbler* test for triggering the defense of absolute immunity *by reference to the type of harm allegedly suffered.* We endorse this useful and sensible approach. *Under this analysis, a prosecutor is immune from a suit to recover for an injury arising solely from the prosecution itself—e.g.,* being compelled to stand trial or to suffer imprisonment or pretrial detention. Such harm must always result in substantial part from the protected prosecutorial· activities of initiating prosecution or presenting the state's case. *Imbler v. Pachtman,* 424 U.S. at 409, 96 S.Ct. at 985.
>
> *Where the alleged harm is inflicted independently of the prosecution, however, absolute immunity will not attach. See Hampton v. Hanrahan, supra.* If, for example, a prosecutor violates the Fourth Amendment by conducting an illegal search, the victim is harmed by the invasion of his zone of privacy, whether or not the evidence unlawfully obtained is introduced at trial. Redress for this harm is not barred by *Imbler. See J. D. Pflaumer, Inc. v. United States Department of Justice,* 450 F.Supp. 1125 (E.D.Pa.1978).

*Lee v. Willins,* 617 F.2d 320, 322 (2d Cir. 1980) (emphasis added).

In the *Lee* case the alleged injuries were five years' imprisonment, "subjection to the ordeal of multiple trials, and the emotional and economic injury resulting therefrom." The Court of Appeals held that "[t]hese are precisely the alleged injuries for which *Imbler* granted absolute immunity." *Id.,* 617 F.2d at 322.

Use of the *Lee v. Willins* analysis was recently reaffirmed by the same court in *Taylor v. Kavanagh,* 640 F.2d 450, 453 (2d Cir. 1981), and harmonizes with the definitions applied by the Tenth Circuit, see *Taylor v. Nichols,* 558 F.2d 561, 565–566 (10th Cir. 1977), and by other courts. Compare *Briggs v.. Goodwin, supra,* 569 F.2d at 19– 20; *Hampton v. Hanrahan, supra,* 600 F.2d at 631–633; *Henzel v. Gerstein,* 608 F.2d 654, 657 (5th Cir. 1979); *Brewer v. Horowitz,* 535 F.2d 830, 834 (3d Cir. 1975); *Forsyth v. Kleindienst,* 599 F.2d 1203, 1213– 1215 (3d Cir. 1979); *Jarvis v. Roberts,* 489 F.Supp. 924, 928 (W.D.Tex.1980); see generally 8A West's Federal Practice Digest 2d 496–514 (1980); *id.,* 1981 Supp., at 69–72 (1981).

A review of the complaint reveals no alleged harm inflicted by the defendants which was inflicted independently from the prosecution of the *Martinez* case. Plaintiff seeks to recover for the expense and stress of being compelled to face trial, mistrial and the commencement of a retrial.[62] Whether one considers the alleged failure to separately investigate the charges made in the indictment, or the purported "cover up" of the "real" reasons for the January 30th confession of mistrial, or even the purported conspiracy to "railroad" the plaintiff as concocted at the January 29th meeting with Judge Winner, one finds each claim to be "intimately associated with the judicial phase of the criminal process," *Imbler v. Pachtman, supra,* 424 U.S. at 430, 96 S.Ct. at 994, be it in the initiation phase or the

---

**62.** At hearing, counsel for plaintiff responded to this Court's inquiry by identifying emotional, economic and reputational harms that were

directly connected to the *Martinez* indictment and mistrial. See Hrg. Tr. at 14–15, 39–40, 96–99, 137.

orchestration of the Government's case at trial.[63]

▮ Dolan, Roberts, Chapman, Barksdale and Christopher participated in no *Hampton*-style raid, or any other similar conduct outside of the specific context of the *Martinez* prosecution—at least no such conduct is alleged in the complaint. Every allegation involves "a prosecutor's decision with respect to the initiation and conduct of particular cases." *Briggs v. Goodwin,* 569 F.2d 10, 20 (D.C.Cir.1977). The plaintiff's claims against these defendants are appropriately dismissed on the grounds of absolute immunity.[64] See also *Norton v. Liddel,* 620 F.2d 1375, 1379 (10th Cir. 1980); *Collins v. Cundy,* 603 F.2d 825, 827 (10th Cir. 1979) (per curiam); *Martinez v. Chavez,* 574 F.2d 1043, 1044 (10th Cir. 1978); *Taylor v. Nichols, supra,* 558 F.2d at 565–566; *Kostal v. Stoner,* 292 F.2d 492, 493 (10th Cir. 1961); *Keating v. Martin,* 638 F.2d 1121 (8th Cir. 1980) ("conspiratorial" meeting between attorneys and judge subject to absolute immunity) (per curiam).

In its *Martinez* opinion, the Court of Appeals for the Tenth Circuit found that "[t]he government's failure to disclose the [Jan. 29] meeting to defense counsel and its misrepresentation as to the grounds for mistrial were obviously improper. The conduct surrounding the government's motion was not ordinary error." *Id.,* 667 F.2d at 890 (footnote omitted). Using this language as a springboard,[65] plaintiff asserts that a gross abuse of prosecutorial authority falls beyond the scope of the immunity doctrine. At argument, counsel urged that there is no immunity from suit for violation of the ABA Code of Professional Responsibility, citing *Hilliard v. Williams,* 465 F.2d 1212 (6th Cir. 1972) as authority. See Hrg. Tr. at 62. In *Hilliard,* the Court of Appeals held that a prosecutor stepped beyond the protection of absolute immunity by knowingly suppressing an F.B.I. report on a seemingly bloodstained article of clothing, a report which exonerated the defendant. The failure to disclose evidence which is material to the question of a defendant's innocence amounts to a denial of constitutional due process, see *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), as does the knowing use of false

---

**63.** While consideration of hidden cameras in the courtroom is to some extent "administrative," plaintiff alleges no agreement by the federal prosecutors, no overt act by them, nor any injury resulting from the cameras which were never installed. See pp. 305–306, *supra.* In a supplemental memorandum dated July 24, 1982, counsel for plaintiff cites *Forsyth v. Kleindienst,* 599 F.2d 1203, 1209–1216 (3d Cir. 1979), for the proposition that the discussion of courtroom cameras is beyond the reach of absolute immunity. Nothing in *Forsyth* prescribes liability without allegation of act and injury. Further, the *Forsyth* opinion observes that a prosecutor's decision to authorize warrantless electronic surveillances "is protected by the shield of absolute immunity when it is made in the context of a quasi-judicial function." *Id.,* 599 F.2d at 1215.

Finally, *Forsyth* dealt with warrantless wiretaps on private telephones. The expectations of privacy that attach to a private telephone are obvious. See *e.g., Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). In contrast, what expectation of privacy attaches to one's presence in a public courtroom? Cf. *Globe Newspaper Co. v. Superior Court,* —— U.S. ——, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982).

**64.** In *Imbler* the Court notes that "[t]he procedural difference between the absolute and the qualified immunities is important. An absolute immunity defeats a suit at the outset, so long as the official's actions were within the scope of the immunity." *Id.,* 424 U.S. at 419 n. 13, 96 S.Ct. at 989 n. 13. Counsel for plaintiff contests this, asserting that a 12(b)(6) dismissal would be inappropriate prior to complete discovery. Plaintiff's Brief in Response, at 29–30, citing *Hospital Building Co. v. Rex Hospital Trustees,* 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976) as authority precluding dismissal. The *Hospital Building* case does *not* preclude dismissal; it advises that it be granted "very sparingly" in certain antitrust conspiracy cases. *Id.,* 425 U.S. at 746, 96 S.Ct. at 1853.

In civil rights actions against federal judges and prosecutors, the Supreme Court has expressed the proper approach:

Insubstantial lawsuits can be quickly terminated by federal courts alert to the possibilities of artful pleading. Unless the complaint states a compensable claim for relief under the Federal Constitution, it should not survive a motion to dismiss. . . .

*Butz v. Economou, supra,* 438 U.S. at 507–508, 98 S.Ct. at 2911.

**65.** See Plaintiff's Brief in Response, at 34 n. 25.

evidence. See *Miller v. Pate,* 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967). *Hilliard* was understood to impose liability for "gross abuse of the prosecutorial function" of *Brady* or *Miller* calibre. See *e.g., Atkins v. Lanning,* 556 F.2d 485, 488 (10th Cir. 1977). Nothing in *Hilliard* indicated that violation of the ABA disciplinary rules *per se* avoids the effect of absolute immunity.[66]

Subsequent to *Hilliard,* the Supreme Court decided *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), immunizing from damages liability a prosecutor's knowing use of perjured testimony, a clear violation of *Miller v. Pate, supra.* How then does *Hilliard* stand in relation to *Imbler?* Once again, counsel for the plaintiff stands upon vacant authority in asserting an argument: in the second appeal in *Hilliard,* 516 F.2d 1344, certiorari was granted by the Supreme Court, which *vacated and remanded* that action for reconsideration in light of *Imbler. Williams v. Hilliard,* 424 U.S. 961, 96 S.Ct. 1453, 47 L.Ed.2d 729 (1976) (order). On remand, the Court of Appeals for the Sixth Circuit directed that the complaint be dismissed pursuant to the rule set forth in *Imbler. Hilliard v. Williams,* 540 F.2d 220, 221 (6th Cir. 1976). Counsel, however, has made no reference to the subsequent history of the *Hilliard* litigation and its consequent lack of precedential value.

While three justices of the *Imbler* Court would have adopted an "egregious conduct" exception to absolute immunity for unconstitutional withholding of *Brady* material, see *Imbler, supra,* 424 U.S. at 432–447, 96 S.Ct. at 996–1003, that view did not prevail, and is not now the law. *Id.,* 424 U.S. at 431–332 n. 33, 96 S.Ct. at 996 n. 33.

The defendants' failure to inform Martinez' defense counsel of the January 29 meeting was held to be seriously improper under the circumstances in *Martinez.* The prohibition of retrial was found to be an appropriate remedy.[67] Plaintiff's argument that a private damages remedy is also available is wholly without merit. See *Hilliard v. Williams, supra,* 540 F.2d at 221.

At the periphery of the defendants' prosecutorial immunity, plaintiff avers that the federal prosecutors negligently failed to independently investigate the charges against him before deciding to seek a grand jury indictment. In effect, plaintiff argues that the defendants owed him a duty to do an adequate independent investigation. Although civil rights claims have been described as "a species of tort liability," *Imbler v. Pachtman,* 424 U.S. 409, 417, 96 S.Ct. 984, 988, 47 L.Ed.2d 128 (1976), "it is perfectly clear that not every injury in which a state [or federal] official has played some

**66.** The Supreme Court has described the actions dealt with in *Miller v. Pate* and *Brady v. Maryland* as "egregious conduct held ... to amount to a denial of constitutional due process" as opposed to "ordinary trial error." *Donnelly v. DeChristoforo,* 416 U.S. 637, 647–648, 94 S.Ct. 1868, 1873, 40 L.Ed.2d 431 (1974). *Hilliard* on its facts reflected an obvious failure to produce *Brady* material. See *Hilliard v. Williams,* 516 F.2d 1344, 1349–1350 (6th Cir. 1975).

**67.** It is not clear that the United States Attorney is duty bound to disclose the substance of such a meeting under all possible circumstances. An *ex parte* communication, though woefully improper, is not evidence material to the defendant's innocence within the meaning of *Brady v. Maryland, supra.* See *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Cf. *Imbler v. Pachtman, supra,* 424 at 432 n. 33, 96 S.Ct. at 996 n. 33. It is indeed difficult to say that on January 29, 1981, the defendants "knew or should have known" that nondisclosure of non-*Brady* material amounted

to a constitutional violation. See *Harlow v. Fitzgerald,* —— U.S. ——, ——, 102 S.Ct. 2727, 2739, 73 L.Ed.2d 396 (1982). Officers exercising discretion can be held liable for damages only for conduct violating "clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.;* see *Procunier v. Navarette,* 434 U.S. 555, 565, 98 S.Ct. 855, 861, 55 L.Ed.2d (1978); *Wood v. Strickland,* 420 U.S. 308, 321, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214 (1975).

Nothing in *Briggs v. Goodwin,* 569 F.2d 10 (D.C.Cir.1977) or *Halperin v. Kissinger,* 606 F.2d 1192, 1208–1214 (D.C.Cir.1979), *affirmed by equally divided court* 452 U.S. 713, 101 S.Ct. 3132, 69 L.Ed.2d 367 (1981), adds any force to plaintiff's case. Though cited by counsel in a supplemental memorandum dated July 24, 1982 as dealing with "cover-up" (i.e., the failure to disclose in violation of a duty to disclose), nothing in these cases deals with a prosecutor's nondisclosure of non-*Brady* information.

part is actionable" under the Civil Rights Acts, *Martinez v. California,* 444 U.S. 277, 285, 100 S.Ct. 553, 559, 62 L.Ed.2d 481 (1980), or directly under the Constitution. Cf. *Davis v. Passman,* 442 U.S. 228, 248, 99 S.Ct. 2264, 2278, 60 L.Ed.2d 846 (1979).

The first question is whether the plaintiff asserts a constitutionally protected right. See *Butz v. Economou, supra,* 438 U.S. at 504, 98 S.Ct. at 2909. Plaintiff cites no legal authority holding that the United States Attorney owes such a constitutional duty of independent investigation; the courts which have previously considered the claim have denied it. *Halpern v. City of New Haven,* 489 F.Supp. 841 (D.Conn.1980) and *Hall v. Flathead County Attorney,* 478 F.Supp. 644 (D.Mont.1979), held such claims to be within the scope of *Imbler* immunity:

> The problem of what evidence to believe, what evidence to present, what avenues of inquiry to pursue, and what cases to file, lie at the heart of the prosecutorial function, and decisions as to them are the kinds which ought not be the subject matter of second-guessing in a civil rights action.

*Hall v. Flathead County Attorney, supra,* 478 F.Supp. at 645; accord, *Halpern v. City of New Haven, supra,* 489 F.Supp. at 843. See also *Henzel v. Gerstein,* 608 F.2d 654, 657 (5th Cir. 1979). Most recently in *Gray v. Bell,* 542 F.Supp. 927 (D.D.C.1982), the U. S. District Court for the District of Columbia rejected an almost identical claim:

> By alleging here that defendants' negligence in conducting the pre-indictment investigation legally caused subsequent violations of his Fifth Amendment rights, Gray assumes that defendants owed him a duty under the Fifth Amendment to conduct a careful, thorough investigation before presenting evidence to the grand jury in their attempt to obtain his indictment. This assumption, however, is misplaced.
>
> Although defendants did owe Gray some duties during the course of their pre-indictment investigation, such as not to violate his Fourth Amendment rights, see *Halperin v. Kissinger,* 606 F.2d [1192] at 1208; *Apton v. Wilson,* 506 F.2d [83] at 93, defendants owed Gray no duty under the Fifth Amendment to conduct a careful, thorough pre-indictment investigation.

*Id.,* 542 F.Supp. at 930 (footnotes omitted).

The grand jury, not the United States Attorney's office, is the constitutionally provided forum for an independent pre-indictment evaluation of the evidence. "The very purpose of the requirement that a man be indicted by a grand jury is to limit his jeopardy to offenses charged by a group of his fellow citizens acting independently of either prosecuting attorney or judge." *Stirone v. United States,* 361 U.S. 212, 218, 80 S.Ct. 270, 273, 4 L.Ed.2d 252 (1960): accord, *United States v. Basurto,* 497 F.2d 781, 785 (9th Cir. 1974). The institution of the grand jury

> was adopted in this country, ... and is designed as a means not only of bringing to trial persons accused of public offenses upon just grounds, but also as a means of protecting the citizen against unfounded accusation, whether it comes from government, or be prompted by partisan passion or private enmity. No person shall be required, according to the fundamental law of the country, ... to answer for any of the higher crimes unless this body, consisting of not less than sixteen nor more than twenty-three good and lawful men, selected from the body of the district, shall declare, upon careful deliberation, under the solemnity of an oath, that there is good reason for his accusation and trial.

*Ex parte Bain,* 121 U.S. 1, 11, 7 S.Ct. 781, 786, 30 L.Ed. 849 (1887). As the Supreme Court more recently re-emphasized, "[t]he grand jury's historic functions survive to this day. Its responsibilities continue to include both the determination whether there is probable cause to believe a crime has been committed and the protection of citizens against unfounded criminal prosecutions. *Branzburg v. Hayes,* 408 U.S. 665, 686–687 [92 S.Ct. 2646, 2659, 33 L.Ed.2d 626] (1972)." *United States v. Calandra,* 414 U.S. 338, 343, 94 S.Ct. 613, 617, 38

L.Ed.2d 561 (1974). It is well-settled that when a duly constituted grand jury returns an indictment that is valid on its face, it "conclusively determines the existence of probable cause and requires issuance of an arrest warrant without further inquiry. *Ex parte United States,* 287 U.S. 241, 250 [53 S.Ct. 129, 131, 77 L.Ed. 283] (1932). See also *Giordenello v. United States,* 357 U.S. 480, 487 [78 S.Ct. 1245, 1250, 2 L.Ed.2d 1503] (1958)." *Gerstein v. Pugh,* 420 U.S. 103, 117 n. 19, 95 S.Ct. 854, 864 n. 19, 43 L.Ed.2d 54 (1975). No independent inquiry may be made to determine the adequacy of evidence considered by the grand jury in making its decisions. *Costello v. United States,* 350 U.S. 359, 361–364, 76 S.Ct. 406, 407–409, 100 L.Ed. 397 (1956). See also *Lawn v. United States,* 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958); *United States v. Blue,* 384 U.S. 251, 255, 86 S.Ct. 1416, 1419, 16 L.Ed.2d 510 (1966); *United States v. Calandra, supra,* 414 U.S. at 344–345, 94 S.Ct. at 618; cf. *United States v. Estepa,* 471 F.2d 1132 (2d Cir. 1972); *United States v. Bracy,* 566 F.2d 649, 655–656 (9th Cir. 1977). The United States Attorney owes the defendant no actionable duty to serve as a second grand jury;[68] and he will not be mulcted in damages for failing to second-guess federal and state law enforcement officers through the redundant device of an "independent" investigation.[69] A proper grand jury indictment stands as an independent preliminary affirmation of the prosecutor's decision to proceed, and "is enough to call for a trial of the charge on the merits and satisfies the requirements of the Fifth Amendment." *Lawn v. United States, supra,* 355 U.S. at 349, 78 S.Ct. at 317.[70]

The plain message of *Imbler, Butz,* and related cases is that judicial review of a prosecutor's conduct in initiating and pursuing a criminal proceeding is not available in the context of a private civil damages action, no matter whether it arises at common law, see *Yaselli v. Goff,* 12 F.2d 396 (2d Cir. 1926), *affirmed* 275 U.S. 503, 48 S.Ct. 155, 72 L.Ed. 395 (1927) (per curiam), under 42 U.S.C. § 1983, *Imbler v. Pachtman, supra,* § 1985, see *Kostal v. Stoner,* 292 F.2d 492, 493 (10th Cir. 1961); *Halpern v. City of New Haven,* 489 F.Supp. 841, 844 (D.Conn. 1980), § 1986, see *Hampton v. Hanrahan, supra,* 600 F.2d at 633 n. 31, or directly under the Constitution itself, *Butz v. Economou, supra.*

To say that the United States Attorney owes no actionable obligation of the kind asserted by the plaintiff does not mean that he owes no duty at all.

The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

---

**68.** Even if the complaint alleged prosecutorial misconduct in dealing with the grand jury, which it does not, the ultimate remedy would have been dismissal of the indictment, see *United States v. Serubo,* 604 F.2d 807 (3d Cir. 1979), not a private civil action for damages.

**69.** Even assuming *arguendo* a duty to make an adequate independent investigation is enforceable against a federal prosecutor through the mechanism of a private civil damages action, the action would seem to lie in favor of the victims of purported crimes, not the perpetra-

tors. Cf. *National Ass'n for the Advancement of Colored People v. Levi,* 418 F.Supp. 1109, 1116–1117 (D.D.C.1976), *dismissed* 76 F.R.D. 134 (1977).

**70.** The fact of grand jury indictment would present a formidable obstacle to a common-law malicious prosecution action, were one pleaded in the complaint. See Annot., 28 A.L.R.3d 748 (1969); *Konas v. Red Owl Stores,* 158 Colo. 29, 404 P.2d 546 (1965); Restatement (2) at Torts § 664 (1977). Counsel for plaintiff admitted as much at hearing. Hrg. Tr. at 137.

*Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). In the words of the late Justice William O. Douglas, "The function of the prosecutor under the Federal Constitution is not to tack as many skins of victims as possible to the wall. His function is to vindicate the right of people as expressed in the laws and give those accused of crime a fair trial." *Donnelly v. DeChristoforo,* 416 U.S. 637, 648–649, 94 S.Ct. 1868, 1873–1874, 40 L.Ed.2d 431 (1974) (Douglas, J. dissenting). As Justice Powell wrote for the court in *Imbler,* "A prosecutor is duty bound to exercise his best judgment both in deciding which suits to bring and in conducting them in court." *Id.,* 424 U.S. at 424, 96 S.Ct. at 992.

Far from a license for gross abuse, prosecutorial immunity is necessary insulation for the exercise of sound professional judgment.[71] The federal district courts and the courts of appeals stand ready to exercise their inherent supervisory powers in dealing with instances of prosecutorial misconduct. *Donnelly v. DeChristoforo, supra,* 416 U.S. at 648 n. 23, 94 S.Ct. at 1873 n. 23; *United States v. Banks,* 383 F.Supp. 389, 392 (D.S. D.1974).

Plaintiff's claims for declaratory and injunctive relief, though not barred by immunity, are as manifestly inappropriate as against the federal prosecutor-defendants as they were against Judge Winner. See pp. 309–312, *supra.* Those claims are likewise properly dismissed. See *O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974).

The plaintiff's common-law claims are addressed against these defendants are barred by prosecutorial immunity as well. *Butz v. Economou, supra,* 438 U.S. at 494–495 & nn. 21–22, 98 S.Ct. at 2904–2905 & nn. 21–22; *Sami v. United States,* 617 F.2d 755, 770–771 (D.C.Cir.1979); *Miller v. De-Laune,* 602 F.2d 198, 199–200 (9th Cir. 1979); *George v. Kay,* 632 F.2d 1103, 1105–1106 (4th Cir. 1980); *Owylee Grazing Ass'n, Inc. v. Field,* 637 F.2d 694, 697 (9th Cir. 1981); see also *Harlow v. Fitzgerald,* —— U.S. ——, 102 S.Ct. 2727, 2739, 73 L.Ed.2d 396 (1982).

## VII. CLAIMS UNDER 42 U.S.C. §§ 1981, 1985, 1986 and 1988

Plaintiff alleges a general claim for relief under 42 U.S.C. § 1981 (1976) against all of the defendants. That section reads:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

This section, a product of the 1866 and 1870 Civil Rights Acts, *Runyon v. McCrary,* 427 U.S. 160, 168–172 & n. 8, 96 S.Ct. 2586, 2593–2595 & n. 8, 49 L.Ed.2d 415 (1976),[72]

---

**71.** A prosecutor often must decide, especially in cases of wide public interest, whether to proceed to trial where there is a sharp conflict in the evidence. The appropriate course of action in such a case may well be to permit a jury to resolve the conflict. Yet, a prosecutor understandably would be reluctant to go forward with a close case where an acquittal likely would trigger a suit against him for damages.

*Imbler v. Pachtman, supra,* 424 U.S. at 426 n. 24, 96 S.Ct. at 993 n. 24. Sir William Blackstone observed long ago that "it would be a very great discouragement to the public justice of the kingdom, if prosecutors, who had a tolerable ground for suspicion, were liable to be sued at law whenever their indictments miscar-

ried." 3 W. Blackstone, Commentaries on the Laws of England 126–127 (1768).

**72.** The Act of Apr. 9, 1866, § 1, read in part:

"That all persons born in the United States . . . of every race and color . . . shall have the same right, in every State and Territory in the United States, to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens, and shall be subject to like punishment, pains and penalties, and to none other, any law, statute, ordinance, regulation, or custom, to the contrary notwithstanding." 14 Stat. 27

"on its face relates primarily to racial discrimination in the making and enforcement of contracts." *Johnson v. Railway Express Agency,* 421 U.S. 454, 459, 95 S.Ct. 1716, 1719, 44 L.Ed.2d 295 (1975). Though primarily enacted to eradicate the "badges and incidents" of black slavery, *Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 438–439, 88 S.Ct. 2186, 2202–2203, 20 L.Ed.2d 1189 (1968); *The Civil Rights Cases,* 109 U.S. 3, 20, 3 S.Ct. 18, 27, 27 L.Ed. 835 (1883), it has been held to bar racial discrimination against all groups involved in the affairs and transactions within its scope. See *e.g., McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 287–289 & nn. 17–20, 96 S.Ct. 2574, 2582–2583 & nn. 17–20, 49 L.Ed.2d 493 (1976); *United States v. Wong Kim Ark,* 169 U.S. 649, 675–676, 18 S.Ct. 456, 467, 42 L.Ed. 890 (1898). As one member of the House of Representatives observed, "Its whole effect is to require that whatever rights as to each of those enumerated civil ... matters the States may confer on one race or color of the citizens shall be held by all races in equality." Cong.Globe, 39th Cong., 1st Sess., at 1293 (1866).[73]

■■ The complaint nowhere alleges that plaintiff has been discriminated against in the making of contracts. Compare *Ramirez v. San Mateo County Dist. Atty's Office,* 639 F.2d 509 (9th Cir. 1981). Nor is it alleged that he has been denied the right to sue, be a party, or give evidence.[74] The complaint says nothing of "punishment, pains, penalties, taxes, licenses, and exactions of every kind," 42 U.S.C. § 1981. To predicate an action under this section, plaintiff must have been denied a legal right which would have been afforded under similar circumstances to a person of a different race. Compare *Vietnamese Fishermen's Ass'n v. Knights of the KKK,* 518 F.Supp. 993, 1001 (S.D.Tex.1981). The alleged wrongdoing by federal officials set forth in the complaint does not fall within the intended scope or purpose of a § 1981 action. See *Harris v. Norfolk & W. Ry. Co.,* 616 F.2d 377, 378 (8th Cir. 1980); note 73, *supra.*[75] Count I of the complaint shall therefore be dismissed against the federal defendants.

■ Similarly, Count V of the complaint fails in large part to state a legally cogniza-

The present codification of § 1981 is derived from Revised Statutes § 1977 (1874), which codified the Act of May 31, 1870, § 16, 16 Stat. 144. Although the 1866 Act rested only on the Thirteenth Amendment, *United States v. Harris,* 106 U.S. 629, 640, 1 S.Ct. 601, 610, 27 L.Ed. 290 (1883); *Civil Rights Cases,* 109 U.S. 3, 22, 3 S.Ct. 18, 29, 27 L.Ed. 835 (1883); *United States v. Morris,* 125 F. 322, 323 (E.D. Ark.1903), and, indeed, was enacted before the Fourteenth Amendment was formally proposed, *United States v. Price,* 383 U.S. 787, 804, 86 S.Ct. 1152, 1162, 16 L.Ed.2d 267 (1966); *Hurd v. Hodge,* 334 U.S. 24, 32 n. 11, 68 S.Ct. 847, 851 n. 11, 92 L.Ed. 1187 (1948); *Oyama v. California,* 332 U.S. 633, 640, 68 S.Ct. 269, 272, 92 L.Ed. 249 (1948); *Civil Rights Cases, supra,* 109 U.S. at 22, 3 S.Ct. at 29, the 1870 Act was passed pursuant to the Fourteenth, and changes in wording may have reflected the language of the Fourteenth Amendment. See *United States v. Wong Kim Ark,* 169 U.S. 649, 695–696, 18 S.Ct. 456, 474–475, 42 L.Ed. 890 (1898). The 1886 Act was re-enacted in 1870, and the predecessor of the present § 1981 was to be "enforced according to the provisions" of the 1866 Act. Act of May 31, 1870, § 18, 16 Stat. 144.

**73.** The Supreme Court has engaged in extensive discussion of the legislative history of this section. See *McDonald v. Santa Fe Trail Transp. Co., supra,* 427 U.S. at 287–296 & nn. 17–26, 96 S.Ct. at 2582–2586 & nn. 17–26; *Runyon v. McCrary, supra,* 427 U.S. at 168–172 & n. 8, 96 S.Ct. at 2593–2595 & n. 8; *id.,* 427 U.S. at 195–211, 96 S.Ct. at 2606–2613 (White, J. dissenting); *Johnson v. Railway Express Agency, supra,* 421 U.S. at 471, 95 S.Ct. at 1725 (Marshall, J.); *Jones v. Alfred H. Mayer Co., supra,* 392 U.S. at 422–437, 88 S.Ct. at 2194–2202.

**74.** The *Martinez* case is plainly not *People v. Hall,* 4 Cal. 399 (1854), *People v. Howard,* 17 Cal. 63 (1860), or *People v. Washington,* 36 Cal. 658 (1869), all of which applied state statutes which read, for example that "no Chinese shall be permitted to give evidence for or against any white person." *People v. Washington, supra.* Nothing alleged in the complaint herein even approaches that kind of discrimination.

**75.** "[A] plaintiff's claim under ... § 1983, must be grounded on the violation of a right of substance and not merely on a theoretical speculation that some right has been infringed." *Holmes v. Finney,* 631 F.2d 150, 154 (10th Cir. 1980).

ble claim under 42 U.S.C. § 1988; "[t]hat section is procedural and alone does not give rise to a cause of action." *Taylor v. Nichols,* 558 F.2d 561, 568 (10th Cir. 1977); *Reeves v. American Optical Co.,* 408 F.Supp. 297, 302 (W.D.N.Y.1976); see also *Redd v. Lambert,* 522 F.Supp. 608, 610–611 (N.D. Miss.1981). Section 1988 speaks of remedies to be afforded under other sections of the Civil Rights Acts, and to the discretionary award of a reasonable attorney's fee to a "prevailing party" in an action under other civil rights sections. See *e.g., Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978). Plaintiff's § 1988 claim for attorney's fees rises or falls with the fate of his other claims.[76] *Hanrahan v. Hampton,* 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980) (per curiam). Count V is otherwise dismissed.

Next considering the allegations of claims under 42 U.S.C. §§ 1985(2),[77] 1985(3) and 1986 (1976), one must again steep the whole of plaintiff's pleading in the strong acid of close analysis in order to press out his statutory claims. "A conspiracy must be judged by its constituent parts," *Cackling Acres, Inc. v. Olson Farms, Inc.,* 541 F.2d 242, 245 (10th Cir. 1976), and this Court must attempt to connect those averred parts to specific language in the statute.[78] This Court approaches "the perfidious syntax of § 1985(2)" with some caution, "for, as the First Circuit recently observed, there is a dearth of authority to light our way. *Hahn v. Sargent,* 523 F.2d 461, 469 (1st Cir. 1975), *cert. denied,* [425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754] (1976)." *Brawer v. Horowitz,* 535 F.2d 830, 837 (3d Cir. 1976). 42 U.S.C.

§ 1985(2) reaches conduct described as follows:

> If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified, or to influence the verdict, presentment, or indictment of any grand or petit juror in any such court, or to injure such juror in his person or property on account of any verdict, presentment, or indictment lawfully assented to by him, or of his being or having been such juror; or if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws; . . .

This Court joins the conclusion of other courts that "§ 1985(2) itself subdivides into two parts—that which precedes and that which follows the semicolon." *Brawer v. Horowitz, supra,* 535 F.2d 840; *Hahn v. Sargent, supra,* 523 F.2d at 469. The first half of § 1985(2) is directed at conspiracies the object of which is direct intimidation of, or retaliation against parties, or witnesses, or grand and petit jurors in any court of the

---

**76.** A claim for § 1988 attorney's fees may well be barred by absolute judicial or prosecutorial immunity. Cf. *Supreme Court of Virginia v. Consumers Union,* 446 U.S. 719, 737–739, 100 S.Ct. 1967, 1977–1978, 64 L.Ed.2d 641 (1980).

**77.** While Count III of the complaint alleges violation of the whole of § 1985, nothing in the pleading refers to any act or conspiracy to impede a federal officer in the performance of his duties, which is the subject matter of § 1985(1). That section is excluded from further consideration.

**78.** In *Coopersmith v. Supreme Court, State of Colorado,* 465 F.2d 993, 994 (10th Cir. 1972), the Court of Appeals reminds us that

> [u]nder the Federal Rules of Civil Procedure, and especially Rule 8(a)(2), a complaint must state the basis for the claim asserted. See *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 and *Ryan v. Scoggin,* 245 F.2d 54 (10th Cir.). Of course, on such a motion as this, facts well pleaded are taken as correct, but allegations of conclusions or of opinions are not sufficient when no facts are alleged by way of the statement of the claim.

Each of the counts of the complaint refer to paragraphs 1–148 of that document as its basis.

United States. See *e.g., Williams v. St. Joseph Hospital,* 629 F.2d 448, 451 (7th Cir. 1980). Other than broad, conclusory allegation of "conspiracy," the complaint sets forth no conduct coming within the scope of this portion of § 1985(2).[79]

 The latter half of § 1985(2) reaches those conspiracies to obstruct justice "in any State or Territory" which have as their object the denial of the equal protection of the laws. While this portion may be limited to interference with state court proceedings, *Williams v. St. Joseph Hospital, supra,* 629 F.2d at 451; *DeBoer v. Martin,* 537 F.Supp. 1159, 1161 (N.D.Ill.1982), in any case it requires an allegation of racial or other class-based discrimination as mandated in § 1985(3) cases under the United States Supreme Court's decision in *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971):

> The language requiring intent to deprive of *equal* protection, or *equal* privileges and immunities, means that there must be *some* racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action. The conspiracy, in other words, must aim at a deprivation of the equal enjoyment of rights secured by the law to all. [Emphasis in original; footnote omitted.]

Plaintiff's complaint as against Judge Winner and the other federal defendants, while heavy with allegations of personalized bias and prejudice against plaintiff, is threadbare in terms of well-pleaded facts from which a racial, or otherwise class-based discriminatory animus may be discerned. Compare *Harris v. Harvey,* 605 F.2d 330, 333 (7th Cir. 1979); *Vietnamese Fishermen's Ass'n v. Knights of the KKK,* 518 F.Supp. 993 (S.D.Tex.1981). Indeed, there is a paucity of facts pleaded in the complaint from which any federal "conspiracy"

may be inferred. "A conspiracy may be implied by a course of conduct and other circumstantial evidence," *Cackling Acres, Inc. v. Olson Farms, Inc., supra,* 541 F.2d at 245, but the circumstantial facts relied upon must at least point in some minimal way to an actionable conspiracy. There must be some indicia of agreement in an unlawful means or end. Cf. *Adickes v. Kress & Co.,* 398 U.S. 144, 158–159, 90 S.Ct. 1598, 1608–1609, 26 L.Ed.2d 142 (1970); *Crowe v. Lucas,* 595 F.2d 985, 993 (5th Cir. 1979); *Hampton v. Hanrahan,* 600 F.2d 600, 621 (7th Cir. 1979); *Hoffman-LaRoche, Inc. v. Greenberg,* 447 F.2d 872, 875 (7th Cir. 1971). Attending a single *ex parte* meeting at the direction of a presiding trial judge, though improper, does not a conspiracy make. Even "[a]cts of covering up, even though done in the context of a mutually understood need for secrecy, cannot themselves constitute proof that concealment of the crime after its commission was part of the initial agreement of the conspirators." *Grunewald v. United States,* 353 U.S. 391, 401–402, 77 S.Ct. 963, 972, 1 L.Ed.2d 931 (1957). A complaint must plead more than self-serving characterizations and conclusions of wrongdoing to state a claim. Cf. *Hahn v. Sargent,* 388 F.Supp. 445, 453 (D.Conn.1974), *affirmed* 523 F.2d 461 (1st Cir. 1975).[80] It is not "sufficient to make out a conspiracy claim merely if the combined effect of the individual actions of the parties was harm to the plaintiff." *Id.,* 388 F.Supp. at 454. As against the federal defendants, any § 1985(2) claim fails for insufficiency in pleading as well as the bar of absolute immunity, when applicable.

 Section 1985(3) seems to bear the closest relationship to the claims expressed in the first 148 paragraphs of the complaint.[81] That section reads as follows:

*Manganaro v. Delavel Separator Co.,* 309 F.2d 389, 393 (1st Cir. 1962).

---

**79.** In *Brawer,* the Third Circuit presents a meaningful analysis of § 1985(2)'s legislative history. See *id.,* 535 F.2d at 837–840.

**80.** While we believe that the plaintiff is entitled to all favorable inferences, he is not entitled to build a case on the gossamer threads of whimsey, speculation and conjecture.

**81.** Yet it is also apparent that the portions of § 1985(3) that deal with exercise of the voting franchise are wholly irrelevant to this case.

If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State of Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

for our purposes herein, the elements that the plaintiff must allege and prove for a 42 U.S.C. § 1985(3) cause of action are as follows:

(1) The defendants must conspire

(2) For the purpose of depriving, either directly, or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and

(3) The defendants must act in furtherance of the object of the conspiracy, whereby

(4) One was (a) injured in his person or property or (b) deprived of having and exercising any right or privilege of a citizen of the United States.

*Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971); *McLellan v. Mississippi Power & Light Co.,* 545 F.2d 919, 923 (5th Cir. 1977) (en banc). Section 1985(3) does not afford any substantive rights of its own, *Great American Savings and Loan Ass'n v. Novotny,* 442 U.S. 366, 372, 99 S.Ct. 2345, 2349, 60 L.Ed.2d 957 (1979); a § 1985(3) claim is exclusively derivative and must be based upon other alleged infringements of the plaintiff's federally protected rights. *Oaks v. City of Fairhope, Ala.,* 515 F.Supp. 1004, 1045 (S.D.Ala. 1981). "[I]nfringement of some federally protected right independent of § 1985(3) is required for a violation of the conspiracy statute to be demonstrated." *Holmes v. Finney,* 631 F.2d 150, 154 (10th Cir. 1980); *Great American Savings and Loan Ass'n v. Novotny, supra;* "[s]ection 1985(3) redresses deprivation of the protection of the laws, and one is only deprived of the protection of the laws when the laws themselves have been violated." *McLellan v. Mississippi Power & Light Co., supra,* 545 F.2d at 926–927; see also *Lopez v. Arrowhead Ranches,* 523 F.2d 924 (9th Cir. 1975); *Vietnamese Fishermen's Ass'n, supra,* 518 F.Supp. at 1006.

Further, the Supreme Court in *Griffin v. Breckenridge* made it clear that § 1985(3) was not "intended to apply to all tortious, conspiratorial interferences with the rights of others," but only to those which were founded upon "some racial, or perhaps otherwise class-based, invidiously discriminatory animus." *Id.,* 403 U.S. at 101–102, 91 S.Ct. at 1798; accord, *Briley v. State of California,* 564 F.2d 849, 859 (9th Cir. 1977); *Hahn v. Sargent, supra,* 523 F.2d at 468–469; *McLelland v. Mississippi Power & Light Co., supra,* 545 F.2d at 924–933.[82] Section 1985(3) thus does not afford a right of action based upon a denial of due

---

**82.** The Supreme Court has also discussed the legislative history of § 1985(3) at some length. See *Great American Savings & Loan Ass'n v.* *Novotny, supra,* 442 U.S. at 370 n. 7, 99 S.Ct. at 2347 n. 7 and cases cited therein.

process standing alone,[83] or a denial of First Amendment rights without more,[84] or an unequal injury, or unequal application of the laws. See *Collins v. Hardyman,* 341 U.S. 651, 661, 71 S.Ct. 937, 941, 95 L.Ed. 1253 (1950); *Snowden v. Hughes,* 321 U.S. 1, 8, 64 S.Ct. 397, 401, 88 L.Ed. 497 (1944); *Taylor v. Nichols,* 409 F.Supp. 927, 936 (D.Kan.1976), *affirmed* 558 F.2d 561 (10th Cir. 1977); *Birnbaum v. Trussell,* 371 F.2d 672, 676 (2d Cir. 1966); *Mitchell v. Greenough,* 100 F.2d 184, 187 (9th Cir. 1938) ("the prohibition against 'denial of the equal protection of the law' was to prevent class legislation or action."). "Conduct directed at a plaintiff because of individual or personal traits rather than because of class membership, is insufficient to sustain a claim under § 1985(3)." *Oaks v. City of Fairhope, Ala., supra,* 515 F.Supp. at 1046 n.31; *McLelland v. Mississippi Power & Light Co.,* 526 F.2d 870, 877 (5th Cir. 1976), *vacated in part on other grounds,* 545 F.2d 919, 933 (1977) (en banc).[85]

Like conspiracies under § 1985(2), conspiracies within § 1985(3) must be pleaded with more than "bare allegations that all the defendants 'conspired' to deprive him of his constitutional rights." *Henzel v. Gerstein,* 608 F.2d 654, 659 (5th Cir. 1979); see *Weise v. Reisner,* 318 F.Supp. 580, 583–584 (E.D.Wis.1970). While it is true that the Supreme Court in *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), directed that a civil rights complaint should not be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief, this standard does not

become operative unless a privilege or right secured by the Constitution or federal law "is identified and put into issue by the allegations of the complaint." *Taylor v. Nichols, supra,* 409 F.Supp. at 932. As the district court explains in *Taylor,*

> Contrary to the plaintiff's apparent belief, however, *Conley et al.,* do not stand for the converse proposition that, if a complaint alleges myriad facts but does not identify the specific constitutional right allegedly implicated in those facts, dismissal is inappropriate unless it appears beyond doubt that the plaintiff can conjure up no constitutional claim on the basis of the facts alleged or on the basis of any other set of facts which might conceivably be proved.... [T]he use of such a standard would directly contravene the requirement of Rule 8(a)(1) that a complaint must set forth a "short and plain statement of the grounds upon which the court's jurisdiction depends."

*Id.,* 409 F.Supp. at 932, *affirmed,* 558 F.2d 561 (10th Cir. 1977)

The Rule 8(a)(2) requirement that a complaint set forth "a short and plain statement of the claim showing that the pleader is entitled to relief" is equally offended by a complaint that alleges a myriad of constitutional and legal grounds for relief but does not identify the specific facts that implicate those grounds.

A complaint in a case like this must set forth facts showing some intentional and purposeful deprivation of constitutional rights. *Snowden v. Hughes,* 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497 (1944). This

---

**83.** See *e.g., Oaks v. City of Fairhope, Ala., supra,* 515 F.Supp. at 1045, and cases cited therein.

**84.** See *e.g., Arnold v. Tiffany,* 487 F.2d 216 (9th Cir. 1973), *cert. denied* 415 U.S. 984, 94 S.Ct. 1578, 39 L.Ed.2d 881 (1974); *Egan v. City of Aurora,* 291 F.2d 706, 707 (7th Cir. 1961).

**85.** The court in *Hahn v. Sargent,* for example, dismissed a § 1985(3) claim the basis for which was "that the plaintiff as an *individual* was *singled out for harm* by these defendants because of his 'militant republicanism' as opposed to any allegation that the defendants' activities were based upon racial or 'otherwise

class-based, invidiously discriminatory animus.'" *Id.,* 388 F.Supp. at 449 (emphasis in original; citations omitted). See also *Taylor v. Nichols, supra,* 558 F.2d at 568. In *Taylor* the Tenth Circuit held that a police officer plaintiff had "failed to make even a minimal showing that he was denied equal protection or equal privileges and immunities ... He has made no showing that other individuals have not been prosecuted in similar circumstances or that groups other than police officers have not been so prosecuted." § 1985(3) plainly requires more than the simple allegation that the plaintiff's constitutional rights have been violated.

complaint does contain some general allegations, framed in broad language closely paralleling that used in Sections 1983 and 1985(3), that defendants successfully conspired to deprive plaintiff of his rights. But plaintiff was bound to do more than merely state vague and conclusory allegations respecting the existence of a conspiracy. It was incumbent upon him to allege with at least some degree of particularity overt acts which defendants engaged in which were reasonably related to the promotion of the claimed conspiracy. *Hoffman v. Halden*, supra, 268 F.2d [280] at 295 [ (9th Cir. 1959) ].

*Powell v. Workmen's Compensation Board of N.Y.*, 327 F.2d 131, 137 (2d Cir. 1964). It is well-settled that a § 1985(3) conspiracy must be pleaded with specificity. See *Boddorff v. Publisher Indus., Inc.*, 488 F.Supp. 1107, 1111 & nn. 9–12 (E.D.Pa.1980), and cases cited therein; *Albright v. R. J. Reynolds Tobacco Co.*, 463 F.Supp. 1220, 1231 (W.D.Pa.1979) ("a plaintiff in a civil rights case must plead highly specific facts in support of the allegations of the complaint, particularly where a conspiracy on the part of the defendants is claimed."); see also *Robinson v. McCorkle*, 462 F.2d 111, 113 (3rd Cir. 1972), *cert. denied* 409 U.S. 1042, 93 S.Ct. 529, 34 L.Ed.2d 492 (1973).

■■■ Counsel for the plaintiff has seemingly sought to avoid these pleading requirements through the argument that the "conspiracy" is itself an actionable injury, without more. See Hrg. Tr. at 39, 121, 137. As noted above, however, a § 1985(3) plaintiff must allege overt acts resulting in injury to rights independent of § 1985(3). Section 1985(3) itself expressly requires an act causing injury. As *El Mundo, Inc. v. Puerto Rico Newspaper Guild, Local 225*, 346 F.Supp. 106 (D.P.R.1972)—a case cited by plaintiff—points out,

In a civil conspiracy, the conspiracy itself is not a cause of action, without overt acts, because again it is the overt act which moves the conspiracy from the area of thought and conversation into action and causes the civil injury and

resulting damages. Accordingly, the cases hold that the damage in a civil conspiracy flows from the overt acts and not from the conspiracy.

*Id.*, 346 F.Supp. at 114, quoting *Hoffman v. Halden*, 268 F.2d 280, 295 (9th Cir. 1959). Accord, *Weise v. Reisner, supra*, 318 F.Supp. at 583. The complaint alleges no overt acts pursuant to the "hidden camera" conspiracy. As to the "railroading" conspiracy, plaintiff points to the prosecutors' confession of mistrial. It is unfathomable how a confession of mistrial is itself a constitutional or legal wrong. See *Holmes v. Finney, supra*, 631 F.2d at 154 (10th Cir. 1980). The "injury" that a declaration of mistrial occasions is not itself actionable, because of both judicial/prosecutorial immunity and sound considerations of public policy. See *Cobbledick v. United States*, 309 U.S. 323, 325–326, 60 S.Ct. 540, 541, 84 L.Ed. 783 (1978).

Beyond that, plaintiff alleges that the federal defendants sought to violate his fundamental right to a fair trial because he is a Chicano activist. The right to a fair trial is a question more of due process rather than equal protection. The complaint does not allege, for example, that the federal defendants routinely deny fair trials to all Chicanos *per se* or that they act pursuant to a statute or regulation that so discriminates. Cf. Complaint at ¶ 141. As the United States Supreme Court observed in *Collins v. Hardyman*, 341 U.S. 651, 71 S.Ct. 937, 95 L.Ed. 1253 (1951):

Plaintiffs' rights were certainly invaded, disregarded, and lawlessly violated, but neither their rights nor their equality of rights under the law have been, or were intended to be, denied or impaired. Their rights *under the laws* and to *protection of the laws* remain untouched and equal to the rights of every other [citizen], and may be vindicated in the same way and with the same effect as those of any other citizen . . . .

*Id.*, 341 U.S. at 661–662, 71 S.Ct. at 941–942.[86]

**86.** The authority of *Collins v. Hardyman* was limited by the Court in *Griffin v. Breckenridge*,

It is one thing to say that a Chicano has been treated unfairly in a criminal trial. It is quite another to say that Chicanos are not entitled to fair trials. The former is a due process problem, the latter an equal protection problem. That a plaintiff is a member of an identifiable racial group or other class does not convert every substantive legal injury into a denial of equal protection.

Martinez' rights were vindicated by the bar of any retrial on the original charges. *Collins v. Hardyman, supra.* That there will be no retrial is not a cognizable injury to the plaintiff. See *Reilly v. Leonard,* 459 F.Supp. 291, 301 (D.Conn.1978).

As noted above, there is a paucity of well-pleaded facts that evidence the federal defendants' agreement to any § 1985(3) "conspiracy". Adversity at trial is not necessarily conspiratorial. See *Ellis v. Cassidy,* 625 F.2d 227, 229 (9th Cir. 1980).

Were the complaint against the federal defendants not dismissed on other more pre-emptive grounds, it would be vulnerable under Rule 8(a) standards.

■ The same can be said of plaintiff's claims under § 1986, which reads as follows:

> Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in this action; and if the death of any party be caused by any such wrongful act and neglect, the legal representatives of the deceased shall have such action therefor, and may recover not exceeding $5,000 damages therein, for the benefit of the widow of the deceased, if there be one, and if there be no widow, then for the benefit of the next of kin of the deceased. But no action under the provisions of this section shall be sustained which is not commenced within one year after the cause of action has accrued.

A § 1986 action is derivative from the existence of a § 1985 conspiracy and merely gives a remedy for misprision of such a conspiracy. A failure to state a claim of conspiracy under § 1985 renders a complaint's § 1986 claims equally vulnerable to dismissal. *Taylor v. Nichols,* 558 F.2d 561, 568 (10th Cir. 1977); *Williams v. St. Joseph Hospital,* 629 F.2d 448, 452 (7th Cir. 1980); *Hahn v. Sargent,* 523 F.2d 461, 469–470 (1st Cir. 1975), *cert. denied,* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754; *DeBoer v. Martin,* 537 F.Supp. 1159, 1162 (N.D.Ill.1982).

403 U.S. 88, 93–96, 91 S.Ct. 1790, 1793–1795, 29 L.Ed.2d 338 (1971). *Griffin* extended the reach of § 1985(3) to include private conspiracies, overruling the "state action" requirement read into the statute by *Collins.* The *Griffin* Court, however, recognized an important limitation:

> That the statute was meant to reach private action does not, however, mean that it was intended to apply to all tortious, conspiratorial interferences with the rights of others.... The constitutional shoals that would lie in the path of interpreting § 1985(3) as a general federal tort law can be avoided by giving full effect to the congressional purpose—by requiring, as an element of the cause of action, the kind of invidiously discriminatory motivation stressed by the sponsors of the limiting amendment....

> The conspiracy, in other words, must aim at a deprivation of the equal enjoyment of rights secured by the law to all.

*Id.,* 403 U.S. at 101–102, 91 S.Ct. at 1798. As originally written, § 1985(3) would have reached conspiratorial acts committed with intent "to do any act in violation of the rights, privileges, or immunities of another person ...." Cong.Globe, 42d Cong., 1st Sess., App. 68 (1871). The language requiring a discriminatory animus was added to limit the statute's scope. *Griffin, supra,* 403 U.S. at 100, 91 S.Ct. at 1797. See also *Gregoire v. Biddle,* 177 F.2d 579, 581 (2d Cir. 1949). The language quoted from *Collins* herein is harmonious with the *Griffin* limitation.

To say that § 1986 renders one with knowledge liable for not aiding in preventing the wrongs conspired to be done, *e.g., Vietnamese Fishermen's Ass'n v. Knights of the KKK,* 518 F.Supp. 993, 1007 (S.D.Tex. 1981), does not extend liability to encompass a failure to expose one person's apparent desire to form such a conspiracy, where he stands alone. Section 1986, like § 1985, premises liability upon the doing of a wrongful conspiratorial act and the causing of a resulting injury.[87]

## VIII. CLAIMS AGAINST THE DEPUTY U. S. MARSHALS

■ That "victims of a constitutional violation by a federal agent have a right to recover damages against the official in federal court despite the absence of any statute conferring such a right" is fundamental. *Carlson v. Green,* 446 U.S. 14, 18, 100 S.Ct. 1468, 1472, 64 L.Ed.2d 15 (1980); *Davis v. Passman,* 442 U.S. 228, 234, 245, 99 S.Ct. 2264, 2271, 2277, 60 L.Ed.2d 846 (1979); *Bivens v. Six Unknown Named Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). However, *Bivens* and its progeny do not create an absolute right to the damages remedy. Damages may be awarded in a *Bivens*-type action if there are "no special factors counselling hesitation in the absence of affirmative action by Congress," *Davis v. Passman, supra,* and if it does not appear "that Congress has provided an alternative remedy which it explicitly declared to be a substitute for recovery directly under the Constitution and viewed as equally effective." *Carlson v. Green, supra,* 446 U.S. at 18, 100 S.Ct. at 1472. Among the "special factors counselling hesitation" is the consideration that "there are some officials whose special functions require a full exemption from liability," *Butz v. Economou,* 438 U.S. 478, 507, 98 S.Ct. 2894, 2911, 57 L.Ed.2d 895 (1978), such as those involved in the judicial process.

■ Under appropriate circumstances, a United States Marshal or his deputies may be a defendant in a § 1985(3) or *Bivens*-type damages action. *Loe v. Armistead,* 582 F.2d 1291, 1294–1295 (4th Cir. 1978) *cert. denied sub nom. Moffitt v. Loe,* 446 U.S. 928, 100 S.Ct. 1865, 64 L.Ed.2d 281 (1980); *Gillespie v. Civiletti,* 629 F.2d 637, 641–642 (9th Cir. 1980). The question here is whether this action presents appropriate circumstances for damages relief or affects special functions requiring full exemption.

The complaint alleges only that Deputy United States Marshals Baer, Dunn, Weisenhorn, and special deputy Spencer were present at the January 29 meeting at Judge Winner's direction, ¶ 89, and that "Dunn, Peyton, Baer [sic] and Weisenhorn ... carried out improper and unconstitutional orders given by defendant Winner, as hereinabove stated [?], and acted as go-between between defendants Winner, Tyus and Nicoletti." Complaint at ¶ 104.[88] 28 U.S.C. § 569(b) provides that "United States marshals shall execute all lawful writs, process and orders issued under the authority of the United States ..." The complaint herein merely hails the defendants into court for having followed that statutory command. The complaint is wholly unspecific as to what "unconstitutional orders" were carried

---

87. Section 1986's strict one year statute of limitations would bar recovery in this lawsuit for any conduct prior to January 29, 1981. See *Creative Environments, Inc. v. Estabrook,* 491 F.Supp. 547 (D.Mass.1980).

88. In the Plaintiff's Brief in Response, counsel makes reference to *unpleaded* allegations that defendant Sandy Spencer (1) tore down a pro-Martinez poster hanging at the University of Denver Law School, where she was a student; and (2) held views in opposition to the plaintiff. Not only is it settled that not every injury inflicted by a public officer is of constitutional stature, see *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981); *Baker v.*

*McCollan,* 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979), it is not at all apparent that she was acting in her official capacity as opposed to her private capacity as a law student. See Hrg. Tr. at 124; compare *Glasson v. City of Louisville,* 518 F.2d 899 (5th Cir. 1975).

Furthermore, the question of whether her alleged bias "so infected the trial with unfairness as to make the resulting conviction a denial of due process," *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974), is not before this Court because the mistrial precluded any "resulting conviction."

out. Even when viewed through the enhancing lens of plaintiff's brief, the deputies appear only as "actors in minor roles," Brief at 29, in the larger conspiracy, who by their failure to dissuade or deter Judge Winner violated 42 U.S.C. § 1986. *Id.,* at 32.[89] Plaintiff alleges no wrongdoing by the deputies that is independent of Judge Winner's actions, nor does he allege an injury proximately resulting from the deputies' conduct independent of that which resulted from the mistrial itself. Cf. *Lee v. Willins,* 617 F.2d 320, 322 (2d Cir. 1980); pp. 316–317, *supra.* Plaintiff does not allege a clear absence of jurisdiction on the part of Judge Winner, nor does he allege that the deputies committed any act in obvious excess of that jurisdiction, such as executing a warrant that is void on its face.

 While as to their general duties, marshals, court clerks, and other court officers are entitled to a qualified official immunity, see *Henriksen v. Bentley,* 644 F.2d at 852, 856 (10th Cir. 1981); *Murray v. City of Chicago,* 634 F.2d 365 (7th Cir. 1980), cert. *dismissed sub nom. Finley v. Murray,* —— U.S. ——, 102 S.Ct. 1703, 72 L.Ed.2d 129 (1982); *Gillespie v. Civeletti, supra,* 629 F.2d at 641–642, quasi-judicial absolute immunity applies in a narrow range of actions, where a marshal or court clerk acts directly under the command of a court decree or explicit instructions from a judge. *Williams v. Wood,* 612 F.2d 982, 985 (5th Cir. 1980). As the United States Court of Appeals for the Fifth Circuit explains as to court clerks:

> The rationale is that, in this limited group of functions, the clerk of court acts as the arm of the judge and comes within his absolute immunity. See *Barr v. Matteo,* 360 U.S. 564, 569, 79 S.Ct. 1335, 1338, 3 L.Ed.2d 1434 (1959). No immunity extends to clerks of court acting outside the scope of their jurisdiction, as is true for judges. See *Bradley v. Fisher,* 80 U.S. (13 Wall.) 335, 343, 20 L.Ed. 646 (1872).

*Williams v. Wood, supra,* 612 F.2d at 985.

The same may be said of deputy marshals acting under court order. See generally

*Erskine v. Hohnbach,* 81 U.S. (14 Wall.) 613, 616–617, 20 L.Ed. 745 (1871); *In re Neagle,* 135 U.S. 1, 10 S.Ct. 658, 34 L.Ed. 55 (1890). The courts of appeals have recognized that the "cluster of immunities protecting the various participants in judge-supervised trials", *Butz v. Economou,* 438 U.S. 478, 512, 98 S.Ct. 2894, 2913, 57 L.Ed.2d 895 (1978), includes court officials and individuals acting pursuant to a court directive. See *e.g., Ashbrook v. Hoffman,* 617 F.2d 474, 476–477 (7th Cir. 1980); *Slotnick v. Garfinkle,* 632 F.2d 163, 166 (1st Cir. 1980); *Waits v. McGowan,* 516 F.2d 203, 206 (3d Cir. 1975); *Slotnick v. Stavisky,* 560 F.2d 31, 32 (1st Cir. 1977), *cert. denied* 434 U.S. 1077, 98 S.Ct. 1268, 55 L.Ed.2d 783 (1978); *Fowler v. Alexander,* 478 F.2d 694, 696 (4th Cir. 1973); *Lockhart v. Hoenstine,* 411 F.2d 455, 460 (3d Cir. 1969), *cert. denied* 396 U.S. 941, 90 S.Ct. 378, 24 L.Ed.2d 244; *Brown v. Dunne,* 409 F.2d 341, 343 (7th Cir. 1969); *Morrison v. Jones,* 607 F.2d 1269, 1273 (9th Cir. 1979) *cert. denied* 445 U.S. 962, 100 S.Ct. 1648, 64 L.Ed.2d 237 (198 ); *Williams v. Wood, supra,* 612 F.2d at 985 n. 3 and cases cited therein; see also *McCray v. State of Maryland,* 456 F.2d 1, 5 (4th Cir. 1972); *Young v. Peoria Housing Authority,* 479 F.Supp. 1093, 1096 (C.D.Ill.1979). The Tenth Circuit as well has acknowledged this narrow exception. See *Henriksen v. Bentley,* 644 F.2d 852, 855 (10th Cir. 1981); *Wiggins v. New Mexico State Sup. Ct. Clerk,* 664 F.2d 812, 815 (10th Cir. 1981).

 Nothing in the Judicial Code provides that the United States Marshal or his deputies shall sit as an *ad hoc* emergency court of appeals, either in review of orders otherwise within a district judge's jurisdiction or in supervision of a district judge's conduct. See 28 U.S.C. §§ 561 et seq. (1976). The Code makes a different remedy available. See 28 U.S.C. §§ 41–49, 1291–1292 (1976). This Court will not, therefore, hold the deputy marshals answerable in damages for not having served the appellate function. Particularly where, as here,

---

**89.** Though this theory is nowhere set forth in the complaint, it does provide a glimmer of

imputed meaning for its otherwise amorphous allegations.

a plaintiff assails the merits of a judge's orders rather than the specific manner in which the defendants executed them, permitting this kind of action against the deputy marshals would be manifestly inappropriate: "[A] nonjudicial officer who is delegated judicial duties in aid of the court should not be a 'lightning rod for harassing litigation' aimed at the court." *Ashbrook v. Hoffman,* 617 F.2d 474, 476 (7th Cir. 1980), quoting *Kermit Constr. Corp. v. Banco Credito Y Ahorro Poncens,* 547 F.2d 1, 3 (1st Cir. 1976); accord, *Wiggins v. New Mexico State Sup. Ct. Clerk,* 664 F.2d 812, 815 (10th Cir. 1981). If "acts alleged to [be] wrongful, were committed by the officer in the performance of an integral part of the judicial process," *Robichaud v. Ronan,* 351 F.2d 533, 536 (9th Cir. 1965), then the officer is absolutely immune from suit for damages.[90]

Since the complaint seeks damages and other relief [91] from deputies Baer, Dunn, Weisenhorn and Spencer for failing to defy the specific directions of a district judge acting within his jurisdiction, it shall be dismissed, notwithstanding that "serious errors may have been committed" by the judge in determining the basis "upon which the order . . . is issued." *Erskine v. Hohnbach, supra,* 81 U.S. (14 Wall.) at 617.[92]

### IX. CLAIMS AGAINST JUSTICE DEPARTMENT AND F. B. I.

It is apparent upon the face of the complaint that plaintiff's claims against the United States Department of Justice and the Federal Bureau of Investigation are vulnerable to dismissal under Rule 12(b)(6). This Court notes at the outset that a suit against a federal agency for money damages is tantamount to an action against the United States itself, since any damages would be paid from the Treasury of the United States. See *e.g., Dugan v. Rank,* 372 U.S. 609, 620, 83 S.Ct. 999, 1006, 10 L.Ed.2d 15 (1963); *Land v. Dollar,* 330 U.S. 731, 738, 67 S.Ct. 1009, 1012, 91 L.Ed. 1209 (1947); *DSI Corp. v. Secretary of Housing and Urban Dev.,* 594 F.2d 177, 179–180 (9th Cir. 1979); *Beller v. Middendorf,* 632 F.2d 788, 798 n. 5 (9th Cir. 1980); *Blackburn v. Goodwin,* 608 F.2d 919, 923 (2d Cir. 1979). Just as the United States cannot be sued in its own name without its express consent, *United States v. Testan,* 424 U.S. 392, 399, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976); *United States v. Sherwood,* 312 U.S. 584, 586, 61 S.Ct. 767, 769, 85 L.Ed. 1058 (1941), "the unincorporated departments and agencies of the federal government cannot be sued *eo nomine* unless Congress has explicitly or impliedly denominated the agency as amenable to such suits." *Hampton v. Hanrahan,* 522 F.Supp. 140, 147 (N.D.Ill.1981); see *Blackmar v. Guerre,* 342 U.S. 512, 514–515, 72 S.Ct. 410, 411, 96 L.Ed. 534 (1951); *Commodity Futures Trading Comm'n v. Hunt,* 591 F.2d 1211, 1224 (7th Cir. 1979); *Sheehan v. Army and Air Force Exchange Service,* 619 F.2d 1132, 1136–1137 (5th Cir. 1980); *Schenker v. U. S. Parole Comm'n,* 85 F.R.D. 696 (D.Colo. 1980); *Pearlstine v. United States,* 469 F.Supp. 1044, 1046 (D.Pa.1979); *Conyugal Partnership v. Gracia,* 331 F.Supp. 521, 522 (D.P.R.1971). Since plaintiff alleges what are in substance tort claims against the United States,[93] the Federal Tort Claims Act requirement that the claims first be presented to the appropriate federal agency applies. See 28 U.S.C. § 2675(a) (1976);

---

**90.** A deputy U. S. Marshal following direct orders of a District Judge is in a far different position from the private co-conspirators held not to be immune in *Dennis v. Sparks,* 449 U.S. 24, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980).

**91.** Claims for equitable and declaratory relief as against the deputy marshals are dismissed for the reasons previously set forth. See pp. 308–312 *supra.* The state law and common-law claims are dismissed as well. See p. 321 *supra; Sami v. United States,* 617 F.2d 755, 770 (D.C.Cir.1979).

**92.** Because its determination of the larger issues is dispositive, this Court does not rule upon defendant Peyton Baer's attack on service of process.

**93.** See Whitman, "Constitutional Torts," 79 Mich.L.Rev. 5 (1981); *Imbler v. Pachtman,* 424 U.S. 409, 417, 96 S.Ct. 984, 988, 47 L.Ed.2d 128 (1976) (§ 1983 "creates a species of tort liability . . .").

*Carlson v. Green,* 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980). That requirement is jurisdictional and may not be avoided or waived. See *e.g., Three-M Enterprises, Inc. v. United States,* 548 F.2d 293, 294 (10th Cir. 1977); *Gregory v. Mitchell,* 634 F.2d 199, 203–204 (5th Cir. 1981); *Bruce v. United States,* 621 F.2d 914, 918 (8th Cir. 1980); *Swift v. United States,* 614 F.2d 812 (1st Cir. 1980); *Contemporary Mission, Inc. v. U. S. Postal Service,* 648 F.2d 97, 104 (2d Cir. 1981); *Garrett v. United States,* 640 F.2d 24, 26 (6th Cir. 1981) (per curiam); *Steele v. United States,* 599 F.2d 823, 825 (7th Cir. 1979); *DSI Corp. v. Secretary of Housing and Urban Dev.,* 594 F.2d 177, 180 (9th Cir. 1979); *Bialowas v. United States,* 443 F.2d 1047, 1049 (3d Cir. 1971). Merely filing suit in federal court does not satisfy this requirement, see *Best Bearings Co. v. United States,* 463 F.2d 1177, 1179 (7th Cir. 1972). The absence of an appropriate administrative claim mandates dismissal of the lawsuit as against the United States. See *e.g., Stephan v. United States,* 490 F.Supp. 323 (D.Conn.1980). While *Carlson v. Green,* 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980), holds that a *Bivens*-type action may be maintained against *individual* federal officers independent of a parallel action under the Federal Tort Claims Act, 28 U.S.C. § 2680(h), it does *not* so hold as to damages claims against the United States or its agencies. See also *DSI Corp. v. Secretary of HUD, supra,* 594 F.2d at 180; *Hampton v. Hanrahan, supra,* 522 F.Supp. at 148. Plaintiff's damages claims must, therefore, be dismissed. His claims for prospective relief suffer the same fate because of the complaint's failure to satisfy the requisite standards for equitable relief. Compare *e.g., Wounded Knee Legal Defense/Offense Comm. v. F.B.I.,* 507 F.2d 1281, 1287–1288 (8th Cir. 1974); see pp. 310–312, *supra.*

## X. CLAIMS AGAINST THE DENVER POLICE AND THE STATE DISTRICT ATTORNEYS

In a nutshell, plaintiff seeks to recover damages from the City and County of Denver, named and unnamed Denver police officers and state district attorneys (1) for false arrest where no arrest occurred; (2) for malicious prosecution by persons who did not in fact prosecute; (3) for unspecified defamation of plaintiff in the news media by unspecified defendants; and for them having engaged in a deliberate pattern of "chilling" surveillance and record-keeping. Complaint, at ¶¶ 18–56.

▬ A claim of false arrest is essentially an official detention variant of the common-law tort of false imprisonment. Such a claim "protects the personal interest in freedom from restraint of movement." W. Prosser, Law of Torts § 11, at 42, 45–47 (4th ed. 1971). Confinement is an essential element of false imprisonment or false arrest. See Restatement (2d) of Torts §§ 35(1)(b), 41 & comments a–h (1965); *Baker v. McCollan,* 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979). In fact, the Restatement (2d) of Torts defines arrest as "the taking of another into the custody of the actor for the actual or purported purpose of bringing the other before a court, or of otherwise securing the administration of the law." *Id.,* § 112 (1965).

▬ While the complaint alleges that with invidiously discriminatory motives, the defendants acted in 1973 "to cause and make a warrant for a false and unfounded arrest of plaintiff," ¶ 37,[94] it is nowhere alleged that the warrant was ever executed. To the contrary, plaintiff fled the jurisdiction to avoid arrest and remained at liberty until 1980, when captured by federal authorities and held pursuant to a federal indictment. *United States v. Martinez,* 681 F.2d 1248, (10th Cir. 1982); *id.,* 667 F.2d 886, 887 & n. 1 (10th Cir. 1981).[95] Noting

**94.** Technically, ¶ 37 may sound in malicious prosecution rather than false arrest. See W. Prosser, Law of Torts § 11, at 49 (4th ed. 1971).

**95.** As noted above, a grand jury indictment, if proper in form, conclusively establishes proba-

ble cause for arrest. *Gerstein v. Pugh,* 420 U.S. 103, 117 n. 19, 95 S.Ct. 854, 864 n. 19, 43 L.Ed.2d 54 (1975); pp. 319–320 *supra.*

that "[t]he Constitution does not guarantee that only the guilty will be arrested," the United States Supreme Court declared:

> Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law. Remedy for the latter type of injury must be sought in state court under traditional tort law principles. Just as "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner," *Estelle v. Gamble,* 429 U.S. 97, 106 [97 S.Ct. 285, 292, 50 L.Ed.2d 251] (1976), false imprisonment does not become a violation of the Fourteenth Amendment merely because the defendant is a state official.

*Baker v. McCollan,* 443 U.S. 137, 145, 146, 99 S.Ct. 2689, 2694, 2695, 61 L.Ed.2d 433 (1979). To state a claim under the Civil Rights Act, a plaintiff must not only allege confinement; he must show a deprivation of his "liberty ... without due process of law." *Id.;* accord, *Lessman v. McCormick,* 591 F.2d 605, 609–611 (10th Cir. 1979).

Where, as here, a complaint does not even allege confinement, it is insufficient as a matter of law on both constitutional and common-law grounds. See *e.g., Harper v. Merckle,* 638 F.2d 848, 860 (5th Cir. 1981).

▌ Similar defects plague Martinez' claims regarding malicious prosecution by the state defendants. Even assuming that malicious prosecution can state a claim under the Civil Rights Acts, cf. *Atkins v. Lanning,* 556 F.2d 485, 488 (10th Cir. 1977), the complaint does not allege even the bare elements of a malicious prosecution cause of action; neither the complaint nor the prior appellate opinions concerning the plaintiff disclose a criminal proceeding instituted or continued by the defendant against the plaintiff. W. Prosser, *Law of Torts,* § 119 at 835; Restatement (2d) of Torts § 654 (1977). It merely alleges that the state district attorney defendants provided information to the United States Attorney which led to the federal indictment and trial proceedings which did not terminate in the plaintiff's favor. See W. Prosser, *Law of Torts, supra;* Restatement (2) of Torts §§ 658–660 (1977). Beyond that, the decision by a state prosecutor to initiate a criminal proceeding is insulated from suit by *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) and the prosecutorial immunity it describes. See also *McDonald v. Lakewood Country Club,* 170 Colo. 355, 461 P.2d 437, 441 (1969); Restatement (2d) of Torts § 656 (1977).

The Supreme Court recently reiterated its view that the Fourteenth Amendment and the Civil Rights Act are not intended to serve as "a font of tort law to be superimposed upon whatever systems may already be administered by the States." *Parratt v. Taylor,* 451 U.S. 527, 544, 101 S.Ct. 1908, 1917, 68 L.Ed.2d 420 (1981), *quoting, Paul v. Davis,* 424 U.S. 693, 701, 96 S.Ct. 1155, 1160, 47 L.Ed.2d 405 (1976). In *Paul v. Davis,* the court held that to establish a claim under § 1983 and the Fourteenth Amendment more must be involved than defamation by a state official. *Id.,* 424 U.S. 693, 701–710, 96 S.Ct. 1155, 1160–1164, 47 L.Ed.2d 405 (1976).

The complaint does not allege what defamatory matter, if any, was published, nor specifically who published it. The single alleged nexus with constitutional due process alleged in the complaint is the purported intent of the defendants to deny plaintiff a fair trial through use of prejudicial pretrial publicity, compare *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), but the mistrial declaration rendered moot any question of the effect of the publicity upon the jurors in *Martinez.* No constitutional or civil rights claim is stated by paragraphs 41 and 48 of the complaint.

▌ Even overlooking the fact that none of the 22 counts of the complaint speaks of liability for defamation, libel or slander, the allegations of the complaint

must set forth what, in substance, is alleged to be defamatory.

It is almost axiomatic that in defamation cases a certain degree of specificity is an essential in pleadings, that the language complained of must be set forth in *words* or *words* to that effect and that the defendant should not be required to resort to the ofttimes expensive discovery process to drag from a litigant what he really intends to do to his adversary by a vehicle shrouded in mystery.

*Dennett v. Smith*, 21 Utah 2d 368, 445 P.2d 983, 984 (1968) (emphasis in original). While strict *in haec verba* or *in totidem verbis* pleading of the defamatory matter is not necessarily required, the substance of the matter complained of must be alleged. See *e.g., Okun v. Superior Court of Los Angeles County*, 29 Cal.3d 442, 175 Cal. Rptr. 157, 629 P.2d 1369, 1379 (1981); 53 C.J.S. Libel and Slander § 164(b); cf. *Ramsey v. Zeigner*, 79 N.M. 457, 444 P.2d 968 (1968).

■ In *Martinez'* complaint, the substance of the defamation is nowhere alleged, rendering it once again vulnerable to Rule 12(b)(6).

Finally, plaintiff charges that the defendants engaged in surveillance and recordkeeping that unlawfully "chilled" his constitutionally protected freedoms of expression and association. Yet aside from one vague and insufficient allegation,[96] Martinez alleges no search or seizure of his person, house, papers and effects by the defendants without a warrant or other lawful authority. See Amend. 4, U.S.Const. Nor is it self-evident that investigatory recordkeeping by police agencies is *per se* a constitutional violation, even where the subject of the records is denied access to review them.

Cf. *Federal Bureau of Investigation v. Abramson,* ── U.S. ──, 102 S.Ct. 2054, 72 L.Ed.2d 376 (1982).

Political activists pose their own dilemma. Warmed by the flames of their political, social or racial views, they "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved," i.e., become in a factual and legal sense "public figures." *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 345, 94 S.Ct. 2997, 3009, 41 L.Ed.2d 789 (1974). They invite attention and comment. They revel in publicity. Often with the best of motives, they seek the public forum and the mass media, hoping to communicate their message to a large audience. This is a liberty common to all citizens. See *Hague v. C. I. O.,* 307 U.S. 496, 515, 59 S.Ct. 954, 963, 83 L.Ed. 1423 (1939) (Roberts, J.).

At the same time, however, many activists find themselves readily "chilled" by official attention. They want no police in their attracted audience. They wish their words recorded in the public mind, but not its official files. Activists come into federal court asserting a Fourth Amendment expectation of privacy in activities that at the same time are largely designed to attract serious public attention and concern. Therein lies the dilemma: how much privacy may one reasonably expect in one's public acts?

No one wishes to live in a society of the kind described in George Orwell's *1984* or Ray Bradbury's *Fahrenheit 451,* and no federal court is going to be willing to grant its imprimatur to police intrusion into the security of an activist's person, house, papers and effects without strict adherence to Fourth Amendment standards. The Constitution protects those who some government

---

**96.** Paragraph 62 of the complaint makes the bare-bones allegations that the F.B.I.—not the Denver Police—"installed or attempted to install a wiretap surveillance device in the Denver offices of Attorney Kenneth A. Padilla, plaintiff's defense attorney ..." Mr. Padilla is not a party to this action. Plaintiff cannot seek damages for infringement upon Padilla's

Fourth Amendment rights. While "electronic eavesdropping on conversations between plaintiff and his attorney ... would be actionable if proved," *Heidelberg v. Hammer,* 577 F.2d 429, 432 (7th Cir. 1978); *Adams v. Carlson,* 488 F.2d 619, 631 (7th Cir. 1973), such actual eavesdropping is not even alleged in paragraph 62.

officials would deem "subversive" no less than others. See *United States v. United States District Court for the E.D. of Mich.,* 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972); *Halperin v. Kissinger,* 606 F.2d 1192 (D.C.Cir.1979).

Law enforcement officers, on the other hand, are entitled reasonably to see what there is to be seen [97] and to hear what there is to be heard,[98] provided that the Fourth Amendment is complied with. "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967). See also Christie, "Government Surveillance and Individual Freedom," 47 N.Y.U.L.Rev. 871 (1972).

In cases such as *Philadelphia Yearly Meeting of the Religious Society of Friends v. Tate,* 519 F.2d 1335 (3d Cir. 1975), courts have held that "mere police photographing and data gathering at public meetings" is "legally unobjectionable and creates at best a so-called subjective chill which the Supreme Court has said is not a substitute for a claim of specific present harm or a threat of specific future harm. [*Laird v. Tatum,* 408 U.S. 1, 13–14, 92 S.Ct. 2318, 2325–2326, 33 L.Ed.2d 154 (1972) ]." *Id.,* 519 F.2d at 1337–1338.

Nor does the sharing of this information with other agencies of government having a legitimate law enforcement function give rise to a constitutional violation. We cannot see where the traditional exchange of information with other law enforcement agencies results in any more objective harm than the original collation of such information. *Id.,* 519 F.2d at 1338.[99]

To maintain an action under the Civil Rights Acts, liability under 42 U.S.C. § 1983 must be based upon the actual "deprivation of any rights privileges or immunities secured by the Constitution and laws" of the United States. *Birnbaum v. Trussell,* 371 F.2d 672, 676 (2d Cir. 1966). Mere "allegations of a subjective 'chill' " resulting from otherwise lawful governmental activities is insufficient. *Laird v. Tatum,* 408 U.S. 1, 13–14, 92 S.Ct. 2318, 2325–2326, 33 L.Ed.2d 154 (1972). Even when one is alleging a conspiracy in violation of 42 U.S.C. §§ 1983 or 1985, "a plaintiff must allege and prove both a conspiracy and an actual deprivation of rights." *Hampton v. Hanrahan,* 600 F.2d 600, 622 (7th Cir. 1979); accord, *Holmes v. Finney,* 631 F.2d 150, 154 (10th Cir. 1980); *Taylor v. Nichols,* 558 F.2d 561, 567 n. 1 (10th Cir. 1977); *Briley v. State of California,* 564 F.2d 849, 858–859 (9th Cir. 1977); Part VII, *supra.* "[I]t is the acts causing damage to the plaintiff that give rise to liability for damages, not the conspiracy itself." *Hostrop v. Board of Junior College Dist. No. 515,* 523 F.2d 569, 576 (7th Cir. 1975). This is true even as to claims regarding surveillance or other investigative techniques allegedly used with malice or bad faith. See *e.g., Socialist Workers Party v. Attorney General of the United States,* 419 U.S. 1314, 95 S.Ct. 425, 42 L.Ed.2d 627 (1974) (Marshall, J. in chambers); *Smith v. Nixon,* 606 F.2d 1183 (D.C. Cir.1979); *Halperin v. Kissinger,* 606 F.2d 1192 (D.C.Cir.1979); *Philadelphia Yearly Meeting of the Religious Society of Friends v. Tate,* 519 F.2d 1335 (3d Cir. 1975); *Unit-*

---

**97.** E.g., *Air Pollution Variance Bd. v. Western Alfalfa Corp.,* 416 U.S. 861, 94 S.Ct. 2114, 40 L.Ed.2d 2114 (1974) (health inspector observing smoking chimneys not a "search"); cf. *United States v. Kim,* 415 F.Supp. 1252 (D.Ha.1976) (F.B.I. agents using an 800 mm. telescope to look into defendant's apartment engaged in "search").

**98.** E.g., *United States v. Fisch,* 474 F.2d 1071 (9th Cir. 1973) (overhearing of clearly audible conversation in adjoining motel room not a "search").

**99.** Plaintiff's counsel cites *Tate* for the proposition that such surveillance, recordkeeping and the disclosure of collected information is a civil rights violation. Plaintiff's Brief, at 41. The opinion itself reads much more narrowly, and to the degree that it deals with the effects of disclosure on a subject's reputation, it must be read in light of *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976).

*ed States v. Gonzalez-Rodriguez,* 513 F.2d 928 (9th Cir. 1975); *Paton v. LaPrade,* 471 F.Supp. 166 (D.N.J.1979); *Founding Church of Scientology v. Director of the F. B. I.,* 459 F.Supp. 748 (D.D.C.1978); *Raffety v. Prince George's County,* 423 F.Supp. 1045 (D.Md.1976).

 Plaintiff alleges that the defendants' actions led to his indictment for criminal offenses by a federal grand jury. That alone does not state a cognizable constitutional claim.

Plaintiff's claims under the Colorado State Constitution as pleaded in Count XIV are wholly unidentified. Perhaps Martinez claims that defendants "violated his right to live a 'quiet, peaceful and unsullied' life and Article II, Section 3 of the Colorado Constitution," *Knowlton v. Cervi,* 142 Colo. 394, 350 P.2d 1066, 1067 (1960), but he does not so inform us. That count shall be dismissed. His other state law claims for negligent police investigation,[100] gross misconduct by public officials,[101] harassment, outrageous conduct,[102] and violations of the ABA Code of Professional Responsibility[103] are best dealt with by the state courts, and with the dismissal of the plaintiff's federal claims, this Court cedes jurisdiction over them. See *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966).

For the reasons hereinbefore stated,[104] the plaintiff's complaint as against the state defendants shall be dismissed, including as to two defendants who have not yet so moved.[105]

## XI. CLAIMS AGAINST PETER WEBB

The complaint's allegations of conspiracy and defamation against new reporter Peter Webb have no more substance nor give any more notice of the claim than they do as to the other defendants. They shall be and are therefore, dismissed.

## XII. CONCLUSION

For the reasons set forth in this opinion,[106] the plaintiff's complaint shall be and hereby is DISMISSED as to all defendants. Those claims which have been dismissed for substantive reasons, *e.g.,* absolute immunity, or some other insufficiency at law, the dismissal is upon the merits. Those claims dismissed for procedural reasons, i.e., failure to plead particular or sufficient facts, see Rule 8(a), F.R.Civ.P., or to exhaust administrative remedies, are dismissed without prejudice. Plaintiff is hereby GRANTED leave to file an amended complaint in this action within 20 days of this date.

---

**100.** See *Cooper v. Hollis,* 42 Colo.App. 505, 600 P.2d 109, 111 (1979).

**101.** See *Flournay v. McComas,* 175 Colo. 526, 488 P.2d 1104, 1106 (1971).

**102.** See Restatement (2d) of Torts § 46 (1965).

**103.** Cf. *Doe v. Pringle,* 550 F.2d 596 (10th Cir. 1976), *cert. denied* 431 U.S. 916, 97 S.Ct. 2179, 53 L.Ed.2d 227 (1977). The § 1981 claim against these defendants is also dismissed for insufficient pleading.

**104.** The plaintiff's equitable claims are dismissed for the reasons set forth in pp. 310–312, *supra.*

**105.** Both Tooley and Garcia raise "failure to state a claim" as an affirmative defense in their pleadings. Cf. *Williams v. Patton,* 410 F.Supp. 1, 3 & n. 2 (E.D.Pa.1976); 2A Moore's Federal Practice ¶ 12.08 & n. 2 (2d ed. rev. 1981); *id.,* 1981–82 Supp. at 84.

**106.** It is useful to note that had this case been remanded to the Colorado state court as plaintiff wished, the same standards would have been applied in evaluating his Civil Rights Act claims. See *e.g., Espinoza v. O'Dell,* 633 P.2d 455 (Colo.1981).